244

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLORADO
2

3   Criminal Action No. 14-cr-0231-WJM-1

4   UNITED STATES OF AMERICA,

5   Plaintiff,

6   vs.

7   RICKY GARRISON,

8   Defendant.

    ------------------------------------------------------------
9
                      REPORTER'S TRANSCRIPT
10                    (Jury Trial - Day 2)
                         VOLUME III
11  ------------------------------------------------------------

12       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13  Judge, United States District Court for the District of

14  Colorado, commencing at 8:50 a.m., on the 22d day of

15  February, 2017, in Courtroom A801, United States

16  Courthouse, Denver, Colorado.

17
                           APPEARANCES
18
         ZACHARY H. PHILLIPS and CELESTE B. RANGEL, Assistant
19  U.S. Attorney, 1801 California Street, Suite 1600, Denver,
    Colorado 80202, appearing for the plaintiff.
20
         MILLER M. LEONARD, Miller Leonard, P.C., 14143 Denver
21  West Parkway, Suite 100, Golden, Colorado 80401 and
         SEAN M. McDERMOTT, McDermott Stuart & Ward, LLP, One
22  Sherman Place, 140 East 19th Avenue, Suite 300, Denver,
    Colorado 80203, appearing for the defendant.
23

24            MARY J. GEORGE, FCRR, CRR, RMR
           901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1                    P R O C E E D I N G S

2            (Call to order of the court outside the presence of

3       the jury at 8:50 a.m.)

4            THE COURT:  All right.  We have a few matters to

5       deal with before we bring in the jury.  First of all, we

6       are going to take a longer than usual lunch today.  I have

7       a presentation I'm hosting for several judges here on our

8       new local rule on the civil side of our docket allowing for

9       limited representation by attorneys.  You may have heard of

10      it.  We're having some state court judges come and give us

11      a presentation on that and I'm the facilitator for this

12      event, so what that means for you folks is that we're going

13      to promptly recess at 12:00 and we will return at 1:30.

14           I have received and looked at the limiting

15      instruction that you folks worked on and thank you for

16      that.  And I understand that it's stipulated to.  Is that

17      correct?

18           MR. PHILLIPS:  Yes, Your Honor.

19           THE COURT:  All right.  Mr. Leonard, is that

20      accurate?

21           MR. LEONARD:  Yes.  Thank you.

22           THE COURT:  Is there an agreement as to when I

23      should read this?

24           MR. PHILLIPS:  I believe that it should be read

25      just prior to when that piece of evidence will -- that type

246

1    of evidence will come in.

2            THE COURT:  Okay, let's do this.  Unless one of

3    you objects -- and what I've done in the past and I think I

4    mentioned this before -- when whoever is conducting the

5    examination should just say, would you do this, "Judge, at

6    this time we believe it's appropriate to read the limiting

7    instruction to the jury," and we'll go from there.  Is that

8    acceptable?

9            MR. LEONARD:  That's acceptable.  Thank you, Your

10   Honor.

11           THE COURT:  All right.  Thank you.  Next I

12   understand, Mr. McDermott, you have a matter you wish to

13   raise with the Court.

14           MR. McDERMOTT:  Your Honor --

15           THE COURT:  If you could take the lectern, please.

16           MR. McDERMOTT:  Thank you.  Your Honor, yesterday

17   I had wanted to make a further record just before we got

18   too far into the trial and memories grew distant.  Just

19   with respect to how we finished things with respect to jury

20   selection, just so my record is clear, the People had

21   passed the panel, the defense looked at the panel and we

22   were satisfied, with the exception of Ms. Hollingsworth,

23   who was No. 2, and she was the alternate.

24           It -- being a novice in this courtroom, and going

25   and reviewing the -- your protocol, we just wanted --

1          THE COURT:  It's not my protocol.  It's a criminal

2     jury trial jury selection protocol that was adopted way

3     before I got here and is used by most of my colleagues and

4     have been for at least a decade.

5          MR. McDERMOTT:  Okay.  To rephrase, then, the

6     Court's protocol that would -- that is in effect.  And so

7     we just wanted to make sure that we were in compliance, and

8     so we hesitated, and I wanted to make sure that we were

9     okay going ahead and striking Ms. Humphrey.  We did strike

10    her -- excuse me, Ms. Hollingsworth.  Ms. Hollingsworth was

11    replaced by Ms. Humphrey.  Ms. Humphrey was seated.

12         The person who was next in line was Mr. Pompeo

13    and, frankly, I thought that he probably would not remain

14    seated there given the answers that he gave.  Not only was

15    he concerned on a personal level about his daughter having

16    a drug problem, but he went further, and he was even saying

17    how he didn't think any case would be good, and how he just

18    really was not engaged with the system, and did not really

19    want to be a juror.

20         With that said, the way things --

21         THE COURT:  I don't think that's quite what he

22    said.  I have a different recollection.  I think that what

23    he said was given his divorce matter 30 years ago where,

24    according to him, his ex-wife and her lawyer lied at every

25    opportunity and facts no longer were facts, that he was

1    frustrated about being involved in another proceeding where

2    facts would be twisted again.

3           I asked him, "Well, wouldn't folks -- at least one

4    way to look at it is that you would be a perfect candidate

5    to be a juror because you're going to be very vigilant

6    about discerning what -- fact from nonfact," so it was his

7    concerns about those issues.  That's my recollection.

8           But I don't know -- I don't know how that's here

9    or there in terms of where we are at this point.

10          MR. McDERMOTT:  Okay.  Well, I -- just the --

11   where I wanted to summarize is we did use eight peremptory

12   strikes and that's just kind of the way it ended up laying

13   out.  And I wanted, just for the record, to be clear that

14   we had used the eight peremptories, and just kind of the

15   way things unfolded, that's where we ended up.

16          And also, just so the Court knows, and also in

17   fairness to Mr. Phillips -- because Mr. Phillips and his

18   team have been very professional with us the entire way and

19   I am very hesitant when I make a *Batson* challenge -- but I

20   will tell the Court, I am especially sensitive to it

21   because obviously our client is African American, it's

22   obvious he's African American.  Yesterday we had a little

23   bit of a back-and-forth about the ethnicity of some of the

24   other jurors.

25          From my perspective, we do have one African

1   American juror who is seated.  Ms. Humphrey was the other

2   one who, from outward appearances, was obviously African

3   American.  There was no question about it.  And I will just

4   tell the Court -- and this is -- just -- I hate to --

5        THE COURT:  Where are we going with this?  Are

6   you -- hold on.  Are you asking me to reconsider my *Batson*

7   ruling?  It's a little late in the game --

8        MR. McDERMOTT:  No, I know that --

9        THE COURT:  What are we --

10        MR. McDERMOTT:  Where we are --

11        THE COURT:  Please don't talk over me.

12        MR. McDERMOTT:  I'm sorry, Your Honor.

13        THE COURT:  Why are we using valuable trial time

14   for you to reminisce about what happened yesterday?  Do you

15   have a motion?  Do you have an argument?  Do you want to

16   make an offer of proof?  What are you doing?

17        MR. McDERMOTT:  I'm just finalizing my record so

18   that it's clear at this --

19        THE COURT:  Go ahead and make your record and sit

20   down.

21        MR. McDERMOTT:  Okay.  To finalize, Your Honor, my

22   concern is jurors are often put in the position where

23   there's an African American defendant on trial and then

24   they're the lone African American in the jury room, and I

25   have had this happen where I have heard them complain that

1    they are kind of put in the position of defending alleged

2    conduct that they're not -- that they don't support in any

3    way, shape or form.  And that is the reason that we did

4    make the challenge that we made yesterday --

5              THE COURT:  First of all, you never made that

6    argument at the time, so that argument is waived.  Now that

7    you're coming up with another argument for your *Batson*

8    challenge after the fact, after the ruling, I guess I can't

9    prevent you from putting it on the record.

10             I don't know what effect -- or what significance

11   it will have at all, but you put it on the record, but you

12   did not make that -- I want to make it crystal clear, you

13   did not make that argument yesterday.

14             MR. McDERMOTT:  And that is -- and you asked why

15   I'm taking up valuable court time.  You are correct.  I did

16   not make that clear yesterday.  And I did want that to be

17   put on the record --

18             THE COURT:  Are you aware of any case -- can you

19   cite to me any case where a Court should consider granting

20   a *Batson* challenge when to deny it would result in one

21   minority person left on the jury panel for the reasons you

22   just articulated so that if the *Batson* challenge were to be

23   granted -- the *Batson* motion to be granted, there would be

24   two minority individuals on the panel such that the dynamic

25   of the deliberations of the jury would be different?

1            Do you -- are you aware of any case that instructs

2      that that's a legitimate consideration for a trial judge to

3      make at the time of a *Batson* challenge?

4            MR. McDERMOTT:  I don't have anything directly on

5      all fours.  I will say that it's somewhat difficult to get

6      into because there are generally proscriptions about

7      contacting jurors and asking them about deliberations, but

8      no, I don't have anything directly on all fours.

9            THE COURT:  Okay.

10            MR. McDERMOTT:  I can research that, but as I

11      stand here right now --

12            THE COURT:  Don't research that.  I am just asking

13      whether you had any authority to give legal support for

14      this argument that you're making.  I would note for the

15      record, this is about my 40th trial since being on the

16      bench, I've never had three African Americans on the venire

17      panel.  That's the most I've ever had.  We don't have a lot

18      of African American folks in Colorado percentage-wise and

19      for some reason the number that show up in our jury panels

20      are even less.  I don't know why that is, if they're not

21      registered to vote, and most of our panelists come from

22      voter registration lists, whatever is the situation, but

23      I've had easily two dozen, 30 trials, where I've had zero

24      African American individuals on the panel or on the venire

25      at all.

1          MR. McDERMOTT:  Your Honor --

2          THE COURT:  We had three yesterday.

3          MR. McDERMOTT:  I don't -- and I don't doubt that

4    at all, and that was my prior experience when I was a

5    public defender in Arapahoe County.  And, frankly, that's

6    part of the reason why we did make the challenge.  And I do

7    think that is somewhat of a systemic problem that is

8    inherited by the United States and the Court, and that is a

9    large reason why I wanted to make the record.

10          THE COURT:  Let me make another comment.  Racial

11   animus, whether involved in the jury selection process or

12   in any of the other aspects in our society, is something

13   that I personally take very seriously.  If you know

14   anything about my background and my career, that's what I

15   focused on for a great part of my career.

16          I am also very sensitive to these kind of issues.

17   And if I felt that there was any evidence that the

18   Government was using race as a way -- as a factor in jury

19   selection, I would have given very serious consideration to

20   your motion and probably granted it, but I was convinced

21   that there was several nondiscriminatory, nonracially

22   animus reasons for the Government's decision to -- to

23   remove -- what's her name?  Ms. Humphrey?

24          MR. McDERMOTT:  Humphrey, yes, Your Honor.

25          THE COURT:  And I put those on the record and

1    they're out there.  They're a matter of record.  And if the

2    good folks across the street want to do something with it,

3    so be it, but that -- I've made my ruling, I've made my

4    factual findings, and I think we need to move on.

5              MR. McDERMOTT:  Thank you, Your Honor.

6              THE COURT:  All right.  Let's bring in the jury.

7              MR. LEONARD:  Your Honor, briefly, I just have

8    three matters, and I think they won't take very much time

9    at all.

10             Exhibit 48, 49, and 50 were admitted yesterday

11   subject to the defendant's ongoing standing objection.  I

12   just want to make the record clear; I do not believe 48,

13   49, and 50 were part of the Court's *James* order.

14             THE COURT:  Okay.  So then -- so finish where

15   your -- finish your sentence.

16             MR. LEONARD:  Well, my understanding was that the

17   Court was admitting the -- those exhibits based on the

18   previous reasons stated in the *James* order, and I wanted to

19   make sure that my record was clear that I don't believe 48,

20   49, and 50 were covered in the *James* order.  I don't think

21   they were submitted as *James* --

22             THE COURT:  I haven't memorized my voluminous

23   *James* order, so I don't -- is that accurate, Mr. Phillips?

24   48, 49 and 50 are not --

25             MR. PHILLIPS:  I have not had an opportunity to

1    review those specifically this morning because I --

2    yesterday briefly it was mentioned, but I didn't get the

3    numbers.  But I can tell the Court that one thing we have

4    reviewed is to make sure that all statements coming in were

5    either on the *James* charge or -- and/or were charged phone

6    counts from the grand jury indictments.

7            THE COURT:  Okay.

8            MR. LEONARD:  It --

9            THE COURT:  Based on that, do you want to make any

10   other objection which -- because I guess I was assuming

11   that that -- that they were.  And I'll take your

12   representation as an officer of the court that that's -- if

13   I were to dig through my order right now, I would not find

14   48, 49, and 50 in that order.

15           And so based on that, I'll give you an opportunity

16   now to make an additional separate objection.

17           MR. LEONARD:  I object, that they are hearsay and

18   there's not been a proper foundation laid pursuant to any

19   other exception to the hearsay rules.

20           THE COURT:  Okay.  And that -- and that

21   objection's now part of the record and that objection's

22   overruled.

23           MR. LEONARD:  Two other very quick issues.

24   Mr. Simeon Ramirez, the reports from pretrial were ordered.

25   I spoke with the Government last night and this morning.

1    Neither party has received the reports that were ordered.

2              THE COURT:  I thought we were talking about -- I

3    thought what was ordered --

4              MR. LEONARD:  Vigil.  I'm sorry.

5              THE COURT:  -- Christopher Vigil.

6              MR. LEONARD:  Christopher Vigil.

7              THE COURT:  Well, we -- as you mentioned, we've

8    got a lot of things going on back in chambers.  I've got

9    other cases I'm doing.  I just issued a major ruling on

10   this airport protest injunction and one of the things we're

11   trying to juggle with all these balls in the air is your

12   request for Mr. Vigil's probation office file.

13             Now it's my understanding right about five to

14   5:00, or a little before that, as I got off the bench, that

15   the probation officer contacted my judicial assistant and

16   said that the file was prepared and ready and asked whether

17   I wanted that file docketed as a CM/ECF item.  I said I did

18   not want it docketed, I did not want it made public, and

19   that he -- I think it's Mr. Junker --

20             MR. LEONARD:  Yes, sir.  Yes, Your Honor.

21             THE COURT:  -- was to contact both of your

22   offices, phone, e-mail, I don't know if we instructed him

23   how, but it was up to him, and ask how both sides wanted

24   that file transmitted to your offices, either as an

25   attachment to an e-mail or whether you wanted to send a

1    runner to pick up hard copies, whatever.

2         So it's my understanding as of 5:00 last night

3    that the files were prepared, ready to go.  You folks just

4    needed to make an arrangement with Mr. Junker on how you

5    wanted to get your hands on that.

6         MR. LEONARD:  Thank you, Your Honor.

7         Last is Mr. Simeon Ramirez has a judgment that the

8    Court entered as part of his sentencing.  I attempted to

9    get a copy of that judgment.  It is restricted.  And I'm

10   requesting that a copy of the Court's judgment be provided

11   to the defense.

12        THE COURT:  And why do you believe you're -- you

13   need Mr. Ramirez's judgment for the defense of your client?

14        MR. LEONARD:  My understanding is Mr. Ramirez

15   has -- was deported as a noncitizen.  He illegally

16   reentered into the United States.  He's currently in

17   custody.  And I don't know whether or not the Court issued

18   orders that if Mr. Ramirez reentered the United States, he

19   was to contact the pretrial probation office as part of the

20   supervised release, and if he -- if that was an order, then

21   I believe he would be in violation of it, and that is

22   proper impeachment.

23        THE COURT:  Can I hear from the Government on

24   that.

25        MR. PHILLIPS:  Your Honor, I don't know if that

1      would be proper impeachment, but I -- my understanding,

2      having prepped Simeon Ramirez, is that he will admit that

3      he was deported.  He is going to say that yes, in fact, he

4      was re-arrested upon coming back into the United States,

5      and has, in fact, pled guilty to illegal reentry and is

6      awaiting sentence.

7              THE COURT:  I think that's all you really need for

8      purposes of impeachment.  I mean, there's items in the

9      judgment that I don't believe are necessary for your -- the

10     defense of your client.  If the point you want to make is

11     that he's back in the country illegally, contrary to our

12     laws, as Mr. Phillips just pointed out, you're going to be

13     able to make that --

14             MR. LEONARD:  And just --

15             THE COURT:  -- point very clear.

16             MR. LEONARD:  Just -- I'm sorry -- just so the

17     Court's aware, I knew he had come in allegedly illegally; I

18     did not know he had pled guilty.

19             MR. PHILLIPS:  He'll admit to that.

20             MR. LEONARD:  I didn't know that, so that was -- I

21     thought we were going to maybe get into that.

22             THE COURT:  Are you satisfied now?

23             MR. LEONARD:  I am.  Thank you.

24             THE COURT:  Okay.  All right.

25             MR. PHILLIPS:  And, Your Honor --

1          THE COURT:  Yes, sir.

2          MR. PHILLIPS:  Just to give the Court a heads up

3    as to where we're going this morning, and we addressed this

4    yesterday and said let's wait and do this today --

5          THE COURT:  Okay.

6          MR. PHILLIPS:  -- when Mr. Gullicksrud testifies

7    this morning, he's going to be moving and talking about

8    proffered statement No. 76, which the Court granted

9    Garrison's portion of the conversation under 801(d)(2)(A),

10   and then noted that the other parties' portion was

11   admissible to context only, unless the Government presents

12   evidence apart from the statement itself that another party

13   was involved in the conspiracy alleged in Count 1 and moves

14   to admit under 801(d)(2)(E).  We will be moving to admit

15   that under (d)(2)(E), just to give everybody the heads-up

16   that's where we're going, especially since it's going to be

17   our position that it's admissible.  If not, we'll have to

18   then ask for the instruction that we've all agreed on.

19         THE COURT:  How do you anticipate making that

20   connection?  What -- through what testimony or --

21         MR. PHILLIPS:  Offer of proof is that Brad

22   Gullicksrud's going to testify that that was the target of

23   the investigation.  They had intercepted numerous phone

24   calls in which they believe there were drug deals going to

25   take place.  And that, in fact, Bhatia Fox was surveyed and

1    was part of the case.  And although he was not indicted, he

2    was certainly a co-conspirator.

3           THE COURT:  All right.

4           MR. LEONARD:  And just to front the issue, Your

5    Honor, if Agent Gullicksrud intends to testify about phone

6    calls that he received and intercepted from Bhatia Fox that

7    aren't part of the *James* proffer, we object that that's

8    hearsay and that that issue has not been litigated in the

9    *James* proffer and the *James* order, which we didn't --

10          THE COURT:  But in the *James* order, I specifically

11   made the comment that if the Government makes this -- links

12   up the conversation, that that could come in under

13   801(d)(2)(E), I think it is.

14          MR. PHILLIPS:  Right.  A lot of numbers this

15   morning.

16          THE COURT:  So you're going to object to the

17   attempt to lay the foundation.

18          MR. LEONARD:  Correct.  If he's trying to do it on

19   the stand, my position is he's testifying -- it's hearsay,

20   what he's testifying about, in an attempt to link it up,

21   and the more proper --

22          THE COURT:  Well, what about that -- that your

23   foundation -- you're going to be attempting -- you're going

24   to attempt to lay a foundation via inadmissible hearsay?

25          MR. PHILLIPS:  He's not going to testify as to

260

1    what Bhatia Fox said on any other day, just that there were

2    intercepted phone calls between Bhatia Fox and Ricky

3    Garrison, and he will be testifying as to the actions that

4    he and other officers took based on those phone calls.

5            THE COURT:  And your argument is going to be so

6    it's not coming in for the truth of the matter that, in

7    fact, what he heard said took place, but that because of

8    those statements, he and others took action based on those

9    statements.

10           MR. PHILLIPS:  Exactly.

11           THE COURT:  All right.  Okay.  Make your objection

12   at the time and then I'll make a ruling.

13           MR. LEONARD:  All right.  Thank you, Your Honor.

14           THE COURT:  All right.  Let's bring in the jury.

15           MR. PHILLIPS:  Would you like Special Agent

16   Gullicksrud --

17           THE COURT:  Yes, you can come back to the witness

18   stand.

19        (Jury was present at 9:13 a.m.)

20           THE COURT:  All right.  Welcome back, ladies and

21   gentlemen of the jury, to day two of our trial.  I

22   apologize for the delay in not starting promptly with you

23   at 8:45, but actually we were out here at 8:45 dealing with

24   a lot of -- a half-hour worth of legal matters we had to do

25   outside your presence.  All right.

261

                    Direct - Gullicksrud

1         Agent Gullicksrud, I remind you you remain under

2    oath.

3         Mr. Phillips, you may resume your direct

4    examination.

5         MR. PHILLIPS:  Thank you, Your Honor.

6              DIRECT EXAMINATION (Continued)

7    BY MR. PHILLIPS:

8    Q.   Special Agent Gullicksrud, I want to kind of shift

9    gears and talk about a different person involved in this

10   investigation.  Are you familiar with a person named

11   Bhatia Fox?

12   A.   I am.

13   Q.   If you could, please tell the jury --

14        MR. LEONARD:  Your Honor, at this time I want to

15   object and front the issue that the Government's getting

16   into about Mr. Fox.  I believe the Government's trying to

17   lay the foundation for Exhibit 106.  I object that the

18   testimony that the agent is going to give is full hearsay,

19   his testimony will not comply with 801(d)(2)(E),

20   specifically that the testimony will not suffice to make

21   the showing under *United States v. Townley,* 472 F.3d 1267,

22   Tenth Circuit, which cites *United States v. James*,

23   Fifth Circuit, and will ask for a continuing objection as

24   the Government now tries to lay their foundation.

25        THE COURT:  All right.  You have a continuing

Direct - Gullicksrud

1    objection.  For right now, the objection's overruled

2    because we hardly have even gone into what it is we're

3    going to do with this line of questioning, but you will not

4    need to make further objections.  I will consider the

5    entirety of this discussion and this examination as subject

6    to your standing objection.

7            MR. LEONARD:  Thank you, Your Honor.

8            THE COURT:  All right.  Go ahead, Mr. Phillips.

9    BY MR. PHILLIPS:

10   Q.   If you could, please describe to the jury how you

11   became familiar with Bhatia Fox.

12   A.   Through a series of intercepted phone calls, Mr. Fox

13   was identified as a drug customer, cocaine, from Mr.

14   Garrison.  A bit more than just a customer; he was

15   identified as someone that was also a friend, is how I

16   describe him.

17   Q.   And you talked yesterday about the fact that there are

18   times that you can intercept phone calls because they're

19   pertinent subject to the judge's order when you get a

20   Title 3, or wiretap, and there are times that you have to

21   not listen because it's not pertinent.

22          Did you, in fact, intercept numerous phone calls

23   with Bhatia Fox and Ricky Garrison that were deemed

24   pertinent?

25   A.   We did.

Direct - Gullicksrud

1    Q.   And as a result of those phone calls, and without

2    going into the specifics of the phone calls, if you could

3    tell the jury some of the actions that you and other

4    officers took in investigating Bhatia Fox and Ricky

5    Garrison.

6    A.   At the end of November, there's a six-day span where

7    there's at least three series of phone calls that we

8    recognized to be set-ups for drug transactions.   In

9    response to those calls, we conducted surveillance.   During

10   those surveillance periods, we observed Mr. Fox meeting up

11   with Mr. Garrison, and we believe that was for purposes of

12   completing the drug transactions.

13   Q.   And kind of shifting gears here a little bit, during

14   the course of this investigation, as well as your training

15   and experience, I want to go over a few terms that are

16   sometimes used in the drug industry that are slang.

17        MR. LEONARD:   Your Honor, I would object to the

18   agent testifying as to the slang terminology.   The

19   defense's position is that's 702 testimony instead of 701,

20   because clearly the purpose is to educate the jury about

21   matters which they do not normally understand, and

22   therefore has a difference between 701 and 702.

23        THE COURT:   All right.   I'm going to sustain the

24   objection right now because you've not laid any foundation

25   that this witness has any knowledge or -- of these terms or

264

Direct - Gullicksrud

1    how it is that he has any knowledge of these terms.

2              Why don't you set that foundation, then we'll

3    revisit this objection.

4    BY MR. PHILLIPS:

5    Q.    Going back to your history and -- as a police officer,

6    how long have you been involved in investigating narcotics

7    crimes?

8    A.    Specifically narcotics crimes since December 2009, but

9    even as a patrol officer I received training and hands-on

10   experience with drug distribution.

11   Q.    And during your course of -- as a police officer and

12   also as a special agent with the FBI, have you had the

13   opportunity to talk to people that are involved in the drug

14   trade and speak to them about different terms and so

15   forth?

16   A.    I have.

17   Q.    And are there sometimes specific terms or general

18   terms that are used not only by the general public, but

19   also by the drug trade, that are used to hide what is

20   happening but are common references?

21   A.    Definitely.

22   Q.    And kind of starting at the most basic level, terms

23   such as "base hit," is that a term that you have heard on

24   the street --

25              MR. LEONARD:  Your Honor, now I object again.

Direct - Gullicksrud

1    We're getting -- I object because the testimony is 702 in

2    nature.  I would cite *United States v. McDonald*, 933 F.2d

3    1519, Tenth Circuit, 1991.  The Court considered whether

4    ordinary citizens can be expected to know certain

5    information or to have had certain experiences.

6            This is not 701 testimony, and the defense's --

7    and the defense's position is that this is 702 testimony.

8            THE COURT:  All right.  That objection's

9    overruled.  I -- it is my view this is not testimony under

10   702 that requires the endorsement and qualification of an

11   expert witness to provide this information; that this

12   witness has been -- has testified as to his experience with

13   these terms and is knowledgeable about these terms and can

14   testify on those -- his knowledge with respect to those

15   terms.

16           MR. LEONARD:  Your Honor, can we have a continuing

17   objection, then, so I don't have to --

18           THE COURT:  For all drug terms?

19           MR. LEONARD:  Yes, sir.

20           THE COURT:  Yes, you have that continuing

21   objection, and that's all overruled.

22           MR. LEONARD:  Thank you, Your Honor.

23   BY MR. PHILLIPS:

24   Q.   I was asking you whether you're familiar with the term

25   "base hit."

Direct - Gullicksrud

1    A.    I am.

2    Q.    What is that?

3    A.    I consider it a derogatory term for someone that's

4    addicted to crack cocaine.

5    Q.    Are you familiar with the term "zip"?

6    A.    I am.

7    Q.    What is a zip?

8    A.    A zip is strictly used to describe an ounce of

9    narcotics, or if someone would say, you know, I need a zip,

10   it means they want one ounce of narcotics.

11   Q.    And just so we're clear, how many grams are in an

12   ounce?

13   A.    28.65.

14   Q.    Okay.  And are you familiar with the term "ball"?

15   A.    I am.

16   Q.    And what is a ball?

17   A.    It will be an eighth of an ounce of crack cocaine, so

18   3.5 grams.

19   Q.    And is it also -- an eight-ball a similar term that's

20   used?

21   A.    Correct.

22          MR. PHILLIPS:  Your Honor, at this time the

23   Government would move to admit Government Exhibit No. 106

24   under Ricky Garrison's part of the conversation under

25   801(d)(2)(A), and the Bhatia Fox part of the conversation

Direct - Gullicksrud

1   under 801(d)(2)(E).

2           THE COURT:  All right.  Subject to the continuing

3   objections, Exhibit 106 is admitted into evidence.

4           (Government's Exhibit 106 received)

5   BY MR. PHILLIPS:

6   Q.   And just to be clear, if you would, have you had an

7   opportunity to review Government Exhibit No. 106?

8   A.   I have.

9   Q.   And the transcript that goes with it?

10  A.   I have.

11          MR. PHILLIPS:  Your Honor, at this time we would

12  ask the jurors to be able to turn to Government Exhibit

13  No. 106.

14          THE COURT:  Is there an objection?

15          MR. LEONARD:  Yes, Your Honor.  The defense --

16          THE COURT:  Is it the same objection you made

17  yesterday that it was so totally intelligible that no one

18  would need to read a transcript?

19          MR. LEONARD:  I -- it is, Your Honor.

20          THE COURT:  Well, that's -- I think I would have

21  understood about one percent of it without the transcript.

22  Overruled.  Go ahead.

23          MR. LEONARD:  May we have a continuing objection,

24  then, to all the transcripts that I believe will be

25  admitted?

268

Direct - Gullicksrud

1    THE COURT:  You may have a continuing objection,

2    and that objection's overruled.

3    MR. LEONARD:  Thank you.

4    MR. PHILLIPS:  Your Honor, at this time we'd ask

5    to publish.

6    THE COURT:  Yes.  106 may be published to the

7    jury.

8    (Phone call played)

9    MR. PHILLIPS:  If I may have one moment, Your

10   Honor.

11   THE COURT:  Yes.

12   BY MR. PHILLIPS:

13   Q.   Now, just prior to this telephone call, you testified

14   as to some of the slang terms you knew and understood.

15   A.   Yes.

16   Q.   Were there certain slang terms in this conversation

17   that you didn't understand?

18   A.   No -- well, there were -- yeah, there's a couple that

19   were indecipherable.  What I can think of right now is the

20   wizzert and whispert, I don't know what they were talking

21   about.

22   Q.   Okay.

23   MR. PHILLIPS:  Nothing further.  Thank you, Your

24   Honor.

25   THE COURT:  All right.  Cross-examination.

269

Cross - Gullicksrud

1      MR. LEONARD:  Thank you.

2                      CROSS-EXAMINATION

3    BY MR. LEONARD:

4    Q.    Agent, do you prefer to be called agent or special

5    agent?

6    A.    However you prefer.  It doesn't matter to me.

7    Q.    I've been calling you agent, but I didn't want to be

8    saying --

9    A.    That works.

10   Q.    -- the wrong term.

11          So, Agent, you had a chance to look at the

12   indictment, correct?

13   A.    Correct.

14   Q.    And in Count 1 of the indictment, the first name is

15   Ricky Garrison, correct?  And that's spelled out, right?

16   A.    Correct.

17   Q.    And then the rest of the names are initials,

18   correct?

19   A.    Yes.

20   Q.    And the first letter would be the person's first name

21   and the last letter would be the person's last name,

22   correct?

23   A.    Correct.

24   Q.    Bhatia Fox, if we were going to make his name into

25   initials, would be B period F period; isn't that correct?

270

Cross - Gullicksrud

1    A.    Correct.

2    Q.    Bhatia Fox's name does not appear in Count 1 of the

3    indictment, does it?

4    A.    No, it does not.

5    Q.    In fact, Bhatia Fox isn't charged in this case

6    whatsoever, is he?

7    A.    No, he was not.

8    Q.    And there's no counts outside the conspiracy where the

9    Government has alleged that Mr. Garrison was doing

10   something illegal with Mr. Fox; isn't that correct?

11   A.    There are no charges against Mr. Fox, no.

12   Q.    Right.  And there's no charges in this case where the

13   Government alleges that Mr. Garrison was distributing, for

14   instance, a product to Mr. Fox; not in this indictment,

15   correct?

16   A.    Correct.

17   Q.    All right.  I want to make sure that was clear.

18         You said some interesting things about the

19   wiretap, and I want to go back to that and just make sure

20   that I understood you correctly.  You said that you've

21   often heard wiretaps referred to as almost like a pre-crime

22   unit; is that right?

23   A.    Sort of.  The comparison I have heard from training

24   I've received in the past is -- I don't know if you

25   remember the movie Minority Report, they -- they can see

271

Cross - Gullicksrud

1    the crime occurring -- or they can see what's going to

2    happen before it actually happens.  It's --

3    Q.   Right.

4    A.   -- the way to describe it.

5    Q.   That's what I was getting at.  You used the wiretaps

6    to see what's going to happen before it happens, correct?

7    A.   Correct.

8    Q.   And you said that, We know, then, from the phone calls

9    where these deals are going to occur; correct?

10   A.   Correct.  Not always, but --

11   Q.   Thank you.  We can anticipate where the drug deals

12   would occur; correct?

13   A.   Correct.

14   Q.   And then we're allowed to get out there and so we can

15   set up surveillance and observe what's going on; correct?

16   A.   Correct.

17   Q.   All right.  Now, I believe you testified earlier that

18   in addition to being a special agent with the Federal

19   Bureau of Investigation, you were previously with the

20   Aurora Police Department; is that correct?

21   A.   That's correct.

22   Q.   And I'm making an assumption, then, based on this

23   job -- your jobs that you told me, if I'm right, you have,

24   in fact, arrested people, correct?

25   A.   I have.

272

Cross - Gullicksrud

1   Q.   All right.  And that's part of the job of a Federal

2   Bureau of Investigation agent; isn't that right?

3   A.   That's correct.

4   Q.   And it would have been part of your job as an Aurora

5   police officer, correct?

6   A.   Correct.

7   Q.   And you're given training on how to make arrests,

8   correct?

9   A.   Correct.

10  Q.   And I would assume you're given training on how to

11  make an arrest when you work at Aurora, right?

12  A.   Correct.

13  Q.   And also with the Federal Bureau of Investigation,

14  right?

15  A.   Correct.

16  Q.   Okay.  So it's just not unusual; it's just part of

17  what you do, right?

18  A.   No, it's part of the job, yes.

19  Q.   And you've arrested people who you suspect have drugs;

20  isn't that true?

21  A.   That's true.

22  Q.   And you've arrested people and found what you think

23  are drugs on them; isn't that right?

24  A.   That is true.

25  Q.   Or you've made arrests and found what you think is

Cross - Gullicksrud

1    drugs in the vicinity of the person you arrested; isn't

2    that right?

3    A.    That's correct.

4    Q.    Okay.  Part of your job is writing a report, too,

5    isn't it?

6    A.    That's correct.

7    Q.    And if you find something that you think is drugs, in

8    your report is all you write, Well, I found suspected

9    drugs; or do you do something else?

10   A.    Are you referring to the report?  How I write the

11   report or -- I'm sorry, can you clarify that?

12   Q.    Let me rephrase.  When you find something that you

13   suspect are drugs, you do something with what you suspect

14   those drugs are.  You send it to a laboratory, don't you?

15   A.    That's correct.  Well, when I worked with the Aurora

16   Police Department we do what's called a microchemical test,

17   and it's just called a presumptive test, so --

18   Q.    Thank you.  I'm not going to go into the presumptive

19   test you do.  What I'm asking, though, is you send off the

20   item that you think is a drug to have confirmation that

21   it's a drug, right?

22   A.    That's correct.

23   Q.    Sight alone isn't going to be good enough for you,

24   right?

25   A.    No.

Cross - Gullicksrud

1   Q.   So next I want to turn to some of the specific counts.

2   And we're going to talk -- I'll give you the date as well,

3   all right?  The counts I'm talking about now are Counts 21

4   through 26.  The charge date is January 5th, 2014.  All

5   right?

6   A.   Okay.

7   Q.   The Government's alleging -- correct? -- that the drug

8   involved in these alleged drug transactions was

9   methamphetamine; isn't that right?

10  A.   I believe so.  I believe -- I know what transaction

11  you are talking about, but I don't have every single count

12  memorized.  But January 5th, I believe I know which deal

13  you're talking about.

14  Q.   And did you, on January 5th of 2014 -- and now we're

15  dealing with a lot of dates -- on January 5th of 2014, did

16  you specifically arrest anyone?

17  A.   No.

18  Q.   Did you arrest Mr. Garrison?

19  A.   No.

20  Q.   My understanding is that the Government alleges that

21  Mr. Painter was also involved in this alleged transaction.

22  Did you arrest Mr. Painter on January 5th, 2014?

23  A.   No.

24  Q.   And my also -- my understanding is that the Government

25  alleges Mr. Martinez was involved on January 5th, 2014.

Cross - Gullicksrud

1    Did you arrest Mr. Martinez?

2    A.    No, we did not.

3    Q.    Now, I would think -- think I'm correct in my

4    assumption that if you didn't arrest anybody, there's

5    nothing you seized on that day; is that correct?

6    A.    That's correct.

7    Q.    All right.  So to be clear, there was no item that you

8    thought was drugs that was seized on January 5th, 2014; is

9    that correct?

10   A.    That's correct.

11   Q.    And then I think it's clear that there's no laboratory

12   report dated January 5th, 2014, showing that the alleged

13   substance that was transacted was methamphetamine; is that

14   correct?

15   A.    That's correct.

16   Q.    Next I want to turn to Counts 33 and 34, with an

17   allegation that these events occurred on February 26th,

18   2014.  All right?

19   A.    Okay.  Again, I'm familiar with some of the dates, but

20   as far as the counts, I -- if you refresh my memory the way

21   you just did on the last line, I will know what you're

22   talking about.

23   Q.    All right.  I'm not trying to -- I'm just trying to

24   make sure that the jury understands what we're talking

25   about so we're not --

Cross - Gullicksrud

1    A.    Understood.

2    Q.    -- wading around.  But on February 26th, 2014, did you

3    arrest Mr. Garrison?

4    A.    No.

5    Q.    To your knowledge, did anyone in the investigative

6    team arrest Mr. Garrison on February 26th, 2014?

7    A.    Nobody arrested Mr. Garrison on that date.

8    Q.    All right.  My understanding is that the allegation is

9    that Mr. Taylor was involved in this alleged transaction.

10   Did you, yourself, arrest Mr. Taylor on this day?

11   A.    I did not.

12   Q.    To your knowledge, did any member of the Government

13   team arrest Mr. Taylor on February 26th, 2014?

14   A.    They did not.

15   Q.    I understand as well that the Government alleges

16   Mr. Aguilar was involved in this alleged transaction.  Did

17   Mr. Aguilar get arrested by you on February 26th, 2014?

18   A.    No, he did not.

19   Q.    To your knowledge, did anyone from the Government team

20   arrest Mr. Aguilar on February 26th, 2014?

21   A.    No, they did not.

22   Q.    All right.  You didn't seize any items on February

23   26th, 2014, did you?

24   A.    No.

25   Q.    So I'm correct in that there are no laboratory tests

Cross - Gullicksrud

1    from February 26th, 2014; is that correct?

2    A.    You're correct.

3    Q.    Next I want to turn to Counts 38 to 44.  All right?

4    And the Government alleges these occurred on March 2nd,

5    2014.

6    A.    Okay.

7    Q.    On March 2nd, 2014, did you arrest Mr. Garrison?

8    A.    No, we did not.

9    Q.    To your knowledge, did any member of the investigative

10   team arrest Mr. Garrison on March 2nd, 2014?

11   A.    No, they did not.

12   Q.    My understanding is that the Government's alleging

13   that Mr. Painter was also involved in these alleged

14   transactions on March 2nd, 2014.  Did you arrest Mr.

15   Painter on March 2nd, 2014?

16   A.    No, we did not.

17   Q.    I further understand that the Government alleges that

18   Mr. Edwards was involved on March 2nd, 2014.  That's the

19   allegation.  Did you arrest Mr. Edwards?

20   A.    No, we did not.

21   Q.    To your knowledge, did any member investigate -- of

22   the investigative team arrest Mr. Edwards?

23   A.    We did not on that date.  Let me clarify.  He was

24   arrested eventually, but not on that date --

25   Q.    Right.

Cross - Gullicksrud

1    A.    Just to clarify.

2    Q.    That wasn't my question, though -- and I appreciate

3    that -- but on March 2nd, on the discrete date of March

4    2nd, 2014, you did not arrest Mr. Edwards and nobody from

5    your investigative team arrested Mr. Edwards.

6    A.    That is correct.

7    Q.    All right.  Now, if I'm correct about my understanding

8    of the discovery, on March 2nd, 2014, you have surveillance

9    up on what you say is an alleged drug deal, right?

10   A.    That is correct.

11   Q.    Okay.  And my understanding is that you believe -- the

12   Government believes that Mr. Painter's going to show up to

13   Mr. Garrison's home; is that right?

14   A.    Correct.

15   Q.    And also Mr. Edwards is going to show up to Mr.

16   Garrison's home, correct?

17   A.    That's correct.

18   Q.    So the Government's alleging two discrete alleged drug

19   transactions on March 2nd, 2014; isn't that right?

20   A.    It's -- it's two separate actions, but I guess it

21   encompasses one -- one deal, so, yes -- yes, it is two

22   transactions.

23   Q.    And you're watching this, right?

24   A.    Correct.

25   Q.    When Mr. Edwards drives up, did you take any steps to

Cross - Gullicksrud

1   stop him?

2   A.   No, we did not.

3   Q.   And at some point, Mr. Edwards drives away, doesn't

4   he?

5   A.   Yes.

6   Q.   You didn't stop him, did you?

7   A.   No, we did not.

8   Q.   And Mr. Painter also drove up, right?

9   A.   Correct.

10   Q.   And you didn't stop him, did you?

11   A.   No.

12   Q.   Now, Agent, you talked about how you have been

13   involved in filling out an application for a wiretap,

14   correct?

15   A.   Correct.

16   Q.   Is it safe to assume that you've also been involved in

17   applying for and filling out an application for a search

18   warrant?

19   A.   Yes.

20   Q.   Did you apply for a search warrant for Mr. Garrison's

21   residence on March 2nd, 2014?

22   A.   No, we did not.

23   Q.   That was something you certainly were capable of

24   doing, wasn't it?

25   A.   That was an available option, but we chose not to do

Cross - Gullicksrud

1    that for --

2    Q.   Thank you.  On March 2nd, 2014, did you seize any item

3    that you thought were drugs?

4    A.   No, we did not.

5    Q.   Did anybody from the investigative team seize any

6    items that you thought were drugs?

7    A.   No, we did not.

8    Q.   So I'm correct that no items were sent to a laboratory

9    for testing; is that correct?

10   A.   From that date, no; no items were sent for testing.

11   Q.   And I'm just talking about March 2nd.

12   A.   Okay.

13   Q.   And I'm correct, then, that on March 2nd, there are no

14   lab results showing the presence of a -- cocaine in any

15   substance; is that correct?

16   A.   That's correct.

17   Q.   I want to turn now to Count 46.  This is March 26th,

18   2014.  All right?  Do you recall that date?

19   A.   I recall that date, yes.

20   Q.   Your prior testimony was, quote, We thought it likely

21   he did not purchase the drugs.  Is that correct?

22   A.   That's correct -- well, yes.  We -- based on those

23   text messages, we believed the deal probably did not

24   occur.

25   Q.   All right.  So again, no drugs were seized on that

281

Cross - Gullicksrud

1   day, were they?

2   A.   No drugs were seized on that day, no.

3   Q.   No drugs, then -- or alleged drugs were sent to a

4   laboratory for testing; is that correct?

5   A.   That's correct.

6   Q.   And --

7        THE COURT:  Mr. Leonard, let me just clarify

8   something in the record.  You keep referring to drugs.  You

9   know, there are legal drugs, over-the-counter drugs.  I'm

10  assuming you mean illegal controlled substances.

11       MR. LEONARD:  Absolutely, Your Honor.  And thank

12  you for that clarification.

13  BY MR. LEONARD:

14  Q.   I am talking about the alleged illegal drugs that were

15  allegedly transacted, correct?

16  A.   Correct.

17  Q.   And my understanding that March 26th, the Government

18  is alleging that the illegal substance that was allegedly

19  transacted was cocaine, correct?

20  A.   That is correct.

21  Q.   And there's no laboratory test, though, to show that,

22  in fact, cocaine was transacted on that day, correct?

23  A.   That is correct.

24  Q.   All right.  Briefly I want to talk about Count 48.

25  This is the May 23d, 2014, date.  Do you remember that day?

Cross - Gullicksrud

1    A.   I do.

2    Q.   And you were present there, weren't you?

3    A.   I was.

4    Q.   This is when the Government gets around to arresting

5    Mr. Garrison, correct?

6    A.   Correct.

7    Q.   And the time that occurred was 6:00 a.m., correct?

8    A.   I believe so.  I know it was in the morning, and 6:00

9    a.m. is the time that makes sense.

10   Q.   And this was at 1250 South Monaco Parkway, Unit 61, in

11   Denver, Colorado, correct?

12   A.   Correct.

13   Q.   And you did have a search warrant for this residence,

14   didn't you?

15   A.   That's correct.

16   Q.   Did Mr. Garrison have a firearm on his person?

17   A.   I -- can you rephrase the question?  I wouldn't say on

18   his person.  How do you mean?  Like --

19   Q.   Did he have it in a holster on his hip?

20   A.   No, he did not have it in his holster.

21   Q.   Did he have a firearm in his hand?

22   A.   No, he did not have one in his hand.

23   Q.   Did he have a firearm in his back pocket?

24   A.   There was no firearm in his back pocket.

25   Q.   Was there a firearm stuck in his waistband?

Cross - Gullicksrud

1    A.    No, he did not.

2    Q.    That's what I mean by "on his person."  Is that

3    correct?

4    A.    That's correct.

5    Q.    You're aware of, in fact, where the firearms were

6    found, aren't you?

7    A.    I am.

8    Q.    One was found inside a cardboard box, right?

9    A.    I believe so.  It was in the little, like, clothing

10   closet, and another one was underneath the mattress.

11   Q.    All right.  Your investigation revealed that there

12   were other people who lived at 1250 South Monaco,

13   correct?

14   A.    Correct.

15   Q.    One was Alexander -- or Alexandra Ernestine Romero,

16   correct?

17   A.    Correct.

18   Q.    And the other one was Antonio Stevenson; is that

19   correct?

20   A.    Correct.

21   Q.    And you found mail that was addressed to Ms. Romero at

22   this address, didn't you?

23   A.    Yes.

24   Q.    And you found pictures of Mr. Stevenson at this

25   residence, didn't you?

284

                        Redirect - Gullicksrud

1    A.    We did.

2    Q.    The apartment wasn't rented to Mr. Garrison, was it?

3    A.    I don't remember -- I don't believe it was.

4    Q.    All right.  Well, you don't -- for instance, you don't

5    have a rental agreement with Mr. Garrison's name on it, do

6    you?

7    A.    No.

8    Q.    And certainly in the powers of the federal government,

9    you could have subpoenaed those records from the apartment

10   company, couldn't you?

11   A.    We could have.

12   Q.    And you don't have those, do you?

13   A.    No.

14             MR. LEONARD:  One second.

15             Thank you, Your Honor.

16             THE COURT:  All right.  Redirect?

17                        REDIRECT EXAMINATION

18   BY MR. PHILLIPS:

19   Q.    Going back to the May 23d, 2014, search warrant.

20   During the course of the previous year from -- well, let's

21   just talk about the conspiracy in June of 2013 through June

22   of 2014, but specifically leading up to May 23d.  Had you

23   and other officers observed things which caused you to want

24   to execute the search warrant on May 23d, 2014?

25   A.    There was.

285

Redirect - Gullicksrud

1    Q.   And what was that?

2    A.   We were receiving information that Mr. Garrison was

3    planning to move back to Michigan, so we wanted to arrest

4    him before he left the state.

5    Q.   Now, we talked about this Monaco address where Mr.

6    Garrison was arrested.  Where was he found during that

7    search warrant?

8    A.   He was found in the bedroom in the basement.

9    Q.   And where were the two guns that defense counsel

10   talked to you about?  Where were they located as far as

11   that's concerned?

12   A.   In that same small bedroom in the basement.

13   Q.   Okay.  And were there any other items that were of

14   interest to you -- although we'll get into that much

15   later -- that assisted you in this investigation, found in

16   that basement area?

17   A.   There were.

18   Q.   And what were some of those?

19   A.   There were some digital scales.  Scales are commonly

20   used to weigh drugs.  There was also bottles of a powder

21   called Anestatal, and that's often used as a cutting agent.

22   A cutting agent is something that's used to increase the

23   volume of the drugs; say, cocaine.  So you take that

24   inositol and mix it with the cocaine, basically; so if you

25   buy one ounce of cocaine, you could put it in the inositol

Redirect - Gullicksrud

1    and now you have two ounces or however you mix it.

2    Q.   Now, going back to some of the previous dates that you

3    were talked to about by defense counsel, like January 5th

4    of 2014; February 26th of 2014; March 2nd of 2014; you

5    mentioned that you didn't rush in and arrest anybody.  Why

6    was that?

7    A.   If we were to do that, if we would rush in and arrest

8    somebody, well, every single other co-conspirator in the

9    case would then either flee or discontinue using their

10   phones.  Basically we would jeopardize the investigation.

11   Once we made an arrest like that, everyone would talk and

12   say, you know, that person was arrested, and anyone that

13   worked with that person would then do everything they could

14   to distance themselves from the organization to avoid

15   arrest themselves.

16   Q.   And what was the purpose of your investigation in this

17   investigation?

18   A.   Again, the purpose of the investigation wasn't to

19   arrest one or two individuals; the purpose of the

20   investigation was to investigate the entire organization,

21   learn as many members of the organization as possible.

22        MR. PHILLIPS:  Thank you.  Nothing further, Your

23   Honor.

24        THE COURT:  All right.  One second.  All right,

25   Agent, thank you very much for your testimony.  You may

1    step down.  This will be a good time for our morning break

2    before you call the next witness.

3              We will be in recess until 10:30.

4         (Recess at 10:16 a.m.)

5         (Proceedings were held outside the presence of the

6    jury at 10:36 a.m.)

7              THE COURT:  Mr. Leonard, you had a matter you

8    wanted to raise before we bring in the jury.

9              MR. LEONARD:  I did, Your Honor.  Thank you.  My

10   understanding is the next witness is Gregory Williams.  Mr.

11   Williams, at least through the statements we've been

12   provided, the *James* material, I expect him to testify about

13   guns and -- or a gun and a bulletproof vest that he saw at

14   Mr. Garrison's home, as well as pimping.  And the reason I

15   wanted to bring this up with the Court was that the defense

16   had filed doc 618 which was the motion for notice for

17   404(b), 405, 406, 608 and res gestae evidence.  And it is

18   the defense's contention that the guns, the bulletproof

19   vest, and references to pimping constitute uncharged prior

20   bad acts under 404(b) or if res gestae is still the term

21   that is being used, res gestae, which we asked for notice,

22   and the Government in doc 675 indicated they would give 60

23   days notice.

24             THE COURT:  All right.  And so you're seeking its

25   exclusion?

1              MR. LEONARD:  We are.

2              THE COURT:  All right.  Mr. Phillips.  Or --

3              MR. PHILLIPS:  Ms. Rangel's witness, Your Honor.

4              THE COURT:  Ms. Rangel.

5              MS. RANGEL:  Your Honor, just as an offer of proof

6    for what this witness is going to say, he's going to say

7    with regard to the prostitution that the defendant made a

8    statement to him that he knew someone who had received a

9    Porsche Cayenne from a woman that he was prostituting, and

10   that the defendant would like to do something similar to

11   that.

12             With regard to the guns and the bulletproof vest,

13   the witness will testify that he was present at the

14   defendant's home in late 2013, within 24 hours of when it

15   was burglarized, and that he saw within the defendant's

16   home a bulletproof vest and two firearms, and that the

17   defendant made a statement to him to the effect of, I'm

18   going to be prepared to defend myself if something like

19   that were to happen again.

20             That's clear, relevant evidence in terms of this

21   conspiracy.  The defense has made it very clear thus far

22   that their defense is that there were not drugs, the

23   defendant is not a drug dealer, and that all of his

24   activities were legitimate and lawful.  This is relevant

25   because when the witness sees a bulletproof vest and

1    firearms and the defendant references that he's never going

2    to essentially get robbed again because he's willing to

3    defend himself, that is circumstantial evidence that he had

4    drugs in his home and he's prepared to defend it.

5         It's also relevant evidence of the subsequently

6    observed firearm under his mattress, which is the 924(c),

7    and it's fair for the jury to consider that when the

8    defendant makes a statement like that, would he then also

9    use that firearm during a drug trafficking crime.  It's all

10   relevant evidence of that.  It's within the charged

11   conspiracy.  It's part and parcel of all of this.  And it's

12   not 404(b) evidence.

13        THE COURT:  So it's the Government's contention

14   these are not prior bad acts that would trigger the 60-day

15   notice requirement.

16        MS. RANGEL:  That's correct.

17        THE COURT:  And that's why you didn't give the

18   notice.

19        MS. RANGEL:  That's correct.

20        THE COURT:  Okay.  The objection's overruled.  I

21   agree with the Government that this is not prior bad acts,

22   404(b) evidence, that would have triggered 404 -- sorry,

23   the 60-day advance notice requirement.  I agree that these

24   are either admissions -- direct admissions -- the testimony

25   will include admissions by the defendant, which are

1    obviously admissible, and personal observations by the

2    witness of current ongoing events and items that he has

3    personal knowledge of as of the date of the activities in

4    his testimony and are relevant to the current charged

5    conduct.  So the objection's overruled.

6         MR. LEONARD:  Your Honor, for -- just how this

7    will work, I believe this issue will come up with

8    additional witnesses.  Does the Court want me to raise that

9    objection before those witnesses come in or can I have a

10   standing --

11        THE COURT:  We'll probably --

12        MR. LEONARD:  -- objection?

13        THE COURT:  It would probably be better for the

14   record that you do raise it with each witness, but you

15   don't have to go to the lengths that you did right now in

16   detailing the particulars of your objection.  Just state

17   that -- something along the lines that similar to your

18   objection that you made with respect to Mr. Williams, or in

19   advance of Mr. Williams' testimony, you want to make a

20   standing objection to all the information -- similar

21   information regarding another defendant.  Just something

22   like that.  A sentence summarizing it that way.

23        MR. LEONARD:  Thank you.  We would request a

24   standing objection for Mr. Williams.

25        THE COURT:  Okay.  And you will -- that standing

Direct - Williams

1   objection is allowed and it's overruled.

2           All right.  Let's bring in the jury.

3        (Jury was present at 10:42 a.m.)

4           COURTROOM DEPUTY:  Your Honor, I just have to

5   have -- hand a pen to one of the jurors.

6           THE COURT:  Government may call its next witness.

7           MS. RANGEL:  Thank you, Your Honor.  The

8   Government calls Gregory Williams to the stand.

9           COURTROOM DEPUTY:  Right here, sir.  And if you'll

10  just stand right there, face me and raise your right hand.

11       GREGORY WILLIAMS, GOVERNMENT'S WITNESS, SWORN

12          COURTROOM DEPUTY:  Please be seated.  And you can

13  scoot your chair all the way up, put your elbows on here.

14  Please state your full name for the record and spell your

15  first and last name.

16          THE WITNESS:  Gregory, G-r-e-g-o-r-y, Duane

17  Williams, W-i-l-l-i-a-m-s.

18          THE COURT:  You may proceed, Ms. Rangel.

19          MS. RANGEL:  Thank you.

20                   DIRECT EXAMINATION

21  BY MS. RANGEL:

22  Q.   Good morning, Mr. Williams.

23  A.   Good morning.

24  Q.   Are you currently employed?

25  A.   Yes, I am.

Direct - Williams

1   Q.   What do you do?

2   A.   I'm in sales.  I do telephone sales for Iconic

3   Results.

4   Q.   Where do you do that?

5   A.   In Phoenix, Arizona.

6   Q.   Are you here today because you received a subpoena to

7   testify?

8   A.   Yes, I did.

9   Q.   Who subpoenaed you to testify today?

10  A.   The United States Government and Zachary Phillips.

11  Q.   Are you testifying today in a case involving conduct

12  from approximately June 1st, 2013, to June 4th, 2014?

13  A.   Yes, I am.

14  Q.   And were you originally charged as a defendant in this

15  case?

16  A.   Yes, I was.

17  Q.   What were you originally charged with?

18  A.   I believe it was conspiracy with intent to distribute

19  a controlled substance; a count for using a electronic

20  device to facilitate in an illegal act; and aiding and

21  abetting.  And I'm not -- I think those three.  I'm not

22  sure what the others are.

23  Q.   Do you recall approximately what the penalties for

24  those charges were?

25  A.   Cumulative, 20 years.

293

Direct - Williams

1    Q.    Those charges are not the first time that you've been

2    charged with a crime; is that fair?

3    A.    That would be fair to say.

4    Q.    Have you previously been convicted of a felony?

5    A.    Yes, I have.

6    Q.    Can you tell me the first time that you were convicted

7    of a felony offense.

8    A.    I think it was 1983.  '82, '83.  I was in college.

9    Q.    Do you recall what that felony conviction was for?

10   A.    Possession of a controlled substance.

11   Q.    Were you convicted of another felony offense after

12   1982, 1983?

13   A.    Yes, I was.  1996.

14   Q.    Okay.  And what was that for?

15   A.    If I wasn't mistaken, it was receiving stolen

16   property, theft.

17   Q.    A theft felony offense?

18   A.    Yes.

19   Q.    Was it possible that it was in 1994?

20   A.    It could have been.  It's been a while.

21   Q.    Did you receive another felony conviction in 1980s?

22   A.    '87, yeah.

23   Q.    Okay.

24   A.    In '87, I was convicted of possession with intent to

25   distribute 500 grams or less of a -- of cocaine.

Direct - Williams

1    Q.   And after your theft conviction in 1994, were you

2    convicted of another felony offense?

3    A.   Yes, ma'am.  I think in 2010, of possession -- 2010, I

4    think it was 2010.

5    Q.   2010?

6    A.   Yes.

7    Q.   And do you recall what that felony offense was?

8    A.   It was possession of controlled substance.

9    Q.   Did you resolve the charges in this case prior to your

10   testimony today?

11   A.   Yes, I did.

12   Q.   Did you reach a plea agreement with the Government?

13   A.   Yes, I did.

14   Q.   Can you look -- you should have an exhibit binder in

15   front of you.  It actually, I think, might be Volume 3.

16   It's Exhibit 122.  Thank you.

17        Mr. Williams, if you could take a moment and look

18   at Government's Exhibit 122.  I think it's a multi-page

19   exhibit.  Mr. Williams, do you recognize that document?

20   A.   Yes, I do, ma'am.

21   Q.   What is that document?

22   A.   This is the -- this is what I agreed to -- this is the

23   deal I took, the agreement I took, for cooperating in my

24   part in this matter.

25   Q.   That's your plea agreement with the Government?

295

Direct - Williams

1    A.    Yes.

2    Q.    And as part of that plea agreement, what did you

3    ultimately plead guilty to?

4    A.    I know I pled guilty to possession -- knowing and

5    intentionally distributing and possess -- with intent to

6    distribute less than 500 grams of a mixture and substance

7    containing cocaine, and also aiding and abetting --

8    aiding -- I believe aiding and abetting, those two

9    charges.

10   Q.    And what are the penalties for that charge?

11   A.    If I'm not mistaken, it carried a 20-year sentence

12   with a fine of a million dollars.

13            MS. RANGEL:  Your Honor, at this time I would move

14   to admit Government's Exhibit 122.

15            THE COURT:  Any objection?

16            MR. McDERMOTT:  No objection, Your Honor.

17            THE COURT:  All right.  Give me one second.

18            All right.  There being no objection, Government's

19   Exhibit 122 is admitted into evidence and may be published

20   to the jury.

21        (Government's Exhibit No. 122 received)

22            MS. RANGEL:  Thank you.

23   BY MS. RANGEL:

24   Q.    As part of that plea agreement, was there an agreement

25   in terms of your sentence in the case?

296

Direct - Williams

1    A.    Yes, there was.

2    Q.    And have you already been sentenced in this case?

3    A.    Yes, I have.

4    Q.    Who sentenced you?

5    A.    Judge Martinez.

6    Q.    What sentence did you receive?

7    A.    Time served and three years supervised release.

8    Q.    How much time had you served at that point in time?

9    A.    I do believe a little over a month, like five weeks, I

10   do believe.

11   Q.    And when you say three years of supervised release,

12   what does that mean?

13   A.    It means that I have to adhere to all commands of the

14   probation department, UAs, monitoring, coming by my home,

15   check in with them if I move or if I change jobs.  Random

16   UAs.  And also a psych evaluation and psycho- --

17   psychotherapy for my drug use.

18   Q.    And you're currently on that three-year term of

19   supervised release right now?

20   A.    Yes, I am.

21   Q.    I want to talk to you about -- I think you referenced

22   cooperation?

23   A.    Yes.

24   Q.    So by "cooperation," do you mean that you sat down and

25   were interviewed by members of the Government?

Direct - Williams

1    A.   Yes, I was.

2    Q.   When was the first time that you did that?

3    A.   The first time I did that was when I was arrested and

4    I was taken to the Denver -- the Denver jail.  Not knowing

5    why I was arrested, I didn't have a clue.  And two of --

6    two agents that are sitting here came down and told me why

7    I was being arrested at the time.  And they played a tape

8    for me.  And -- and I heard the tape, and I was like, Are

9    you kidding me?

10           And so at that time, it was like, you know, I --

11   it was my voice on the tape, it was, like -- so I basically

12   said, I -- they said, Listen, we're not giving out too many

13   deals.  Do you want your fair shot right now?  Then you

14   need to talk about it.  So I did.

15   Q.   And, Mr. Williams, if you can, just for the sake of

16   the court reporter, just try to slow down a little bit in

17   your answers, okay?

18   A.   Okay.  Sorry.

19   Q.   Thank you.  Is it fair to say that you were arrested

20   June 9th, 2014?

21   A.   Yes, it was.

22   Q.   So the interview that you just described took place on

23   that date?

24   A.   Yes, it did.

25   Q.   You referenced that you spoke to two investigators

                            Direct - Williams

 1   present in the courtroom today.

 2   A.   Yes, I did.

 3   Q.   And you're -- it appears that you're looking over at

 4   the Government table.

 5   A.   Yes.

 6   Q.   Is it fair to say that you're looking at Agent Brad

 7   Gullicksrud and Investigator Josh Mohlman?

 8   A.   Yes.

 9   Q.   Those are the individuals you spoke with?

10   A.   Yes.

11   Q.   Now, were you arrested at the time you sat down with

12   them?

13   A.   Yes.

14   Q.   And you were taken where?

15   A.   To the Denver -- Denver -- I think Denver city jail.

16   Q.   Are you familiar with what's commonly referred to as

17   Miranda rights?

18   A.   Yes.

19   Q.   What are those rights?

20   A.   You get -- could have an attorney present before

21   speaking or volunteering any information, and if you get --

22   if you do -- if you do -- if you did not agree to have an

23   attorney present, I was giving up my rights to do so.  And

24   I did.

25   Q.   So they talked to you about your Miranda rights at

Direct - Williams

1    that time?

2    A.   Yes, they did.

3    Q.   And you waived those rights?

4    A.   Yes, I did.

5    Q.   Did you sit down after June 9th, 2014, again with

6    members of the Government?

7    A.   Yes, I did.

8    Q.   In that same book in front of you, there's

9    Exhibit 123.

10   A.   123?

11   Q.   Yes.  It should be right after 122.

12   A.   Yes, I see it.

13   Q.   Do you recognize that document?

14   A.   Yes.

15   Q.   Is that document a letter that you received when you

16   sat down with the Government the second time?

17   A.   Yes, it is.

18   Q.   What's the date on that letter?

19   A.   September 5th, 2014.

20        MS. RANGEL:  At this time I would move to admit

21   Exhibit 123.  And I apologize, I think there's a

22   stipulation on that.

23        THE COURT:  My exhibit list doesn't show a

24   stipulation, but it could be stipulated to.

25        MR. McDERMOTT:  There's no objection to it, Your

300

Direct - Williams

1       Honor.

2              THE COURT:  Okay.  All right.  There being no

3       objection, Government's Exhibit 123 is admitted into

4       evidence and may be published to the jury.

5              MS. RANGEL:  Thank you, Your Honor.

6           (Government's Exhibit 123 received)

7       BY MS. RANGEL:

8       Q.   When you look at that letter, Mr. Williams, that you

9       received on September 5th, 2014, does that outline the

10      terms of your cooperation agreement with the Government?

11      A.   Yes.

12      Q.   Is testifying here today part of the terms of that

13      agreement?

14      A.   Yes.

15      Q.   When you sat down with the Government on June 9th,

16      2014, did you know who ultimately would go to trial in this

17      case?

18      A.   No.

19      Q.   What about when you sat down with them on September

20      5th, 2014?

21      A.   Not really.  No.  No.

22      Q.   You didn't know who would ultimately go to trial?

23      A.   No.

24      Q.   And your agreement to come in here and testify today,

25      were you told what to testify to?

Direct - Williams

1   A.   No.

2   Q.   What were you told?

3   A.   To tell the truth and the whole truth and nothing but

4   the truth.

5   Q.   I want to talk to you about an individual named Ricky

6   Garrison.  Do you know a person named Ricky Garrison?

7   A.   I -- it -- I know who Ricky Garrison is now, but at

8   the time I knew him as G.

9   Q.   The person that you knew as G that you now know is

10  Ricky Garrison, do you see him present in the courtroom

11  today?

12  A.   Yes, I do.

13  Q.   Can you please just point him out for the record by

14  where he's seated and an article of clothing he's wearing.

15  A.   He's sitting there in a blue shirt.

16  Q.   And you've gestured to your right.

17  A.   Yes.

18       MS. RANGEL:  Your Honor, if the record could

19  reflect that the witness has identified the defendant

20  subject to cross-examination.

21       THE COURT:  The record will so reflect.

22       MS. RANGEL:  Thank you.

23  BY MS. RANGEL:

24  Q.   When was the first time that you met Mr. Garrison?

25  A.   Sometime in 2011.

Direct - Williams

1    Q.   And was that through a mutual friend?

2    A.   Yes.

3    Q.   Did there come a time when you began to have a more

4    significant relationship with Mr. Garrison?

5    A.   Probably -- I think I would say 18 months later from

6    that time.  Had to be 2011 -- later in 2012, I would say.

7    Q.   And the nature of that relationship, is it fair to say

8    you -- as the months progressed, you became a little bit

9    closer to him?

10   A.   Yes.

11   Q.   Did there come a time when you began buying cocaine

12   from Mr. Garrison?

13   A.   Yes.

14   Q.   When was that?

15   A.   It was -- we -- we met a couple of times in 2012, but

16   then, again, in 2013.

17   Q.   And approximately when in 2013 would you say it was

18   that you would purchase cocaine from him?  If you could

19   just give us time of the year.

20   A.   The fall; September, late September, October,

21   November.

22   Q.   Did you use some of the cocaine that you would

23   purchase from Mr. Garrison?

24   A.   The majority of it, I did, yes.

25   Q.   At that time of your life, would you use cocaine

Direct - Williams

1    fairly routinely?

2    A.   At that time in my life, every day.

3    Q.   How long had you been a cocaine user?

4    A.   When I first -- I first used cocaine, I was in

5    college.  I was a junior.  So it kind of plagued my life

6    from that point throughout my -- throughout my life.  It's

7    been periods of time that I was clean, and my -- the birth

8    of my children and stuff like that.  But as I started

9    making more money and hanging out at the bar, I started

10   seeking to -- to abuse drugs, most definitely.

11   Q.   And correct me if I'm wrong, Mr. Williams, but when we

12   were earlier talking about your felony convictions, it

13   sounded like you were in college in the early '80s?

14   A.   Yes, I was.

15   Q.   So is it fair to say that you had been a cocaine user

16   since the early '80s --

17   A.   Yes.

18   Q.   -- off and on?

19   A.   Yes, most definitely.

20   Q.   So when you would purchase cocaine from Mr.

21   Garrison -- and we'll focus on 2013 on -- how frequently

22   would you buy cocaine from him?

23   A.   Twice a week.

24   Q.   When you would purchase cocaine from him in one time,

25   how much would you purchase?

304

Direct - Williams

1    A.    $450 worth, which was -- which would be 10 1/2 grams.

2    That's all I had a budget for.

3    Q.    Now, when you talk about 10 1/2 grams, would you

4    communicate to Mr. Garrison, I need 10 1/2 grams, or did

5    you call it something else?

6    A.    Quarter -- a quay, eight-ball, teeners, that type of

7    thing.

8    Q.    When you say quay -- and could you maybe spell that

9    for the court reporter?

10   A.    Q-u-a-y.

11   Q.    So a quay refers to what?

12   A.    Quarter of an ounce, 7 grams.

13   Q.    And you also referred to, I believe, an eight-ball?

14   A.    Yeah.  That's -- yes, ma'am, 3 1/2 grams; an eighth of

15   an ounce of cocaine.

16   Q.    And did you use another term?

17   A.    Teener.  T-shirt.  It will be a 16th of a gram.

18   Q.    Teener or T-shirt is a 16th?

19   A.    Yes.

20   Q.    Okay.  And how much would you pay for a quarter ounce

21   of cocaine?

22   A.    Rough -- 300 bucks.

23   Q.    So is it fair to say, then, that the eight-ball would

24   be $150?

25   A.    Yes.

Direct - Williams

1    Q.   With the 10 1/2 grams that you would purchase from

2    Mr. Garrison, you used some or all of that?

3    A.   I used the majority -- I used the majority of it.  I

4    used the majority of it myself, and friends.  I -- I used

5    to -- what I would do, I would go to a bar, and my friends

6    and I would go to the bar.  I would get their money -- they

7    would prepay me -- then I would meet Mr. Garrison, and then

8    we would go get drunk and then we would do coke after we

9    would drink, so we would kind of balance out our drink --

10   our drunkenness so we wouldn't be drunk.

11          That was the reason for drinking, so that we could

12   get high.  It was kind of like prepare yourself to get

13   high.

14   Q.   If I could just clarify your last statement, when you

15   said, We would go get drunk and use the cocaine, are you

16   referring to your friends?

17   A.   My friends.

18   Q.   Okay.  And that's after you purchased the cocaine from

19   Mr. Garrison?

20   A.   Yes.

21   Q.   How many friends would you do this with?

22   A.   Three.

23   Q.   Would they give you money towards the cocaine or did

24   you buy the cocaine for them?

25   A.   Sometimes -- sometimes they would give me money.  I

Direct - Williams

1    would want the money first so that I know that, you know --

2    that they would go through with it so I wouldn't be stuck

3    with it.  And at other times I couldn't get to them so I

4    would go ahead and do it myself and they would reimburse me

5    after the transaction.

6    Q.   Did you ever make money off of the cocaine you would

7    purchase from Mr. Garrison?

8    A.   Yes, I did.

9    Q.   How much money would you say you made?

10   A.   $100; 125 at the most.

11   Q.   And that money would come off of how much cocaine?

12   A.   It was basically -- we would get -- we -- I would get

13   mine for free and the remainder I would make a small

14   profit, so I can drink and eat that night and pay for gas.

15   But I did make money; yeah, I did.

16   Q.   How did you communicate with Mr. Garrison that you

17   needed cocaine?

18   A.   Well, at first we didn't have to talk, we didn't -- we

19   never really talked on the phone hardly ever.  It was

20   just -- we would just meet.  And for some reason, later on,

21   I think I moved, and I would have to let him know what I

22   needed so he wouldn't be driving around with -- just on one

23   product.  That's just my assumption.

24   Q.   So how would you communicate with him that you wanted

25   some cocaine?

Direct - Williams

1    A.   I would -- by the phone, text messaging, called him,

2    or he called me.

3    Q.   Did you meet him at any particular location to obtain

4    the cocaine?

5    A.   Yes.  We had a parking lot.  I know one time we met at

6    my residence -- in my residence in Arvada on 52nd and

7    Wadsworth.  That stands out.  But other times, we met at

8    Taco Bell.

9    Q.   And was there a specific Taco Bell you would meet

10   at?

11   A.   On Parker Road and -- Parker Road and 225, yes.

12   Q.   Is that in Aurora?

13   A.   That's in Aurora.

14   Q.   Was that near your residence at that time period?

15   A.   Yes.  Before I moved to Arvada.

16   Q.   When did you move to Arvada?

17   A.   Moved to Arvada in October.

18   Q.   Of 2013?

19   A.   Yes.

20   Q.   And you indicated that at that point in time, you

21   would meet up closer to your home in Arvada?

22   A.   Well, the one time that we met in my residence, he

23   came -- he drove up and that really stands out because that

24   was the first phone call I ever heard -- that was the phone

25   call that I heard from the Government.

Direct - Williams

1        And I texted my address, which I saw the text in

2   discovery.  So it was self-evident.  I mean, it was all

3   there.  Other times, I would drive to his -- drive to his

4   house off 13th and Havana.

5   Q.   His residence was off of 13th and Havana?

6   A.   Yes, ma'am.

7   Q.   All right.  Now, you've referenced a phone call.  I'm

8   going to direct your attention -- and I apologize, I think

9   it's in the first binder, Exhibit 1.  It's been admitted

10  into evidence by the Government.  And you also have a

11  binder of transcripts.

12        Sorry to make you jump around, Ms. Hansen.

13        COURTROOM DEPUTY:  Also 1?

14        MS. RANGEL:  Yes.

15        THE COURT:  Okay.  One second, counsel.  I think

16  one of our jurors needs -- do you need to use the restroom?

17        COURTROOM DEPUTY:  Go ahead, sir.

18        THE COURT:  Just come around.  You can come

19  around.  Just hang tight until he comes back.

20        MS. RANGEL:  Okay.

21     (Pause)

22        THE COURT:  Please be seated.  Let's proceed.

23  BY MS. RANGEL:

24  Q.   Mr. Williams, we are talking --

25  A.   Yes.

309

Direct - Williams

1    Q.    -- Government's Exhibit 1.

2              MS. RANGEL:  And at this time, Your Honor, I would

3    move to publish Exhibit 1 and ask that the jurors follow

4    along with the transcript for Exhibit 1 in their binders.

5              THE COURT:  All right.  That's fine.  Once an

6    exhibit is admitted, you don't need to seek leave to have

7    it published, just go ahead and publish it.

8              MS. RANGEL:  Thank you, Your Honor.

9              THE COURT:  With respect to the transcript, we

10   have a standing objection to the use of transcripts, which

11   I've overruled, so you can just go ahead and use the

12   transcripts.

13             MS. RANGEL:  Thank you.

14             THE COURT:  All right.

15         (Phone call played)

16   BY MS. RANGEL:

17   Q.    Mr. Williams, do you remember that phone call?

18   A.    Yes, I do.

19   Q.    The -- that phone call occurred on November 16th,

20   2013.

21   A.    Yes.

22   Q.    And you recognize your voice on that call?

23   A.    Yes, I do.

24   Q.    Do you recognize the voice of Mr. Garrison as well?

25   A.    Yes.

310

Direct - Williams

1    Q.   What was your phone number back on November 16th,

2    2013?

3    A.   720-285-6822.

4    Q.   285-6822?

5    A.   Yes.

6    Q.   Did you call Mr. Garrison in that call contained on

7    Exhibit 1?

8    A.   I know I had called him.  I know I had called him

9    earlier that day.  I wasn't for sure if he had called me

10   back or -- but I -- I could have called him, or he could

11   have called me.  We -- I think I might have called.  I

12   think he was calling me to say -- to let me know he was

13   coming out my way anyway, because I -- I -- if I'm not

14   mistaken, I was calling to let him know, listen, I was

15   going to see him tomorrow because I was tired and I didn't

16   want to drive all through town, and then he said that he

17   could come that way because he was on his way -- that way,

18   anyway.

19   Q.   And when we're talking about where you lived on

20   November 16th, 2013, approximately where did you live?

21   A.   Arvada, 52nd and Wadsworth.

22   Q.   What did you want Mr. Garrison to bring you on that

23   date?

24   A.   Roughly 10 -- 10 1/2 -- 10 1/2 grams.

25   Q.   And is that how you talk about it in that call?

Direct - Williams

1    A.    Yes.

2    Q.    You say 10 1/2 grams?

3    A.    Well, I said -- we said nine -- nine and a teener,

4    which was nine grams and -- well, basically he was going to

5    give me a little more because a teen is 1.75, so it was

6    going to look like a little bit more than 10 1/2 grams,

7    approximately about 10.75.

8    Q.    And you wanted 10.5?

9    A.    I always bought 10.5, I mean.

10   Q.    What does it mean when Mr. Garrison says nine soft?

11   A.    Powder.  Nine grams of powder.

12   Q.    Can you explain to the jury what 9 grams of powder is.

13   A.    Well, powder -- powder cocaine is normally, you could

14   put it in your drink, stir it up and drink it, or you could

15   snort it, or you put it in a cigarette and smoke it.  Those

16   are the ways I've used it.

17   Q.    And how does powder cocaine -- what's the difference

18   between powder cocaine and a teener hard?  What's a teener

19   hard?

20   A.    A teener -- a teener hard is -- is where you can smoke

21   it out of a -- some type of device.  I mean, a pipe, or a

22   make-shift pipe, foil, stuff like that.  It's -- it's --

23   you pull -- you use baking soda or some other type of

24   substance to make it come -- come together, and so it's

25   hard.

Direct - Williams

1   Q.   And is hard cocaine called something specifically?

2   A.   Base, freebase, crack, those type of terms we used.

3   Q.   And how is -- is hard or -- I'm sorry, is hard or

4   crack cocaine, is it made from powder cocaine?

5   A.   Yes, it is.

6   Q.   And how is that made?

7   A.   The way I did it, put it in the microwave with some

8   baking soda and just let it melt down and stir it back

9   together and put some cold water in it and then it

10  contracts and comes back together.  Or --

11  Q.   So you -- I'm sorry.

12  A.   Or you can put it on the -- a pot of water and put the

13  bottle in the water and cook it down and put some water in

14  there and make it come back together like that.

15       Is that too fast?

16  Q.   So that's -- essentially you can make crack cocaine

17  from powder cocaine.

18  A.   Yes.

19  Q.   Where were you going to meet Mr. Garrison in order to

20  obtain the 10.5 grams of cocaine?

21  A.   Well, I was -- I was going to drive down to Denver,

22  but I was -- I was tired.  I was like, Listen, I'll see you

23  tomorrow.  And he suggested that he could come to my place

24  and meet me.  And so I was like, Okay, if you want to drive

25  out, fine, save me a trip.  I was kind of glad that he was

Direct - Williams

1    going to come to me because I didn't want to drive out

2    there and, you know, and -- so that -- he came to 52nd and

3    Wadsworth to my apartment.  I think the address is 771 West

4    52nd Street.

5    Q.    Since you got there -- in your binder in front of you,

6    could you look at Exhibit 2, Government's Exhibit 2.

7    A.    Uhm-hum.

8          MS. RANGEL:  If we could have Exhibit 2 on the

9    screen, please.  If you could, could you zoom in that

10   bottom part where it says text message down.  That's fine.

11   BY MS. RANGEL:

12   Q.    Do you recognize that, Mr. Williams?

13   A.    Yes.

14   Q.    What is that?

15   A.    771 West 52nd Avenue, Arvada, Colorado 80002.

16   Q.    And specifically when we look at Exhibit 2, is that a

17   text message?

18   A.    Yes.

19   Q.    Is that a text message that you sent to Mr. Garrison

20   on that date?

21   A.    Yes, it is.

22   Q.    Now, in this -- the call that we listened to -- thank

23   you -- on Exhibit 1, did you talk about cars in that -- in

24   that conversation?

25   A.    Yes.

314

Direct - Williams

1    Q.    Specifically what did Mr. Garrison tell you with

2    regard to a vehicle?

3    A.    He spoke about a Porsche Cayenne.

4    Q.    And approximately the age of the car and the money for

5    the car and all of that?

6    A.    Yes.

7    Q.    Had you previously had a conversation with Mr.

8    Garrison about a Porsche Cayenne?

9    A.    Yes.

10   Q.    And what did he tell you about a Porsche Cayenne?

11   A.    That he was going -- he was going to buy one, he loved

12   that car.  It was actually a truck, a Porsche truck.  And,

13   you know, he was working on purchasing one, and he wanted

14   to get one because one of his good friends had one.

15   Q.    And did he tell you specifically how he was going to

16   afford that vehicle?

17   A.    Various ways through hustling.  We -- he might have

18   mentioned -- I don't -- I don't know if it looks like

19   hearsay that one of his friends was pimping, got one or

20   something like that, but some -- something along those

21   lines.

22   Q.    That he could finance a vehicle through pimping?

23   A.    Something like that.

24   Q.    When you talk about hustling --

25   A.    Uhm-hum.

315

Direct - Williams

1    Q.   -- what are you referring to?

2    A.   Well, entrepreneurial term where you can go out and

3    sell drugs, any type of way to make money.  I mean,

4    working.  Working is hustling.  I mean, you know, picking

5    up garbage, cutting lawns, selling drugs.  It's just a

6    street term that we use to make money, so it could be

7    different -- many ways that you could hustle.  You know,

8    legitimate hustles, legal hustles.  But we weren't cutting

9    lawns, we weren't picking up garbage, you know, so -- we

10   were selling drugs.

11             I was buying drugs and using drugs and selling

12   drugs.  That was my part of it.  That's what I did.

13   Q.   Mr. Williams, did you meet with Mr. Garrison on

14   November 16th, 2013?

15   A.   Yes, I did.

16   Q.   Where did you meet with him?

17   A.   In the parking lot of my -- in the parking lot at the

18   address that I text him.

19   Q.   Did he bring you any cocaine at that time?

20   A.   Yes, he did.

21   Q.   What did he bring you?

22   A.   Nine grams of soft and 1.75 of hard cocaine, which

23   is referred to as, like I said, a teener, a T-shirt.

24   Q.   Did you pay him money at that time?

25   A.   Yes, I did.

Direct - Williams

1    Q.   How much did you pay him?

2    A.   $450.

3    Q.   What did you do with the cocaine you purchased from

4    Mr. Garrison?

5    A.   Well, I went upstairs and I did some with my roommate.

6    We -- not a lot, because I -- like I said, I was tired, but

7    the next day we went out and drank and partied and did the

8    majority of it.

9    Q.   Now, when you talk about using cocaine that you

10   purchased from Mr. Garrison, did you get high from that

11   cocaine that you used?

12   A.   Yes.

13   Q.   I'm going to direct your attention to Government's

14   Exhibit 101.  I think it might be in that third binder.

15   And the transcript binder you're going to need as well for

16   Exhibit 101.  Thank you very much.

17        Do you have Exhibit 101 and the transcript for 101

18   in front of you?

19   A.   I have 101.

20   Q.   I'm kind of burying you with binders up there.  I

21   apologize.  Thank you very much.

22   A.   Okay.

23   Q.   Okay.  And that's a call that occurred on November

24   29th, 2013?

25   A.   Yes.

Direct - Williams

1        MS. RANGEL:  At this time, let's go ahead and play

2   Government's 101.  And that's going to be transcript 101.

3        (Phone call played)

4   BY MS. RANGEL:

5   Q.   Mr. Williams, do you recognize that call from

6   November 29th, 2013?

7   A.   Yes, I do.

8   Q.   And you recognize your voice and Mr. Garrison's voice

9   on that call?

10  A.   Yes.

11  Q.   What are you talking about at the beginning part of

12  that call when you ask him, So what's up?  You back on or

13  what?

14  A.   If he -- if he had any cocaine.

15  Q.   And he asks, You're going to need soft or hard?  What

16  did that mean?

17  A.   It meant powder or base, or -- powder or crack.  Hard

18  is crack; powder is soft.

19  Q.   How did you respond?

20  A.   I think I said yeah.

21  Q.   Did you talk about "just my normal"?

22  A.   Yeah, that was -- I was -- I was trying not to talk on

23  the phone, so I would be like incognito, but some kind of

24  way I always ended up talking about product on the phone.

25  But, yeah, I was just trying to say my normal so I wouldn't

318

Direct - Williams

1   actually spell it out what I needed.  I just kind of had a

2   bad feeling, so I was trying to, like, minimize the

3   conversation.

4   Q.   And so when you talk about soft and quay, what are you

5   talking about?

6   A.   Some -- a quarter of an ounce of -- a quarter of an

7   ounce of powder cocaine.

8   Q.   Was Mr. Garrison -- does he indicate to you that he

9   would have that ready for you?

10  A.   Yes.

11  Q.   When you were purchasing cocaine from Mr. Garrison,

12  was there ever a time when he was not able to supply you

13  with cocaine?

14  A.   Rarely.  I mean, if I -- if I called him, if he called

15  me, we -- we knew that, the reason why we were talking.

16  We -- we -- you know, and that was just -- that was just

17  the nature of our business.  I could trust him.  I mean, it

18  wasn't -- I mean, people sell you all kinds of stuff, all

19  right; rob you, and -- and we were friends.  I -- we were,

20  you know.

21          That's just pretty tough for me to sit here and do

22  this, but we were friends, and I liked him.  We had good

23  conversations.  You can hear on the phone we laughed.  We

24  joked around.  I spent a lot of time with him that summer.

25  Q.   Later on in the conversation, Mr. Garrison indicates

Direct - Williams

1    that he was going to cook something.  What did that mean to

2    you?

3    A.    It means that he was going to cook some powder.

4    Cocaine.

5    Q.    And cook it into crack?

6    A.    Yes.

7    Q.    During the times that you were purchasing cocaine from

8    Mr. Garrison, did you ever see him cooking cocaine into

9    crack?

10   A.    Well, I -- I've never actually seen him cooking

11   cocaine into crack, but he suggested on the phone, as you

12   heard, that he was preparing, so -- to cook, or he was

13   going to cook, and -- did I buy it?  Yes.

14   Q.    I have one more call for you on November 29th, 2013,

15   which is Government's Exhibit 102.  If you could turn to

16   the next transcript.

17         Do you have that in front of you, Mr. Williams.

18   A.    Yes, I do.

19         MS. RANGEL:  At this time, I'd like to play

20   Government's Exhibit 102, which is going to be transcript

21   102.

22         (Phone call played)

23   BY MS. RANGEL:

24   Q.    Mr. Williams, do you recognize that call as well?

25   A.    Yes, I do.

320

Direct - Williams

1    Q.   And you recognize the voices on that call?

2    A.   Yes, I do.

3    Q.   In that call, is it fair to say that call is

4    essentially a continuation of Government's Exhibit 101?

5    A.   Yes.

6    Q.   Just a little bit later?

7    A.   Yes.

8    Q.   So when you talked to Mr. Garrison and he asks if you

9    want a seven, what does that mean?

10   A.   A quarter -- a quarter of an ounce of powder

11   cocaine.

12   Q.   So when you respond by saying "a shirt of the other

13   one since you're doing it," what do you mean?

14   A.   1.75, hard -- hard crack, base cocaine.

15   Q.   And do you discuss meeting up with Mr. Garrison to

16   obtain that cocaine?

17   A.   Yes.

18   Q.   Did you ultimately meet up with Mr. Garrison on

19   November 29th, 2013?

20   A.   Yes.

21   Q.   Where did you meet?

22   A.   I went to his place, to his house.

23   Q.   And do you recall where he lived at that time?

24   A.   13th and Havana.

25   Q.   In Aurora?

Direct - Williams

1    A.    Yes.

2    Q.    Did you buy cocaine from him on November 29th, 2013?

3    A.    Yes.

4    Q.    How much did you buy?

5    A.    That -- that particular, 7 and like 9 -- so it would

6    have been like 9 point -- 9 1/2, 9.75, some -- so it was

7    less than I normally would get.  So it was -- it was 7, and

8    a shirt would be 1.75.  So it was a little less than what I

9    normally would buy.

10   Q.    Okay, so -- I'm sorry to break this down, but I just

11   want to make sure I'm understanding you.  So when you talk

12   about -- when you talk about 7, is that powder or crack?

13   A.    Powder.

14   Q.    So 7 grams?

15   A.    Of powder.

16   Q.    Point 75 grams of what?

17   A.    Hard.

18   Q.    Do you remember how much you paid him on that date?

19   A.    $350.  $100 less than what I normally pay.

20   Q.    And fair to say when you paid him, did you pay him in

21   cash?

22   A.    Yes.

23   Q.    When you were purchasing cocaine from Mr. Garrison, do

24   you know who supplied him with cocaine?

25   A.    No.  Not personally.  No.

Direct - Williams

1    Q.    Did he ever tell you about a source of supply for him

2    for cocaine?

3    A.    He might have mentioned a Mexican guy, but I really --

4    I didn't know who he was, in conversation.

5    Q.    I want to move forward in time with you to April of

6    2014.

7    A.    Okay.

8    Q.    Did you see Mr. Garrison at a party in April 2014?

9    A.    Yes, I did.

10   Q.    Did he express to you anything with regard to moving

11   out of the state of Colorado?

12   A.    Yes.  He was -- you know, he was all -- he was -- he'd

13   always expressed, you know, leaving because of the

14   situations here.  It was kind of -- being in a small town

15   with a small market, I think that -- I mean, I -- he was --

16   he expressed moving, yes.  He said that he was getting out

17   of this -- out of this thing, and he was looking at doing

18   other things, basically, you know.

19   Q.    Did he express where he might be moving to?

20   A.    I think he said he might be moving back home,

21   Michigan.

22   Q.    So he's from Michigan?

23   A.    Yes.

24   Q.    Did he ever talk to you about a woman from Michigan?

25   A.    Yes.  Yes.  He had a friend of his, he said he -- that

Direct - Williams

1    he had a couple of friends that were kind of screwed up on

2    drugs in Michigan.  He was bringing them out to -- to clean

3    them out and help them out and make -- they can probably

4    hustle and make some money together.  It wasn't -- it

5    wasn't -- I don't remember the name of the -- of the person

6    or -- I never even saw the person, but he did mention that

7    he had a couple of female friends, one in particular I

8    think, that came out to visit to stay with him.

9    Q.   From Michigan?

10   A.   Yes.

11   Q.   Did he ever talk about taking a woman from Michigan to

12   Oklahoma?

13   A.   Yeah, I think on the phone call he had mentioned

14   taking somebody to Oklahoma to turn a trick or something

15   like that, yes.

16   Q.   So what do you mean by "turn a trick"?

17   A.   Prostitution.

18   Q.   Did you ever talk to him about prostitution and,

19   specifically, a website, backpage.com?

20   A.   Well, yeah, I used to frequent -- I used to

21   frequent -- I mean, doing my -- my -- getting high, and I

22   would probably call -- use Backpage.  And I think he and I

23   discussed Backpage a couple of times.

24   Q.   Did he specifically tell you anything with regard to

25   posting an advertisement on backpage.com?

Direct - Williams

1    A.   Yeah, because the -- yes, because one of the --

2    because the girl that I was having the date, she was -- she

3    was like prostituting.  That's kind of like how I met her.

4    And so the way to not be detected or, you know, by

5    authorities is like you want to buy a poster like this,

6    poster like that.  It was -- it was a conversation.

7    Q.   And that's what he described to you?

8    A.   Yes.

9    Q.   I'm going to take -- I'm not trying to jump around

10   with you, but I want to take you back just a couple of

11   months to the end of 2013.

12   A.   Okay.

13   Q.   At the end of 2013, are you aware of a burglary that

14   occurred at the defendant's home?

15   A.   Yes.  I'm -- I was -- I happened to go by one day and

16   he was out -- he was having his door repaired.

17   Q.   What --

18        MR. McDERMOTT:  We'll just renew our 404

19   objection.

20        THE COURT:  Where are we going with this?

21        MS. RANGEL:  To what he observed within the home

22   and the defendant's statements with regard to that

23   burglary.

24        THE COURT:  And you said at the end of 2013?

25        MS. RANGEL:  Correct.

Direct - Williams

1        THE COURT:  All right.  I'll allow it.  Overruled.

2   BY MS. RANGEL:

3   Q.   And just so we're clear, Mr. Williams, where did he

4   live at that time?

5   A.   Off of 13th and Havana.

6   Q.   Off of 13th and Havana?

7   A.   Yes.

8   Q.   And you indicated that you went by and the front door

9   was being repaired?

10  A.   Yes.

11  Q.   What damage had occurred to the front door?

12  A.   I couldn't -- I couldn't say.  He mentioned that

13  someone kicked the door in, but I wasn't there, and I -- I

14  don't really know if that happened or not, but I know the

15  door was being repaired.

16  Q.   Okay.  When you were present at his home?

17  A.   Yes.

18  Q.   Did you -- when you were present at the defendant's

19  home at this time, did you observe any firearms inside of

20  his home?

21  A.   Walking through, I noticed a couple of pistols,

22  bulletproof vest.  I -- he didn't mention if they were his

23  or not, but I saw them lying on the bed.

24  Q.   Did he tell you anything with regard to those

25  firearms?

Direct - Williams

1    A.    He had to be -- that -- he had a problem.  He didn't

2    mention who the problem was with or what the problem was

3    about, but he needed to defend himself, be prepared.

4    Q.    Did he indicate to you that he would be ready to

5    defend himself?

6    A.    Something along those lines.  It's been a while, so

7    I -- it's been almost three years.  So I -- yeah, I mean,

8    he was -- he was upset about it, you know.  Somebody would

9    do that and -- like I said, he -- like he -- I'm not -- I

10   didn't know a lot of his business because we only met like

11   a couple of times a week, and it was fast; I would be in

12   and out.  And so we didn't -- didn't really talk about his

13   other things that -- other thing -- I didn't know a lot of

14   what he did besides what he did with me.

15   Q.    During this time period that we've been talking about

16   when you were buying cocaine from Mr. Garrison, outside of

17   the money that you would give him, did you ever see him

18   with a large amount of money?

19   A.    Yeah, yeah, I was -- you know, I mean, I couldn't

20   count the amount.  I just -- one day I observed he had a

21   large amount of hundred-dollar bills.  One day he was,

22   like -- he was like flash.  He was like, like, I'm balling,

23   some term like that.  I got -- I'm paid, or I'm making

24   money.  Yeah.  I did.  I --

25   Q.    Where --

Direct - Williams

1    A.   I couldn't say how much it was, but. . .

2    Q.   Where was he when you observed that money?

3    A.   He was in his car.  He was in his car, and we were --

4    we were talking.  And I came to the car and he had it in

5    his lap.

6    Q.   Do you recall which vehicle he was in at that time?

7    A.   He was in the Porsche truck.

8              THE COURT:  When are we talking about?

9              MS. RANGEL:  Your Honor?

10             THE COURT:  When are we talking about?

11   BY MS. RANGEL:

12   Q.   When did that occur, Mr. Williams?

13   A.   Like, I think, in 2014, if I'm not mistaken.

14   Q.   During this time period when you were purchasing the

15   cocaine from Mr. Garrison, so late 2013, early 2014 --

16   A.   Yes.

17   Q.   -- did you ever know him to have a job?

18   A.   The -- he spoke -- he spoke to me about owning a

19   barbershop, working a barbershop.  I knew that -- I knew

20   that we had together discussed doing clothes together,

21   doing some radio shows together, and also I knew he was

22   promoting at a bar called Frogs.  I used to meet him there,

23   and we would talk about doing some promoting together.

24             He knew me to have connections with nightclubs,

25   and I did a lot of promoting of my own clubs, so we would

Cross - Williams

1    seriously talk about making money together in that way.

2    But I -- as far as him saying, Listen, this is my job, this

3    is where I work, no, he never -- we never talked like that.

4           But as far as looking at business ventures

5    together, we did most definitely talk about making money

6    together legally that way, for sure.

7    Q.   Did you ever do anything, take any action on those

8    conversations with Mr. Garrison?

9    A.   No.

10          MS. RANGEL:  Your Honor, if I may have just one

11   moment.

12          THE COURT:  You may.

13          MS. RANGEL:  Thank you.

14          I have no further questions for this witness.

15          THE COURT:  All right.  Cross-examination.

16                      CROSS-EXAMINATION

17   BY MR. McDERMOTT:

18   Q.   Mr. Williams, the Government began by talking about

19   your prior criminal record.  And I know it's not something

20   you're proud of, but I do want to talk about that, okay?

21   A.   Yes, sir.

22   Q.   Okay.  Now, my understanding is you had a conviction

23   in Denver for drugs in -- for a case that occurred in 2010,

24   correct?

25   A.   Yes, sir.

Cross - Williams

1    Q.    And the conviction was actually entered under the name

2    Gregory Kamal Alli (phonetic).  Correct?

3    A.    That is correct.

4    Q.    That was, at that time, your name, correct?

5    A.    Yes, it was.

6    Q.    And then since you had felony convictions, you had to

7    change your name back to what your current name is,

8    correct?

9    A.    Yes.

10   Q.    And you were very aware of not just this conviction,

11   but your prior drug convictions, correct?

12   A.    Yes.

13   Q.    The one in New Mexico you obtained when you were

14   younger.

15   A.    Yes.

16   Q.    And that was for distribution, correct?

17   A.    Yes.

18   Q.    And when you were arrested in this particular case,

19   you were very concerned about your prior convictions.

20   A.    Oh, most definitely.

21   Q.    And you had it in your mind when you were arrested

22   that you could get up to 20 years in prison.

23   A.    Or more.

24   Q.    Or more.  And, as a matter of fact, I believe when you

25   went to court, you were informed -- it was your belief that

Cross - Williams

1    you could get up to 40 years in prison.

2    A.   Yes, it was stated, yeah, we made an error.  We're

3    seeking 40 years for Mr. Williams.

4    Q.   And that was because of your priors.

5    A.   Yes.

6    Q.   Okay.  And fair to say after you were arrested, you

7    were very concerned about not getting out of prison until

8    you were an older man?

9    A.   About dying in prison.  Would that suffice?

10   Q.   Dying in prison.  That was a concern.

11        Now, Mr. Williams, you talked about your dealings

12   with Mr. Garrison.

13   A.   Yes.

14   Q.   And during that time, you were using -- using drugs on

15   a regular basis.

16   A.   Yes, sir.

17   Q.   And you were drinking on a regular basis.

18   A.   Every day, sir.

19   Q.   Fair to -- fair to say, partying every day with

20   cocaine and alcohol?

21   A.   Yes, sir.

22   Q.   And fair to say that everyday use of cocaine and

23   alcohol is not good for one's physical or mental health.

24   A.   You can say that.  I agree.

25   Q.   All right.  Mr. Williams, when you were dealing with

Cross - Williams

1    Mr. Garrison, your purchases were made for your personal

2    use.

3    A.   Yes, sir.

4    Q.   They were made so that you could use it for yourself,

5    use it for a girlfriend, and use it with some friends.

6    A.   Yes, sir.

7    Q.   And I believe on direct examination, you indicated

8    that you would use it with about three of your friends.

9    A.   Yes.

10   Q.   And I believe on direct you did indicate that from

11   time to time, you'd make approximately $100 from some of

12   your drugs.

13   A.   Yes, per transaction.

14   Q.   Right.  Did -- you did that independent of Mr.

15   Garrison, correct?

16   A.   Yes.

17   Q.   That was not any agreement that you had with Mr.

18   Garrison.

19   A.   It wasn't.

20   Q.   You were purchasing for your own use and so that you

21   could go and party with friends and your girlfriend.

22   A.   Yes, sir.

23   Q.   And if you needed a little extra money to get you by,

24   that's what the -- you would do that on your own, on your

25   own initiative?

Cross - Williams

1    A.   It was just for my time.  And if I was drinking, I was

2    going to buy something to eat that night, yes, I was -- it

3    was all understood.  They knew.  That's why they -- they

4    paid me because I -- they knew I could deliver.

5    Q.   And when you're saying "they," you are talking about

6    the people you're partying with?

7    A.   Yes, my friends.

8    Q.   Mr. Williams, with respect to going over to Mr.

9    Garrison's in 2013, you initially told that to officers

10   when you first met with them in June of -- in June of 2014

11   after you were arrested, correct?

12   A.   Yes.  I did.

13   Q.   Okay.  And at that time, you did not describe -- the

14   firearm that you saw, you didn't clarify whether it was a

15   revolver or a semi-automatic, correct?

16   A.   I -- I can't remember exactly what I said.  It's been

17   quite -- quite some time.  But I -- I did make that

18   statement.  I don't know what -- how it came about, but

19   I -- in passing -- I mean, I would go through and go right

20   back out.  I just sit there and seen him put on -- I didn't

21   see him put on or have guns in his hands or anything like

22   that; I just noticed it.  And so yeah, I might -- I know, I

23   did -- I did mention that for sure to them.

24   Q.   Okay.  You mentioned that to them, and you mentioned

25   that to them after they had told you that they don't give

Cross - Williams

1  very many deals, correct?

2  A.   Correct.

3  Q.   And they told you there weren't going to be very many

4  deals in the case.

5  A.   That's correct.

6  Q.   And at that time, you were extremely concerned about

7  spending up to the rest of your life in prison.

8  A.   40 years.

9  Q.   And when you talked about that day, when you went over

10  to his house, you did not specify when you saw any

11  bulletproof vest or firearm, correct?

12  A.   Right.

13  Q.   Fair to say it wasn't a very specific description at

14  all.

15  A.   Well, it -- I mean, to answer that question, I saw it

16  and I made that statement, so I -- to where it leads, I

17  don't know.  I just -- I know I saw that -- those

18  particular items, okay, if I could -- I mean, I'm trying to

19  do the best I can here.  So how -- I'm just saying I saw

20  those items in the house; I can't say what day.

21  Q.   Okay.  And I understand.  And even on direct you

22  indicated that Mr. Garrison didn't say whether they were

23  his.

24  A.   Correct.

25  Q.   And at the time, he was living with other people; is

Redirect - Williams

1    that correct?

2    A.   Correct.

3    Q.   You don't know whether they belonged to those other

4    people?

5    A.   That's correct.

6    Q.   Mr. Williams, as a result of this case, you ended up

7    getting time served and supervised release, correct?

8    A.   Yes, sir.

9    Q.   Okay.  And you have not had any other contact with

10   Mr. Garrison since you were arrested on this case, correct?

11   A.   No, sir.

12        MR. McDERMOTT:  Your Honor, those are my

13   questions.

14        THE COURT:  All right.  Redirect.

15        MS. RANGEL:  Yes, Your Honor, if I may have just

16   one moment.

17        THE COURT:  You may.

18                  REDIRECT EXAMINATION

19   BY MS. RANGEL:

20   Q.   Mr. Williams, I just have a couple of questions for

21   you.  If we could go back to your plea agreement in this

22   case, which is Exhibit 122, if my memory serves.  Yes.

23   122.

24   A.   Uhm-hum.

25   Q.   I think it is in -- it should be in the Volume 3 book.

Redirect - Williams

1        COURTROOM DEPUTY:  102?

2        MS. RANGEL:  I'm sorry, 122.

3   BY MS. RANGEL:

4   Q.   Do you have that document in front of you?

5   A.   Yes.

6   Q.   Okay.  And I'm going to have you look at a few parts

7   of this document.  If we could first go to page 3 of that

8   document.

9        MS. RANGEL:  And if we could put page 3 up on the

10  screen as well for the jurors.  Thank you.

11  BY MS. RANGEL:

12  Q.   And specifically, I'm going to direct your attention

13  to this paragraph here that I drew a little yellow line by.

14       If we could blow that up for the jurors, please.

15  Thank you.

16       And, Mr. Williams, you have it in front of you.

17  You also have it on the screen, whichever is easiest for

18  you to read off of, okay?

19  A.   Okay.

20  Q.   In that paragraph, what is that paragraph talking

21  about?

22  A.   It says, In the further consideration of this plea,

23  the United States Attorney's Office for the District of

24  Colorado determines, in its sole discretion, that the

25  defendant has cooperated fully, provided substantial

336

Redirect - Williams

1   assistance to law enforcement authorities or otherwise

2   compiled [sic] with the terms of this agreement, the

3   Government at the time of sentencing will file a motion

4   with the sentencing court pursuant to Section 5K1 dot 1 of

5   the sentencing guidelines, provided the defendant continues

6   to truthfully cooperate and does not retract or otherwise

7   recant the information supplied.  This motion will permit

8   the Court, in its discretion, to impose a sentence below

9   the applicable sentencing guideline range.

10  Q.   And so what does that paragraph mean to you?

11  Specifically that last sentence that talks about the Court

12  exercising discretion.

13  A.   Well, it means to me that my part in -- my part that I

14  played, the part that I played in this matter is that I

15  tell the truth and the whole truth about what I did, and --

16  and the Court at that time -- well, at that time it was --

17  would enter the 5K1.1 sentencing where it could go outside

18  the range of sentencing, where it could be a little more

19  lenient if I was able to cooperate and do what I said I

20  did.

21  Q.   And whose ultimate decision is that, or was that,

22  since you've already been sentenced?  Was that up to your

23  lawyer, Mr. Phillips, or the judge?

24  A.   I thought it would be up to the judge.

25  Q.   If we could please go to page 4.  Great.  Thank you.

Redirect - Williams

1    And if we could blow up this paragraph here for the jury.

2    I'm sorry, the one that starts with "the parties."  And

3    the -- perfect.  All the way down.  Perfect.  Thank you,

4    Ms. Wall.

5            And what are we talking about in that paragraph?

6    I'm sorry, those two paragraphs; there's two paragraphs up

7    there for you.

8    A.    Yeah, should I read them or just --

9    Q.    If you could just tell the jury what your

10   understanding of what those paragraphs mean is.

11   A.    I'm giving up -- I'm giving up my rights to defend

12   any -- any or anything prior to this agreement and that the

13   Government could impose a sentence outside of what I agreed

14   to if they -- if they deemed necessary.

15   Q.    And does it say that the Government is going to be

16   sentencing you or the Court?

17   A.    The Court.

18   Q.    And does it talk about the Court having sole

19   discretion in your sentencing?

20   A.    Yes.

21   Q.    And when you went before Judge Martinez, did he, in

22   fact -- was he, in fact, the one that sentenced you?

23   A.    Yes.

24   Q.    So your testimony today to this jury, is it solely

25   because you wanted to avoid 40 years and potentially life

1    in prison?

2    A.    My -- yes.  It's -- well, most definitely, yes.

3    Q.    So you were motivated by that.  Are you saying

4    absolutely anything that the Government wants to hear?

5    A.    No.  I'm saying what the truth was.

6           MS. RANGEL:  I have no further questions for this

7    witness.

8           THE COURT:  All right.  May this witness be

9    excused, Ms. Rangel?

10          MS. RANGEL:  Yes, Your Honor.

11          THE COURT:  For the defendant?

12          MR. McDERMOTT:  That's fine, Your Honor.

13          THE COURT:  All right.  Mr. Williams, your

14   testimony is concluded.  You're excused and you may step

15   down.

16          THE WITNESS:  Okay.

17          THE COURT:  All right, ladies and gentlemen of the

18   jury, we're going to take our lunch break right now.  We're

19   going to take a longer one than usual.  I have a function

20   with some of my colleagues, some of the other judges here,

21   that was scheduled months ago, actually, and so we're

22   going -- and so far as it affects you, we're going to be in

23   recess until 1:30, so you'll have more time for lunch.

24          I ask that you be back in the jury deliberation

25   room by no later than 1:25 so we can start promptly at

1    1:30.

2          Please do not discuss this case with yourself --

3    or among yourselves or with anyone else and please do not

4    do any independent research into the facts or law or the

5    persons involved in this case.

6          We will be in recess until 1:30.

7       (Recess at 12:02 p.m.)

8                    AFTERNOON SESSION

9       (In open court outside the presence of the jury at

10   1:35 p.m.)

11         THE COURT:  How long do we think the examination

12   is going to be?

13         MR. PHILLIPS:  I anticipate an hour, total.  I see

14   a bit of a nod.

15         MR. LEONARD:  I think that's correct.

16         THE COURT:  Okay.  Let's see.  We'll take like a

17   five-minute recess and then we'll do that.  Okay.  Great,

18   let's bring in the jury.

19      (Jury was present at 1:36 p.m.)

20         THE COURT:  All right.  We have everyone.  Okay.

21         All right.  The Government may call its next

22   witness.

23         MR. PHILLIPS:  Thank you, Your Honor.  The United

24   States would call Sidney Taylor.

25         COURTROOM DEPUTY:  Mr. Taylor, will you stand and

Direct - Taylor

1    raise your right hand, please.

2          SIDNEY TAYLOR, GOVERNMENT'S WITNESS, SWORN

3          COURTROOM DEPUTY:  Please be seated.  State your

4    full name for the record and spell your first and last

5    name.  And you can move up and put your elbows right on

6    there.  All right.  Thank you.

7          THE WITNESS:  Sidney Taylor.

8          COURTROOM DEPUTY:  And spell your first and last

9    name.

10         THE WITNESS:  S-i-d-n-e-y.  T-a-y-l-o-r.

11         THE COURT:  Mr. Leonard.

12         MR. LEONARD:  Your Honor, the defense reasserts

13   its 404(b) objection and incorporates the objections

14   previously stated on the record.

15         THE COURT:  That's understood.  You made your

16   objection.  It's overruled.  And I'll treat it as a

17   standing objection for purposes of this witness.

18         Mr. Phillips.

19         MR. PHILLIPS:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21   BY MR. PHILLIPS:

22   Q.   Mr. Taylor, I see that you're in detention center

23   clothing.

24   A.   Yes, sir.

25   Q.   And are you in custody?

341

Direct - Taylor

1   A.   Yes.

2   Q.   How long have you been in custody?

3   A.   Since 2014.

4   Q.   Okay.

5   A.   June.

6   Q.   And is that as part of this case that you're here on

7   today to testify about?

8   A.   Yes.

9   Q.   Okay.  And I want to, if you would, look at Government

10  Exhibit No. 116, which I believe will be in the third book.

11  You will be given that in just a moment.

12       Do you recognize Government Exhibit No. 116?

13  A.   Yes.

14  Q.   And what is that?

15  A.   Agreement.  United States District Court for the

16  District of Colorado, United States of America, plaintiff,

17  versus Sidney Taylor, me, defendant.

18  Q.   And is that a plea agreement in this case?

19  A.   Yes.

20  Q.   And is that your plea agreement in this case?

21  A.   Yes.

22  Q.   And does that outline everything that is part of the

23  plea agreement for you in this case?

24  A.   Yes, sir.

25  Q.   And if you would, if you remember, do you recall what

Direct - Taylor

1    you were originally charged with in this case?

2    A.   I was caught -- I was charged with selling drugs and

3    buying and distributing drugs.

4    Q.   Do you know what your original potential sentence was?

5    A.   Five to -- I can't remember right now.  I think it was

6    five to 20 for conspiracy.

7    Q.   Okay.

8    A.   Drugs, three to five.  I can't remember right off.

9    Q.   But five to something?

10   A.   Yes, sir.

11   Q.   Okay.  And as part of your plea agreement, what did

12   you plead guilty to?

13   A.   I pled guilty to buying and distributing cocaine.

14   Q.   Okay.  And what potential sentence are you looking at

15   now?  Do you know?

16   A.   I believe it's 36 to 48 --

17   Q.   And --

18   A.   -- months.

19   Q.   I guess let's go to page --

20          THE COURT:  Do we want to clarify months versus

21   years?

22          MR. PHILLIPS:  I will in just a minute.

23          THE COURT:  All right.

24   BY MR. PHILLIPS:

25   Q.   If you would, turn to page 7 of the exhibit book -- or

343

Direct - Taylor

1     of your plea agreement, and specifically where -- the part

2     where it says statutory penalties.

3     A.    Yes.

4     Q.    Does that outline the potential penalties you could

5     receive having pled guilty to the charge you did?

6              THE COURT:  Hold on one second.  This exhibit is

7     not in evidence.  You're asking him to read from a --

8              MR. PHILLIPS:  I'm sorry, Your Honor.  We did have

9     one thing to bring up to the Court before we came in.

10             THE COURT:  All right.

11             MR. PHILLIPS:  I can tell the Court that

12    Exhibits -- Exhibits 110 through 122 have been stipulated

13    by both parties.

14             THE COURT:  All right.  So this is a recent

15    stipulation because it's not in your exhibit list, I take

16    it.

17             MR. PHILLIPS:  And I apologize.  Somehow, Your

18    Honor, Your Honor did not receive this, but we had filed at

19    one point, but we have -- we could confirm that this is

20    stipulated now, all of those.

21             THE COURT:  Do you confirm that, Mr. Leonard?

22             MR. LEONARD:  Yes, all the pleas and proffers that

23    are being sought to be admitted have been stipulated to.

24             THE COURT:  And are you moving for the admission

25    of 110 through 122 -- or 122 is already in.  110 through

Direct - Taylor

1   121?

2          MR. PHILLIPS:  I would, Your Honor.

3          THE COURT:  Okay.  Given the stipulation between

4   the parties, Exhibits 110 through 121 are admitted into

5   evidence and may be published to the jury.

6          (Government's Exhibit 110, 111, 112, 113, 114, 115,

7   116, 117, 118, 119, 120, and 121 received)

8   BY MR. PHILLIPS:

9   Q.   And looking at page 7 of your plea agreement.  What is

10  the potential maximum penalty you could receive?

11  A.   It says maximum penalty -- the maximum statutory

12  penalty for a violation of Title 21 U.S.C. 841(a)(1) and

13  (b)(1)(c) is not more than 20 years imprisonment; not more

14  than $1,000 in fine or both; not less than three years

15  supervised release; and $100 special assessment fee.  There

16  is no -- and there is no restitution.

17  Q.   Now, you haven't been sentenced yet; is that correct?

18  A.   Yes.

19  Q.   You're awaiting sentencing still?

20  A.   Yes.

21  Q.   And when you go to sentencing, who's responsible for

22  your sentence?

23  A.   The judge.

24  Q.   Okay.  And as part of this plea agreement, did you

25  agree to cooperate with the Government?

Direct - Taylor

1    A.   I guess when -- I took responsibility when it first

2    happened 2 1/2 years ago before I even knew I had to even

3    come to testify or nothing.

4    Q.   Okay.  So let me ask you to look at Government Exhibit

5    No. 117.

6    A.   117?

7    Q.   Yes.  Now, you just mentioned you took responsibility

8    very soon after being arrested.

9    A.   Yes.

10   Q.   Is 117 a cooperation agreement letter that you and

11   your attorney came in and met with myself and agents?

12   A.   Yes.

13   Q.   And does that outline what your agreement was with the

14   Government?

15   A.   Yes.

16   Q.   And was your agreement to tell the truth in what you

17   knew about this case?

18   A.   Yes.

19   Q.   Now, that letter's dated June 19, 2014; is that

20   correct?

21   A.   Yes.

22   Q.   It's not signed.  That particular copy is not signed;

23   is that correct?

24   A.   No, not -- no, it's not signed, sir.

25   Q.   Do you recall signing a letter like that and giving it

Direct - Taylor

1   to the Government, and my office not being able to produce

2   the actual signed copy today?

3   A.   Yes.

4   Q.   Okay.  But you did sign that?

5   A.   Yes.

6   Q.   And you're with your attorney John Mosby?

7   A.   Yes.

8   Q.   Now, you mentioned that you were arrested in June.  Do

9   you recall what day you were arrested?

10  A.   The 6th.

11  Q.   Okay.  So this was 13 days later that you came in and

12  met?

13  A.   Yes.

14  Q.   Why did you come meet with the Government so

15  quickly?

16  A.   Because I was guilty, and I just wanted to take

17  responsibility for my action.

18  Q.   I want to take you back now to the summer of 2013.

19  Were you receiving cocaine from a person named Key?

20  A.   Michael Key, yes.

21  Q.   Okay.  And if you would, describe to the jury what you

22  were doing in order to get cocaine from Michael Key and how

23  much you were getting.

24  A.   Well, probably 1.6 and sometimes 3.5.  1.6 is

25  considered a teenager, 3.5 is considered an eight-ball.

Direct - Taylor

1    Q.   When you say 1.6, is that grams?

2    A.   Yeah, a gram and a half.

3    Q.   Okay.  And 3.5 is a gram?

4    A.   3 grams and a half.

5    Q.   Now as you were buying from Michael Key, what were you

6    doing with the cocaine?

7    A.   Using it as -- as personal use and family use.

8    Q.   Okay.  And you'd give it to family members?

9    A.   Yes.

10   Q.   And as time went by, did eventually something happen

11   with Michael Key that you were unable to get cocaine from

12   him?

13   A.   Yes.  It was hard to catch up with him for one; and

14   for two, he was, I guess, having problems with his -- in

15   his relationship because I was calling him and meeting with

16   him so I could get drugs.

17   Q.   Okay.  And did Michael Key assist you in any way in

18   finding another source for cocaine?

19   A.   Yes.

20   Q.   And if you would, describe to the jury how that took

21   place.

22   A.   Three times I called him.  He said, Well -- on

23   occasion he said, Let me hook you up with my guy, the guy

24   that I get it for -- for you.

25        So the guy he went through, he introduced me to

Direct - Taylor

1    him.

2    Q.   Okay.  And who was that guy you got introduced to?

3    A.   Mr. Garrison.

4    Q.   And when you say Mr. Garrison, how did you know -- or

5    what name did you know him by at that time?

6    A.   He went by G.

7    Q.   Okay.  And do you know -- do you see the person you

8    know as Mr. Garrison in the courtroom today, or G?

9    A.   Yes.

10   Q.   If you could, please point to him and identify a piece

11   of clothing or something that he's wearing.

12   A.   The blue shirt.  Right here with glasses on.

13        MR. PHILLIPS:  Ask the record reflect

14   identification of the defendant subject to

15   cross-examination.

16        THE COURT:  The record will so reflect.

17   BY MR. PHILLIPS:

18   Q.   Okay.  Now when you talked about Key eventually

19   introduced you to G, or Mr. Garrison, if you would describe

20   to the jury what you started to do, then, in the summer and

21   fall of 2013 with Mr. Garrison.

22   A.   I personally would call him and set up drug

23   transactions for myself.  I would buy, myself, personally,

24   from him.

25   Q.   And when you were ordering drugs from Mr. Garrison,

Direct - Taylor

1   how much -- or what quantity of drugs would you normally

2   order?

3   A.   The normal that I order is 16 to an eight-ball, which

4   an eight-ball is considered 8.5.  16 is 1.6 or 1.5.

5   Q.   What type of cocaine were you getting?

6   A.   I would get them both, crack cocaine and powder.

7   Q.   Okay.  And if you could, describe to the jury what you

8   mean by crack cocaine.

9   A.   Well, you take powder and you cook it and, again, it's

10  like a base, and it forms it with -- and you cook it and

11  make it hard, you know; that's why you call it rocks.  You

12  just mix it with baking soda or whatever, and water, until

13  it forms.

14  Q.   Okay.  Now I'm going to ask you to look in the exhibit

15  book, Government Exhibit Number 8.  And she's probably

16  going to have to get you a different book because

17  they're . . .

18          Do you recognize that document -- or that disk?

19  A.   Yes.

20  Q.   And what is that?

21  A.   This is a tape.  DVD, recorded DVD.

22  Q.   And is that a recorded -- or copy of a recorded

23  conversation between you and Ricky Garrison on November

24  23d, 2013, at about 7:32 p.m.?

25  A.   I can't tell you the time until I hear it.  I don't

Direct - Taylor

1   know.

2   Q.   Let me ask you this:  Have you had an opportunity to

3   review that and put any type of markings on it so you would

4   be sure that's what you reviewed?

5   A.   Yes, I marked this with my initials.  After listening

6   to it, I marked my initials on it.

7           MR. PHILLIPS:  Now, I'd ask the jurors to please

8   turn to transcript Government Exhibit No. 8.

9           If we could, please, publish Government Exhibit 8.

10           (Phone call played)

11   BY MR. PHILLIPS:

12   Q.   Do you recognize the two people speaking on the

13   telephone conversation?

14   A.   Yes.

15   Q.   And who are they?

16   A.   Myself and Mr. Garrison.

17   Q.   And the Mr. Garrison we identified just a few moments

18   ago?

19   A.   Yes.

20   Q.   Going over that phone call, when Mr. Garrison says to

21   you, You one of Mikey's people?

22   A.   Right.

23   Q.   What was he referring to or what did that mean to

24   you?

25   A.   How he knew me.

Direct - Taylor

1   Q.   And would Mikey be the Michael Key you identified

2   earlier?

3   A.   Michael Key.  Yes.  Yes.

4   Q.   And when Mr. Garrison started discussing, when he was

5   saying 250 and then later it's three, what did that mean to

6   you?

7   A.   He was saying that the price of it was 300 instead of

8   250.

9   Q.   Okay.  And then as the conversation went on and you

10  said, Half and half, what were you referring to?

11  A.   When he was saying it was 350, I said, Let's just do

12  half of that, so it would be 150 instead of 250, which

13  would be half and half on the 16.

14  Q.   And when you said 16-year-old soft and then a

15  16-year-old hard, I think you said earlier --

16  A.   That's it.  Eight-ball, where if you weigh them both

17  together they should be 3.5, but you do half and half, it's

18  16 each.

19  Q.   What would be the cost for those two half and halves

20  or an eight-ball total?

21  A.   150.

22  Q.   And on that particular day, did you, in fact, receive

23  both cocaine and crack cocaine from Ricky Garrison?

24  A.   If I called him, sir, and I told him to meet me, I did

25  it, I did receive it.

Direct - Taylor

1    Q.   Now, how often were you getting cocaine or crack

2    cocaine from Ricky Garrison during this time?

3    A.   Just a couple times.  Whenever my -- I couldn't get it

4    from the other person I was messing with.

5    Q.   And how many times would you estimate between June of

6    2013 and June of 2014, that year-long period, did you get

7    cocaine or powder cocaine from Ricky Garrison?

8    A.   Right off I can't -- I -- because I started in, like,

9    messing with him through Mikey, so I can't say from June

10   because I didn't know him.  So I'm going to say November,

11   October, personally when I start dealing with him would

12   have been October, November of 2013.

13   Q.   Okay.  So from October or November of 2013 until

14   June --

15   A.   To February -- to February of 2014.

16   Q.   Okay.  And approximately how many cocaine deals did

17   you do with Ricky Garrison?

18   A.   I did -- it just depends if it was what I -- what I

19   was doing, myself, at the time.

20   Q.   Okay.

21   A.   Three, four times, something -- maybe once a week,

22   sometimes three times a week; just depends.

23   Q.   Okay.  So sometimes you'd meet him once a week,

24   sometimes three times a week?

25   A.   (Nodded head)

Direct - Taylor

1    Q.    What was the typical amount you purchased during that

2    one to three times per week?

3    A.    The normal would be a 16 to -- eight-ball.

4    Q.    And --

5    A.    Most of the time.

6    Q.    And, again, for the jury's knowledge --

7    A.    Eight-ball's 3.5.

8    Q.    Now I want you to -- to ask you to look at Government

9    Exhibit No. 43, see if you recognize that.  Is that another

10   disk with your initials on it?

11   A.    Yes.

12   Q.    And have you had an opportunity to review that call

13   and check it for accuracy?

14   A.    Yes.

15           MR. PHILLIPS:  At this time I'd ask the jurors to

16   look at Government Exhibit No. 43 in their transcript book.

17           Ask to publish Government Exhibit 43, please.

18         (Phone call played)

19   BY MR. PHILLIPS:

20   Q.    Now during that telephone -- let me ask you, do you

21   recognize those two voices?

22   A.    Yes.

23   Q.    And who was that?

24   A.    Myself and Mr. Garrison.

25   Q.    Okay.  And during that telephone call conversation

Direct - Taylor

1    when Mr. Garrison said to you, What you trying to do, what

2    did that mean to you?

3    A.   What -- what I want.

4    Q.   Okay.  And when you asked for a bizel, what is a

5    bizel?

6    A.   Slang for ball.  Instead of saying eight-ball, just

7    bizel.

8    Q.   And that's 3.5 grams of cocaine?

9    A.   Yes.

10   Q.   And when Mr. Garrison said to you, I only got it, uh,

11   uh, uh, baby, what did that mean to you?

12   A.   That means soft.

13   Q.   Okay.  And what is soft versus hard?

14   A.   Powder.

15   Q.   And on that particular day, did you, in fact, meet

16   with Mr. Garrison and get a bizel or eight-ball or 3.5

17   grams of cocaine from him?

18   A.   Yes, sir.

19   Q.   And was that powder cocaine, the soft --

20   A.   Yes.

21   Q.   Now, this was just another one of the one to three

22   phone calls a week that you would get cocaine from him; is

23   that correct?

24   A.   Yes.

25   Q.   When you would get the cocaine between November,

Direct - Taylor

1    October, of 2013, all the way through February of 2014,

2    would you get high from that cocaine?

3    A.    Yes.

4    Q.    Would you get high from the crack cocaine?

5    A.    Yes.

6    Q.    Now you mentioned -- taking you all the way back to

7    the very beginning when you said you cooperated right away

8    and came in and took responsibility --

9    A.    Yes.

10   Q.    -- at that time did you know who was going to go to

11   trial?

12   A.    No.

13   Q.    Were there a bunch of people charged in this case at

14   that time?

15   A.    Yes, total of 16.

16   Q.    And you told the jury why you're in custody here

17   today.  You've been convicted of a felony before,

18   correct?

19   A.    Yes.

20   Q.    Two different felonies?

21   A.    Yes.

22   Q.    When was that?

23   A.    20 years ago, 1997, I got a first-degree assault,

24   second-degree assault, kidnapping.

25   Q.    And those two convictions, what was the sentence for

Direct - Taylor

1    those convictions?

2    A.    Well, I had 25 years.  I did 14 straight.

3         MR. PHILLIPS:  And may I have one moment.

4         THE COURT:  Sure.

5    BY MR. PHILLIPS:

6    Q.    And on the February 26th bizel deal, did you give Mr.

7    Garrison money for that?

8    A.    Yes.  Once again, like I said, if I called him and he

9    had it, I got it.

10   Q.    And did you pay him for it?

11   A.    Yes.

12        MR. PHILLIPS:  Nothing further.  Thank you, Your

13   Honor.

14        THE COURT:  All right.  I have a question for you,

15   Mr. Taylor.  What -- do you still have that page open, the

16   second page of your conversation, of your transcript?  Your

17   second line, you say --

18        COURTROOM DEPUTY:  Your Honor, he doesn't have the

19   transcript, so which number are you --

20        THE COURT:  We're talking about 43.  Was there not

21   a 44, Mr. Phillips?  I'm just looking at my --

22        MR. PHILLIPS:  Your Honor, there is a Government

23   Exhibit 44, but it's not a transcript.

24        THE COURT:  Oh.  Got it.  So it's not in the

25   binder -- what is this -- I have the paper organized up

Cross - Taylor

1    here -- it's in a different binder, then?

2              MR. PHILLIPS:  We do.  We have all the evidence in

3    one particular binder, but we have the transcripts in a

4    unique binder so that the jury just gets those

5    transcripts.

6              THE COURT:  Got it.  Okay.  All right.

7              Mr. Taylor, on the second page, the second line,

8    you say, Oh, uh, you know, like, um, a bizel and, you know,

9    a nager.  What is a nager?

10             THE WITNESS:  A bizel is a nager -- nager,

11   short -- slang for teenager.  Instead of saying teenager,

12   say nager.

13             THE COURT:  Oh, teenager.  Nager.

14             THE WITNESS:  So --

15             THE COURT:  So the 16 --

16             THE WITNESS:  Yes, sir.

17             THE COURT:  Okay.  Cross-examination.

18                     CROSS-EXAMINATION

19   BY MR. LEONARD:

20   Q.   Good afternoon, Mr. Taylor.  How are you?

21   A.   All right.

22   Q.   So, Mr. Taylor, I want to cover something that you

23   testified about.  You said that you were buying the alleged

24   drugs to use yourself; is that correct?

25   A.   Yes.

Cross - Taylor

1    Q.    And also to give to family members; is that correct?

2    A.    Yes.

3    Q.    You indicated to the Government that you believe that

4    the sentence you were looking at was five years to 20

5    years, correct?

6    A.    You said -- I don't recall.  You said I said that --

7    since the time I was looking at was five to 20 years?

8    Q.    Correct.

9    A.    That was for the -- five to 20 years was for the --

10   for everybody, for the conspiracy.  That's what it carries,

11   five to 20.

12   Q.    And that five is a mandatory minimum, right?  Five

13   hard?

14   A.    Is it -- you said a mandatory of five years?

15   Q.    Correct.  No less than five years and up to 20,

16   correct?

17   A.    Yes, sir.

18   Q.    And you haven't been sentenced yet.  I believe you

19   testified to that.  That's correct?

20   A.    Yes.

21   Q.    Now, in exchange for your cooperation, you did get

22   charges dismissed, didn't you?

23   A.    Yes.

24   Q.    One charge you got dismissed was that conspiracy

25   charge; isn't that correct?

Cross - Taylor

1    A.    Yes.

2    Q.    And many others, right?

3    A.    From taking responsibility, that's what it was for.

4    Q.    I understand that's what you're saying, but other

5    charges were dismissed as well, correct?

6    A.    The wiretap, I believe.

7    Q.    Let's talk a little bit more about your plea

8    agreement.  This is a cooperation agreement, correct?

9    A.    Yes.

10          MR. LEONARD:  Can you pull up Exhibit 116.  This

11   is going to be page 4.

12   BY MR. LEONARD:

13   Q.    Now, Mr. Taylor, can you see what's been highlighted

14   on your screen?

15   A.    Yes.

16   Q.    You agree with me, then, that the Government is

17   talking about filing what's called a 5K1.1 motion.  Would

18   you agree with me?

19   A.    Yes.

20   Q.    And what they're stating there is the Government is

21   going to recommend that the Court impose a sentence of 40

22   percent reduction from the guideline range.  Would you

23   agree with me that's what it says?

24   A.    Yes.

25   Q.    And then they would recommend a term of supervised

Cross - Taylor

1    release; is that correct?

2    A.    Yes.

3    Q.    Supervised release is a term that means you're not in

4    prison, correct?

5    A.    Yes.

6    Q.    You have to report to, basically, a probation officer;

7    isn't that right?

8    A.    Yes.

9    Q.    Now, it says the parties understand and agree that the

10   decision of whether to file such a 5K1.1 motion is entirely

11   within the discretion of the Government.  Would you agree

12   with me that that means the only party that gets to

13   determine whether there's a recommendation for a 40 percent

14   reduction is the Government, right?

15   A.    Yes.

16   Q.    Now, I want to direct your attention -- this is page 9

17   of Exhibit 116, is that before you?  It's on the screen in

18   front of you is what I mean.

19   A.    Yeah, I'm looking.

20   Q.    And you can read that.  You pled guilty to Count 12,

21   which was on November 23d, 2013, correct?

22   A.    Yes.

23   Q.    And it indicates -- I'm going to read this -- As a

24   result of those phone calls, Ricky Garrison supplied the

25   defendant with cocaine base on November 23d, 2013.  Is that

Cross - Taylor

1    correct?

2    A.   Yes.

3    Q.   Would you agree with me that there is no amount of

4    cocaine base listed within that sentence?

5    A.   Yeah, it don't.  It don't have it.

6    Q.   All right.  The Government asked you some questions

7    about -- when you came in -- when you came in to talk to

8    them, do you remember those questions?

9    A.   Not really.  It's been almost three years ago.

10   Q.   Well, I didn't phrase -- I didn't phrase that very

11   well.

12   A.   Okay.

13   Q.    I apologize.  I meant just a few minutes ago, when

14   Mr. Phillips was asking you questions, he talked to you

15   about when you had come in to talk to the Government.  Do

16   you recall those --

17   A.   Okay, yes.

18   Q.   And that was on June 24th of 2014, correct?

19   A.   I'm not sure the date, but I know it was the same

20   month I got arrested.

21   Q.   Have you had a chance to look at the notes that were

22   prepared by Investigator Mohlman from your proffer

23   interview?  By proffer, that's when you came in and talked

24   to them.

25   A.   You said did I have a chance to look over them?

Cross - Taylor

1    Q.   Yes.

2    A.   Yes.

3    Q.   All right.  And if I showed you those notes, do you

4    believe it would refresh your recollection as to the date

5    that that interview took place?

6    A.   I have to see it.  I can't answer it; I have to see

7    it.

8    Q.   All right.  Why don't I give you a copy of the

9    interview notes.  And I will hand --

10           THE COURT:  Is it labeled as an exhibit?

11           MR. LEONARD:  It's not.  I'm just using it to

12    refresh recollection.

13           THE COURT:  Why don't you hand it to Ms. Hansen.

14    She'll hand it to the witness.

15           MR. LEONARD:  There are two copies.  One is for

16    Your Honor.

17           All right?

18           THE COURT:  One second.

19           MR. LEONARD:  Sorry.  All right.

20           THE COURT:  All right, go ahead.

21    BY MR. LEONARD:

22    Q.   Mr. Taylor, do you have a document that's titled

23    Aurora Police Department Supplemental Report in front of

24    you?

25    A.   Yes.

Cross - Taylor

1    Q.   On the bottom, it says page 1 of 6.

2    A.   Yes.

3    Q.   And if you look at the date of the original report,

4    it's June 24th, 2014, correct?  That's at the top.

5    A.   Yup, the original date is 6-24-14.

6    Q.   All right.  And on the narrative section it says, June

7    24th, 2014, a proffer interview was conducted with you,

8    correct?

9    A.   Yes.

10   Q.   So this was on June 24th, correct, that you came in to

11   talk to the Government, right?

12   A.   That's what it says.

13   Q.   And you came to talk to them to get a better deal,

14   right?

15   A.   You said I came to talk to them to get a better deal?

16   Q.   Right.  You didn't come and talk to them just out of

17   the goodness of your heart, did you?

18   A.   Well, I talked to them because I was guilty for what I

19   was doing.

20   Q.   And you wanted --

21   A.   So --

22   Q.   -- to get a better deal, correct?

23   A.   I didn't need to get a better deal because I was --

24   already took -- I was paying for what I was doing, so I

25   didn't need to get a better deal.

364

Cross - Taylor

1    Q.   You talked to the Government on June 24th.  Did you

2    see any audio recording device?

3    A.   I suppose there was one.

4    Q.   You think there was an audio recording device?

5    A.   Could have been.

6    Q.   All right.  Could have been.  Was there a

7    videorecording device?

8    A.   I don't remember right off, but there could have

9    been.

10   Q.   Have you seen any videorecording of this June 24th

11   statement?

12   A.   No.

13   Q.   Have you listened to any audio recording of this June

14   24th statement?

15   A.   No.  Not that I remember, anyway.

16   Q.   Now, I want to talk about what you said in this June

17   24th interview.  All right?

18   A.   (Nodded head)

19   Q.   You told the Government during your interview that

20   Mr. Garrison was not a reliable source of drugs; isn't that

21   right?

22   A.   Because he was always gone.  That's why I say when he

23   asked me how often was I buying from him, whenever I catch

24   him or whenever I didn't have my other supplier.

25   Q.   And you would agree that means somebody's not

Cross - Taylor

1    reliable, correct?

2    A.   I wouldn't call it reliable or -- I didn't have a

3    problem.

4    Q.   Sometimes Mr. Garrison wouldn't answer his phone;

5    isn't that right?

6    A.   Yes.

7    Q.   And you stated to the Government that sometimes he

8    wouldn't follow through with transactions when you

9    requested cocaine; isn't that right?

10   A.   I said sometimes he wouldn't follow through?  As far

11   as what?

12   Q.   Delivering the cocaine.

13   A.   The time or the right time and a -- that could be a

14   number of things.

15   Q.   Well, why don't you please turn to page 2 of 6 of the

16   proffer before you.  All right.  I -- are you on that page

17   now, sir?

18   A.   Page 2 of 6?

19   Q.   Yes, sir.  Are you on that?  I want you to look at the

20   first paragraph.  Taylor said Garrison would sometimes not

21   have powder cocaine available, correct?

22   A.   Yes.

23   Q.   So sometimes you would -- you wanted powder, but that

24   wasn't available, right?

25   A.   Right.

Cross - Taylor

1   Q.   So you would have to purchase crack instead; is that

2   what it said?

3   A.   Right.

4         THE COURT:  All right, Mr. Leonard, you're now

5   heading into a direction, but I let you use this exhibit to

6   refresh his recollection about the date of the proffer, now

7   we're going into reading from and questioning about the

8   contents of a document that's not in evidence.

9         MR. LEONARD:  Thank you, Your Honor.  I'll

10  rephrase from now on.

11        THE COURT:  All right.

12  BY MR. LEONARD:

13  Q.   You also stated that you never saw Mr. Garrison with a

14  amount of alleged drugs larger than what you ordered,

15  correct?

16  A.   Yes.

17  Q.   You said to the Government that the crack that Mr.

18  Garrison allegedly provided was poor quality, right?

19  A.   Yes.

20  Q.   And you said that was due to cutting agents, right?

21  A.   It probably was cut too much.

22  Q.   I want to talk a little bit more about page -- what

23  you said on page 2 of 6.  You never saw Mr. Garrison with a

24  firearm, did you?

25  A.   Not that I recall, no.

Cross - Taylor

1   Q.   And do you remember the Government had you listen to

2   some calls on June 24th?

3   A.   Yes.

4   Q.   All right.

5   A.   Some calls from me, myself, talking to Mr. Garrison?

6   Q.   Right.  They played you some phone calls, correct?

7   A.   Yes.

8   Q.   And one of the phone calls they played to you was a

9   phone call No. 102 on November 16th, 2013; isn't that

10   right?

11   A.   Yes.

12   Q.   And you indicated that November 16th was the first

13   time you met -- met Mr. Garrison; isn't that right?

14   A.   The first time I met him?

15   Q.   Yes.  That's what you told the Government.

16   A.   I believe it was October -- I was going through him,

17   but I didn't officially know him personally.

18   Q.   Well, that's what I said, you told the Government

19   November 16th, 2013, was the first time you met Mr.

20   Garrison.

21   A.   I told the Government it was maybe October or November

22   2013 that I personally started dealing with Mr. Garrison.

23   Q.   Did you also listen to call No. 1905?  Do you recall

24   that?

25   A.   No, you can play it, though.

Cross - Taylor

1   Q.   Well, would it help refresh your recollection if you

2   looked at page 4 of 6 of this document?  Let me know if

3   that's helped refresh your recollection, sir.

4   A.   Page 4 of 6?

5   Q.   Yes, sir.  Roughly in the middle.

6   A.   June 23d -- November 23d, 2013?

7   Q.   No, December 8, 2013.  Call No. 1905.

8   A.   Yes.

9   Q.   Does that refresh your recollection by reading over

10  these notes?  Help you remember?

11  A.   I don't recall.  Like I said, I don't recall.

12  Q.   Do you recall telling the Government you didn't think

13  that this alleged drug transaction took place or was

14  completed; isn't that correct?

15  A.   It says it right here.

16  Q.   Well -- and I'm asking you if that's what you told the

17  Government, that the drug transaction -- you didn't think

18  the drug transaction was completed.  That's what you told

19  the Government.

20  A.   If I -- if I talked to Mr. Garrison and he had what I

21  wanted, you can best believe I got it.

22  Q.   That's not my question, sir.

23  A.   But --

24  Q.   My question is --

25  A.   If I told them that, that was a mistake.

Cross - Taylor

1    Q.   All right.  So you're saying it was a mistake --

2    A.   I -- if I talked to Mr. Garrison and set up a drug

3    transaction, it -- it got complete.  If he had the drugs, I

4    got it.  If he didn't have it --

5    Q.   Thank you, Mr. Taylor.

6    A.   -- I didn't get it.  Thank you.

7    Q.   I want to understand you correctly.  You are saying it

8    was a mistake that you told the Government that you didn't

9    think that the drug transaction was completed; is that what

10   your testimony is?

11   A.   Well, it says right here that he said that during this

12   call, Taylor and Garrison discussed meeting for a drug

13   transaction.  Taylor said he did not think they completed

14   the transaction.

15        Evidently I didn't recall, I couldn't remember at

16   that time, when I had the interview.

17   Q.   Now, I want to turn your attention to call No. 2015 on

18   December 10th, 2013.  That was played for you, wasn't it?

19   A.   December 10th, 2013?

20   Q.   Uhm-hum.

21   A.   Call 1988?

22   Q.   Right.

23   A.   No.

24   Q.   All right.  Now, you talked about your prior

25   convictions.  There were two felonies that you indicated,

Cross - Taylor

1    correct?

2    A.    Yes.

3    Q.    First degree assault, second degree assault, and

4    kidnapping --

5    A.    Yes.

6    Q.    -- correct?  You indicated you had a 20-year sentence

7    for that; is that right?

8    A.    25.

9    Q.    Oh, 25.  I apologize.

10   A.    Yes.

11   Q.    And --

12   A.    With a five-year run.

13   Q.    And you did --

14   A.    14.

15   Q.    -- 14 years straight --

16   A.    Right.  Yes, sir.

17   Q.    -- is that correct?

18   A.    Yes, sir.

19          THE COURT:  One second, Mr. Taylor.

20          THE WITNESS:  Yes.

21          THE COURT:  My court reporter can only take down

22   one voice at a time, so I need you to slow down.  Wait for

23   Mr. Leonard to finish his question, then you answer.  All

24   right?

25          Okay.  Go ahead.

371

Cross - Taylor

1    BY MR. LEONARD:

2    Q.   All right.  So let's -- you did 14 years straight; is

3    that correct?

4    A.   Yes.

5    Q.   And then you get released on parole in 2012?

6    A.   Yes.

7    Q.   If I understand what you told the Government during

8    your meeting with them in June of 2014, you began using

9    cocaine in the summer of 2013; is that about right?

10   A.   I can't -- it could be roughly around there.

11   Q.   Roughly.  And you have terms and conditions when

12   you're on parole; isn't that correct?

13   A.   Yes.

14   Q.   And it is correct to say that you cannot use cocaine

15   while you're on parole, correct?

16   A.   You ain't supposed to.

17   Q.   It's a violation, correct?

18   A.   Yes.

19   Q.   When you started using cocaine, did you tell your

20   parole officer that you were violating the terms and

21   conditions of --

22   A.   No.

23   Q.   Your plea agreement calls for an advisory sentencing

24   range of 37 to 46 months; is that correct?

25   A.   I believe so.

372

Redirect - Taylor

1    Q.    And you're going to request a 40 percent reduction

2    from that advisory sentencing range, aren't you?

3    A.    Yes.

4    Q.    And, in fact, you're going to come in the court and

5    ask for time served, aren't you?

6    A.    Yes.  It's up to the judge, though, it's not up to

7    me.

8    Q.    Well, of course.  I would never suggest otherwise.

9    It's up to the judge, I understand that.  But you would

10   agree with me that time served is a pretty good sentence

11   for something that you were looking at up to 20 years.

12   A.    Yes.

13          MR. LEONARD:  Thank you.  I have no further

14   questions, Your Honor.

15          THE COURT:  All right.  Redirect.

16          MR. PHILLIPS:  Thank you, Your Honor.

17                  REDIRECT EXAMINATION

18   BY MR. PHILLIPS:

19   Q.    Mr. Taylor, you mentioned that you came in immediately

20   and took responsibility for this.

21   A.    Yes.

22   Q.    And agreed to plead guilty.

23   A.    Yes.

24   Q.    But you would agree that you were doing this and

25   you're hoping to get a benefit from that.

373

Redirect - Taylor

1    A.   Yes, for taking responsibility for my actions, sir.

2    Q.   Now, you were asked a number of questions regarding

3    violation of your parole.  Are you looking to being

4    sentenced on that case as well?

5    A.   Yes, sir, for violating it.

6    Q.   And -- and fair to say that there's no agreement

7    whatsoever in that case?

8    A.   No.

9    Q.   Now, you've mentioned that there were times that you

10   wouldn't do deals and you were asked about that, although

11   you weren't played any phone calls or anything, that you

12   didn't think that deal went through.  Why wouldn't a

13   cocaine or crack cocaine deal with Ricky Garrison go

14   through?

15   A.   Only way it wouldn't go through if he didn't have

16   it.

17            MR. PHILLIPS:  Thank you.  Nothing further.

18            THE COURT:  All right.  Mr. Phillips, may this

19   witness be excused?

20            MR. PHILLIPS:  He may.

21            THE COURT:  All right.  Mr. Leonard, for the

22   defendant?

23            MR. LEONARD:  Your Honor, I have a question about

24   the Court's procedure on witnesses.  Can we approach

25   quickly?  I just want to --

374

Redirect - Taylor

1           THE COURT:  Sure.

2              (Discussion at side bar)

3           MR. LEONARD:  There was some questions that I

4    believe he either said he didn't remember or answered

5    differently than he did in the proffer.  I want to ask

6    Investigator Mohlman, who attended the proffer session,

7    about those.  I just want to make sure it's okay to release

8    this witness and then ask Mr. -- Investigator Mohlman those

9    questions.  I don't want to run afoul of any procedure

10   otherwise.

11          THE COURT:  Well, that's entirely appropriate.  My

12   only restriction was that -- and this is -- he's on the

13   witness stand once.

14          MR. LEONARD:  I just wanted to make sure I was

15   following your procedure.

16          THE COURT:  Did you have some things --

17          MR. PHILLIPS:  That makes perfect sense.

18          MR. LEONARD:  I'm sorry.

19          THE COURT:  That's all right.

20             (End of discussion at side bar)

21          MR. LEONARD:  This witness may be excused.

22          THE COURT:  All right.  Ladies and gentlemen of

23   the jury, we're going to take -- everyone else in the

24   courtroom, stay where you are.  Ladies and gentlemen of the

25   jury, we're going to take a five-minute recess as far as

Redirect - Taylor

1   you are concerned.  It's not so much a recess, but we have

2   to handle a couple of things here outside of your presence,

3   so we're going to excuse you for about five minutes, and

4   we'll come right back at you.

5        (Jury left the proceeding at 2:26 p.m.)

6             THE COURT:  Okay, Marshals, you can . . .

7             Everyone else can sit down.  We're just doing a

8   witness swap here.

9             Who's your next witness, Mr. Phillips?

10            MR. PHILLIPS:  Robert Painter.

11            THE COURT:  All right.  We'll wait for Ms. Hansen

12   to come back and then we'll resume.  All right.

13            Are we ready to bring back in the jury?  Everyone

14   prepared?

15            MR. PHILLIPS:  Yes, Your Honor.

16            THE COURT:  All right.  Bring in the jury.

17        (Jury was present at 2:28 p.m.)

18            THE COURT:  It appears that Mr. Robert is not

19   feeling a hundred percent today, so we need to be a little

20   patient here.

21        (Pause)

22            THE COURT:  Government may call its next witness.

23            MR. PHILLIPS:  Thank you, Your Honor.  The

24   Government would call Robert Painter.

25            COURTROOM DEPUTY:  Right here, sir.  Right up

Direct - Painter

1    here.  Right here, sir.  Go ahead and take the stand.  Stay

2    standing and raise your right hand, please.

3        ROBERT PAINTER, GOVERNMENT'S WITNESS, SWORN.

4        COURTROOM DEPUTY:  Please be seated.  You can

5    scoot all the way up and put your elbows on here.

6        THE WITNESS:  I'm all right.

7        COURTROOM DEPUTY:  Please state your full name for

8    the record and spell your first and last name.

9        THE WITNESS:  My full name is Robert Louis

10   Painter; Robert, R-o-b-e-r-t, Painter, P-a-i-n-t-e-r.

11       MR. LEONARD:  Your Honor, defense renews its

12   404(b) objections previously made and incorporates the

13   basis of those objections and asks for a standing objection

14   as to this witness.

15       THE COURT:  All right.  Your objection's noted.

16   Your request that it be a standing objection is accepted

17   and the objection is overruled.

18       You may proceed, Mr. Phillips.

19       MR. PHILLIPS:  Thank you, Your Honor.

20                  DIRECT EXAMINATION

21   BY MR. PHILLIPS:

22   Q.   Mr. Painter, you're here in regular clothes today.

23   Are you out of custody?

24   A.   Yes.

25   Q.   If you would, tell the jury a little bit about

Direct - Painter

1    yourself.  Are you working?

2    A.   Yes, I'm working.  I'm a plumber.  I work --

3         COURTROOM DEPUTY:  Can you please scoot your chair

4    up so the court reporter can -- needs to hear all your

5    words.

6         THE WITNESS:  Yes, I'm working.  I'm a plumber.

7    BY MR. PHILLIPS:

8    Q.   And how long have you been working in the job you

9    presently have?

10   A.   Seven months now.

11   Q.   And where do you live?

12   A.   I live in 8828 East Florida Street --

13   Q.   Okay.  And is that here in Denver?

14   A.   Yes.

15   Q.   And do you have any children?

16   A.   Yes.

17   Q.   And how many?

18   A.   I got four.

19   Q.   And do they live here or where do they live?

20   A.   They live out of state.

21   Q.   Are you presently serving a sentence in some form,

22   whether that would be probation or supervised release?

23   A.   Yes.

24   Q.   And does that allow you to travel out of state for

25   those children?

Direct - Painter

1    A.    No.

2    Q.    Now, you mentioned that you're presently out of

3    custody.  Was there a time that you were in custody?

4    A.    Yes.

5    Q.    And was that on this case?

6    A.    Yes, it was.

7    Q.    How long were you in custody?

8    A.    27, 26 months, something like that.

9    Q.    Do you recall what day you were originally arrested?

10   A.    June 6th, 2014.

11   Q.    And do you recall what day that you finally got out of

12   custody?

13   A.    Like July -- June or July of -- the 17th of 2016.

14   Q.    June 17th, 2016 sound familiar?

15   A.    Yes.  Yes.

16   Q.    Now, when you're in custody and ultimately released,

17   have you pled guilty in this case?

18   A.    Yes, I have.

19   Q.    And I'll ask you to look at Government Exhibit No. 112

20   and see if you recognize that document.  And you'll get

21   that in just a moment.

22          Do you recognize that document?

23   A.    Yes, I have -- yes, I do.

24   Q.    And is that your plea agreement?

25   A.    Yes, it is.

379

Direct - Painter

1  Q.   And did you, in fact, plead guilty in this case?

2  A.   Yes, I did.

3  Q.   And what did you plead guilty to?

4  A.   Time served.

5  Q.   Do you recall what charge you pled guilty to?

6  A.   Oh, possessing with the intent to distribute and --

7  and -- possessing with the intent and -- to distribute

8  and -- possession.

9  Q.   Possession with intent to distribute?

10 A.   Yes.

11 Q.   And were you looking at a sentencing from zero to 20

12 years at the time of your sentencing?

13 A.   Yes.

14 Q.   And ultimately when you were sentenced on June 17th of

15 2016, who imposed the sentence?  Or who decided your

16 sentence?

17 A.   Zachary Phillips.

18 Q.   Do I sentence you or did somebody else sentence you?

19 A.   Oh, the judge; Martinez.

20 Q.   Okay.  And at that sentencing, did he hear from me

21 regarding what sentence I would advise to impose?

22 A.   Did he hear from you?

23 Q.   Right.

24 A.   I'm not too sure.

25 Q.   Okay.  But it was certainly up to the judge as to

Direct - Painter

1    any --

2    A.    Absolutely it was up to the judge.

3    Q.    And when you pled guilty, did you know who was going

4    to go to trial or if anybody would go to trial?

5    A.    No.

6    Q.    And as part of your plea agreement, what did you agree

7    to do as far as cooperating with the Government?

8    A.    I just agreed on telling the truth.

9    Q.    And I'd ask you to look at Government Exhibit No. 113

10   and see if you recognize that.

11   A.    113?

12   Q.    Yes.  Do you recognize that document?

13   A.    Yes.

14   Q.    And is that a letter where you're agreeing to do, like

15   you just said, tell the truth when you cooperate with the

16   Government?

17   A.    Yes.

18   Q.    Now I want to talk to you a little bit about the case

19   you're here in custody on -- or not in custody, but here to

20   testify on.  Do you know a person named Ricky Garrison?

21   A.    Yes.

22   Q.    And how do you know that person?

23   A.    We've been friends for a while, since 2008 -- '-9, I

24   think.

25   Q.    So 2008 or 2009?

Direct - Painter

1    A.   Yes.

2    Q.   And do you see the person you know as Ricky Garrison

3    in the courtroom today?

4    A.   Yes.

5    Q.   Would you please point to him and tell us what he's

6    wearing.

7    A.   He's wearing the blue shirt and glasses.

8           MR. PHILLIPS:  Your Honor, at this time we'd ask

9    the record reflect identification of the defendant subject

10   to cross-examination.

11          THE COURT:  The record will so reflect.

12   BY MR. PHILLIPS:

13   Q.   Now I want to take you to 2013, roughly the summer of

14   2013.  You had mentioned that you'd known Ricky Garrison

15   for a number of years.  In 2013, what was your relationship

16   with Ricky Garrison?

17   A.   We smoked weed together.

18   Q.   And were you purchasing anything from him?

19   A.   Occasionally.

20   Q.   What would you purchase from him?

21   A.   For personal use, a little bit of cocaine, meth.

22   Q.   Did you ever buy crack from him?

23   A.   A couple of times.

24   Q.   And when you would buy crack or cocaine or meth, you

25   mentioned you were using some of that.  Were there other

Direct - Painter

1    times that you were selling crack and cocaine and meth?

2    A.    I just got it for a friend of mine every once in a

3    while, but not really.

4    Q.    Would you be able to use an ounce of cocaine at a

5    time?

6    A.    Oh, no.  That was just for a party I went to, the --

7    the Rhianna concert, as I explained.  But no, you can't use

8    a whole ounce by yourself.

9    Q.    Ounce of cocaine is a lot of cocaine?

10   A.    Yes, it is.

11   Q.    And so a lot of people would have to use that.

12   A.    Yes.

13   Q.    And what -- do you recall what -- what was your

14   relationship with Mr. Garrison as far as the drug

15   relationship?

16   A.    We were friends.  We kicked it.  Kicked it, we were

17   friends, smoked weed together.

18   Q.    Okay.  And let me take you -- on average -- on average

19   in a month, how many times would you buy cocaine from Ricky

20   Garrison?

21   A.    In a month?  A couple of times.

22   Q.    Do you recall telling these officers four to five

23   times a month?

24   A.    Yeah, around four or five for personal use, yes.

25   Q.    And just so the record's clear, you agreed to be

Direct - Painter

1    truthful.

2    A.    Yes.

3    Q.    How many times would you get cocaine from Ricky

4    Garrison, roughly?

5    A.    Roughly, about five times a month, maybe.

6    Q.    I'm going to ask you if you would look at the

7    Government exhibits in front of you.  And I'm going to ask

8    you to look at Government Exhibits No. 98 and 100.

9    A.    Okay.  It's a CD.

10   Q.    And is there anything specific on that CD that you

11   recognize?

12   A.    That I recognize?  Yeah.  My -- my initials.

13   Q.    And did you put those initials there after reviewing

14   that?

15   A.    Yes, I have.

16   Q.    And is that the same thing for Government Exhibit

17   No. 100?

18   A.    Yes.

19         MR. PHILLIPS:  At this time, I'd ask the jurors to

20   turn to Government Exhibit No. 98 in their transcript

21   books.

22         Please publish Government's Exhibit No. 98.

23       (Phone call played)

24   BY MR. PHILLIPS:

25   Q.    Do you recognize the people in that telephone

384

Direct - Painter

1    conversation?

2    A.    Yes.

3    Q.    Who was it?

4    A.    It was me and Ricky Garrison.

5    Q.    And when Mr. Garrison says to you, I ain't no good,

6    what did that mean to you?

7    A.    That means he ain't use -- he ain't got none.

8    Q.    And when you say none, what are you talking about?

9    A.    He ain't got nothing I want.  He ain't got nothing

10   what I called for.

11   Q.    And --

12   A.    Which was probably cocaine.

13   Q.    And when he said to you, Waiting on my Mexican

14   partner, if he ain't got -- if he ain't got it with me, if

15   we don't get it by three, then I'm going to go through

16   somebody else, what did that mean to you?

17   A.    He's going to go through somebody else, some -- one of

18   his other connects, probably.

19   Q.    Fair to say you're calling Mr. Garrison that day in

20   order to get cocaine?

21   A.    On that call, probably -- yes.

22        MR. PHILLIPS:  Your Honor, at this time I'd ask

23   the jurors to be able to turn to Government Exhibit No. 99

24   in their transcript books.

25        And I'd ask to publish call No. 99 that's

385

Direct - Painter

1    previously been admitted.  It's from November 29th, 2013,

2    approximately one minute after the previous call, the

3    conversation between Simeon Ramirez and Ricky Garrison.

4              THE COURT:  All right.

5          (Phone call played)

6    BY MR. PHILLIPS:

7    Q.   Okay.  Later on November 29th, 2013, did you have

8    another conversation with Ricky Garrison?

9    A.   Yes.

10   Q.   Approximately 4:56 p.m.

11   A.   I'm not too sure on what time it was, but around that

12   time, yes.

13   Q.   Okay.  Ask you to look at Government Exhibit No. 100

14   and see if you recognize that.  Actually, I think you've

15   already told us you do.

16   A.   Yeah.  100?

17             MR. PHILLIPS:  I'd ask the jurors to turn to

18   transcript No. 100.

19             THE WITNESS:  You got these in --

20             MR. PHILLIPS:  And publish 100, please.

21         (Phone call played)

22   BY MR. PHILLIPS:

23   Q.   What was that phone call about?

24   A.   It was about getting some coke off -- off of Ricky

25   Garrison.

Direct - Painter

1    Q.    And did you, in fact, get some coke off of Ricky

2    Garrison that day?

3    A.    I believe so, yes.

4    Q.    Do you recall how much it was?

5    A.    Probably a ball or a quarter.

6    Q.    And what is a ball and what's a quarter?

7    A.    A ball is 3 1/2 grams, and a quarter is 7 grams.

8    Q.    And do you recall meeting with these officers and

9    saying that that day you believed you got a quarter?

10   A.    Yes.

11   Q.    And when you would get a ball or a quarter from Ricky

12   Garrison, how much would it cost you?

13   A.    150 to 300.

14   Q.    And let's talk about a quarter.  Is that a quarter

15   ounce?

16   A.    Quarter ounce.

17   Q.    And how much would that --

18   A.    300.  A ball is 150.

19   Q.    I'm going to turn your attention to January 5th of

20   2014.  And look at Government Exhibit No. 19.  Have you had

21   a chance to review that call and initial it?

22   A.    19?

23   Q.    Yes.

24   A.    I don't think I have it.

25   Q.    See, we tricked you, we didn't actually have the right

387

Direct - Painter

1    book there.  I apologize.

2    A.   Yes.

3            MR. PHILLIPS:  At this time I'd ask the jurors to

4    turn to Government Exhibit No. 19 in the transcript book.

5            And ask to publish Government -- not ask, please

6    publish.

7            (Phone call played)

8    BY MR. PHILLIPS:

9    Q.   Again, you and Mr. Garrison?

10   A.   Yes.

11   Q.   In that telephone call, when Mr. Garrison said to you,

12   I still need to talk to you about that M game, did you

13   understand what he was talking about at first?

14   A.   No, not at first.

15   Q.   And then as the call went on and Mr. Garrison said, On

16   the meth, my people just started getting like pounds, what

17   did that mean to you?

18   A.   That meant it was on.  That meant he was -- I can get

19   some meth -- some methamphetamines.

20   Q.   And as the conversation went on, you said you needed

21   to get at least a bizel or a quad.  What were you referring

22   to then?

23   A.   A ball, 3 1/2 grams, or a quarter ounce, 7 grams.

24   Q.   And is the ball a bizel?

25   A.   A bizel.

388

Direct - Painter

1    Q.   And the quad is the quarter ounce?

2    A.   Quarter ounce.

3    Q.   When you said to him, What's the ticket on it, what's

4    that mean?

5    A.   What's the price?

6    Q.   And what did it mean to you when Mr. Garrison said a

7    thousand or 1100?

8    A.   That meant it was kind of high.

9    Q.   Kind of expensive for the meth at that time?

10   A.   Yes.

11   Q.   And when you went up then, moving on, and saying you

12   needed a quad right now, what were you saying you needed to

13   buy?

14   A.   A quarter ounce.

15   Q.   And when Mr. Garrison asked you if you knew zips, what

16   is that?

17   A.   An ounce, 28 grams.

18   Q.   What about two or three minutes after that call?  Do

19   you recall Government Exhibit No. --

20          MR. PHILLIPS:  Or, actually, Your Honor, I would

21   ask to -- the jurors to please turn to Government Exhibit

22   No. 20, previously admitted conversation with Ricky

23   Garrison and Christopher Martinez.

24          And publish 20.

25        (Phone call played)

Direct - Painter

1   BY MR. PHILLIPS:

2   Q.   On January 5th, 2014, at about one minute after that

3   call, did you have another conversation with Ricky

4   Garrison?

5   A.   Yes, I think I did, yeah.

6   Q.   Okay.  And ask you to look at Government Exhibit

7   No. 21.

8        MR. PHILLIPS:  Ask the jurors to turn their

9   transcripts to Government No. 21.

10       And please publish Government 21.

11       (Phone call played)

12   BY MR. PHILLIPS:

13   Q.   Now, on that phone call when he said, Yeah, he said

14   he'd be over here in like 30 minutes, what did that mean to

15   you?

16   A.   That meant get ready and come on over.

17   Q.   And when you said, But it's a definite, definitely,

18   what did that mean?

19   A.   That means -- I said definite, that means he's got

20   it.

21   Q.   That he's definitely going to be able to do a drug

22   deal?

23   A.   Absolutely.

24       MR. PHILLIPS:  At this time, Your Honor, I'd

25   ask -- well, actually --

Direct - Painter

1    I'd ask you all to please publish Government

2    Exhibit No. 22, text message between Ricky Garrison to

3    Christopher Martinez.  Go to the second page and highlight

4    the actual text.  Thank you.

5         Ask the jurors to turn in their notebooks to

6    Government Exhibit No. 23.  Previously admitted exhibit.

7         Ask to publish -- or please publish phone call

8    between Ricky Garrison and Christopher Martinez.

9       (Phone call played)

10   BY MR. PHILLIPS:

11   Q.   And, Mr. Painter, if you would, please look at

12   Government Exhibit No. 24.  And if you initialed that.

13   A.   Yes, I did.

14   Q.   Is that a telephone call from Ricky Garrison a -- is

15   that a telephone conversation between you and Mr. Garrison

16   on January 5th, 2014, at approximately 7:59 p.m.?

17   A.   Yes.

18        MR. PHILLIPS:  Ask the jurors to turn to Exhibit

19   No. 24.

20        And please publish Exhibit 24.

21      (Phone call played)

22   BY MR. PHILLIPS:

23   Q.   Now, in that call, it sounds like you were going to

24   wait until the next day to do a drug transaction; is that

25   fair to say?

Direct - Painter

1    A.    Yes.

2    Q.    Did that change as the evening went on later?

3    A.    Yeah, it changed, yes.

4          MR. PHILLIPS:  Ask the jurors to look at

5    Government Exhibit No. 25.

6          And please publish Government Exhibit No. 25,

7    phone call on January 5th, 2014, at approximately 8:47.

8       (Phone call played)

9    BY MR. PHILLIPS:

10   Q.    Now, in this conversation, did you wind up changing

11   your request for drugs and actually did want drugs that

12   night?

13   A.    Yes.

14   Q.    And --

15   A.    I didn't change nothing.  I went and got what I

16   wanted.

17   Q.    Okay.  And how much was that?

18   A.    Quarter ounce of meth.

19         MR. PHILLIPS:  Ask the jurors to turn to

20   Government Exhibit No. 26.  Telephone call between Ricky

21   Garrison and Christopher Martinez.

22         And please publish that.

23      (Phone call played)

24         MR. PHILLIPS:  And ask the jurors to please turn

25   to Government Exhibit No. 27 in their transcripts.

Direct - Painter

1        And publish No. 27, please.

2          (Phone call played)

3    BY MR. PHILLIPS:

4    Q.   And was that, again, you and Mr. Garrison?

5    A.   Yes, it was.

6    Q.   And what were you talking about during that telephone

7    conversation?

8    A.   To come by in 40 minutes to get -- pick up a quarter

9    ounce of meth.

10         MR. PHILLIPS:   And the Government Exhibit No. 28,

11   look in your transcripts, please.

12         And publish Government's Exhibit 28.

13         (Phone call played)

14   BY MR. PHILLIPS:

15   Q.   If you could, please describe to the jury what you

16   meant when you were talking about, You got the money, you

17   don't got no money?

18   A.   I was telling him to cover it, the buy, for me until I

19   get there.

20   Q.   Okay.   And if Mr. Garrison bought meth for you and

21   then you got there, what would you have to do?

22   A.   Buy it off him.

23         MR. PHILLIPS:   Ask the jurors to turn to

24   transcript No. 29.

25         Please publish Government Exhibit No. 29.

Direct - Painter

1      (Phone call played)

2    BY MR. PHILLIPS:

3    Q.   In that conversation, there's some talk before you

4    were -- actually got on the call, is that fair to say,

5    before it got connected?

6    A.   Yeah, I didn't -- I didn't hear that.  Can you repeat

7    that?

8    Q.   If you want, there's a transcript in front of you, if

9    that will assist you.

10              COURTROOM DEPUTY:  What number again?

11              MR. PHILLIPS:  Government's Exhibit No. 29.

12         (Phone call played)

13   BY MR. PHILLIPS:

14   Q.   There's a conversation before you actually -- Mr.

15   Garrison actually heard you; is that fair to say?

16   A.   What he was saying?

17   Q.   Yeah.

18   A.   I don't know what he was saying, but he said he was

19   ready, so I said all right.

20   Q.   And so when he said, I'm ready, and you said, All

21   right, late, what did that mean to you?

22   A.   That means come on over.

23   Q.   And when he says, I'm ready, he's got what?

24   A.   He's got the meth for me.

25              MR. PHILLIPS:  Ask you to turn to Exhibit No. 30.

Direct - Painter

1          And please publish Government Exhibit 30.

2             (Phone call played)

3    BY MR. PHILLIPS:

4    Q.   On January 5th, 2014, at approximately 9:58 p.m.

5    during the time of that phone call, where were you?

6    A.   Knocking on his door.

7    Q.   What were you there for?

8    A.   To get meth.

9    Q.   And do you recall the amount?

10   A.   Quarter ounce.

11   Q.   Okay.  And when you say "get meth," who were you

12   getting that from?

13   A.   Ricky Garrison.

14   Q.   When you got meth and cocaine and crack cocaine from

15   Ricky Garrison, would you use some of it?

16   A.   Yeah, most of it.

17   Q.   And would you get high?

18   A.   Yes.

19   Q.   I want to take you now to March of 2014, and

20   specifically Government's Exhibit No. 45.

21          MR. PHILLIPS:  Ask the jurors to turn to

22   transcript No. 45.  March 2nd of 2014.

23          Please publish Exhibit No. 45.

24             (Phone call played)

25   BY MR. PHILLIPS:

Direct - Painter

1    Q.    During that phone call, you first asked about the

2    clear stuff.   What were you asking about?

3    A.    Methamphetamine.

4    Q.    And when you said -- when you -- Let me see what my

5    boy wanted, what were you referring to there?

6    A.    I was seeing what my -- my friend wanted to chip in

7    with me for it.

8    Q.    And when you asked for a whole onion, what amount is

9    that?

10   A.    28 grams.

11   Q.    So an onion is an ounce?

12   A.    Yes.

13   Q.    And when you asked about it being hard, what did

14   you -- had you changed the drug talk and talking about a

15   different drug at that point?

16   A.    Yes.

17   Q.    And what drug were you asking about then?

18   A.    Crack cocaine.

19          MR. PHILLIPS:  Ask the jurors to turn to

20   Government Exhibit 46.

21          And please publish Government Exhibit 46.

22        (Phone call played)

23          THE COURT:  Mr. Phillips, would this be a good

24   time for our afternoon break?

25          MR. PHILLIPS:  Certainly.

Direct - Painter

1          THE COURT:  All right.  All right.  We're going to

2     be in recess, ladies and gentlemen, until 3:30.

3          (Jury left the proceedings at 3:12 p.m.)

4          THE COURT:  Mr. Painter, because you're in the

5     middle of your testimony, I direct you not to speak with

6     any of the lawyers, prosecution or defense.  You can speak

7     with your personal lawyer but not with any other lawyers

8     during the --

9          THE WITNESS:  Sounds great.

10         THE COURT:  -- the break.  All right.

11         (Recess at 3:12 p.m. to 3:35 p.m.)

12         THE COURT:  Mr. Painter, I remind you that you

13    remain under oath.

14         THE WITNESS:  Yes.

15         THE COURT:  Mr. Phillips, you may resume your

16    direct examination.

17         MR. PHILLIPS:  Thank you, Your Honor.

18    BY MR. PHILLIPS:

19    Q.   Mr. Painter, I believe we just listened to and read

20    through published Government Exhibit No. 46.  In that

21    telephone conversation, was it -- again, was that you and

22    Mr. Garrison?

23    A.   Yes.

24    Q.   And in that conversation, you said, I'm coming to get

25    that.  What is the "that" that you're referring to?

Direct - Painter

1   A.   That was the meth.

2   Q.   Was it meth or --

3   A.   No, that was -- that was the -- that was 46.  You said

4   49.  We're on 49 right now, aren't we?

5   Q.   Sorry, I'm on 46.

6   A.   Yeah, that was the meth.  And then we -- and then we

7   talked about the hard --

8   Q.   Help you to go back, maybe a call or two, and

9   determine --

10  A.   The clear stuff, which was the meth.

11  Q.   And when Mr. Garrison --

12  A.   We talked about the onion, which was the 28 grams of

13  crack.

14  Q.   Oh.  And so on -- just so we're clear, on March 2nd of

15  2014, when you went and met with Mr. Garrison and got an

16  onion or a zip, what were you getting from him on that

17  day?

18  A.   Crack cocaine.

19  Q.   And how much crack cocaine?

20  A.   28 grams.

21  Q.   During the time that you were dealing drugs with Ricky

22  Garrison, did you ever discuss with him whether he was

23  prostituting women?

24  A.   We talked about it.

25  Q.   If you would, please tell the jury what Mr. Garrison

Direct - Painter

1    told you about that.

2    A.   He was talking about that he had a couple of girls

3    that he was going to make money with.

4    Q.   Did he ever at any time identify one of those girls by

5    name?

6    A.   No.   I seen one of them before, but I don't -- I

7    didn't know her name.

8    Q.   Do you recall speaking with these officers on April

9    27th of 2016?

10   A.   Yes.

11   Q.   And during that time, do you recall telling them that

12   one of Garrison's prostitutes was named Heather, who lived

13   in Flint, Michigan?

14   A.   Yeah -- yes.  Yes, I did.  Yes, I did.  Heather, yeah,

15   that was one of them.  Yes.

16   Q.   Okay.  So you do recall that?

17   A.   Yes, I do.

18   Q.   And that's one of Ricky Garrison's prostitutes?

19   A.   Yes.  It's just been a long time, and I've -- I be

20   forgetting sometimes.

21   Q.   And to be fair, do you prepare reports when you go to

22   an interview or anything like that?

23   A.   No.

24   Q.   And it's been several years?

25   A.   Yes, it has.

Direct - Painter

1    Q.   And during the course of the conspiracy between June

2    of 2013 and June of 2014, did you ever see Ricky Garrison

3    with guns?

4    A.   Yes.

5    Q.   And was that during drug transactions with

6    Mr. Garrison?

7    A.   Yes.

8    Q.   If you could describe to the jury those instances.

9    A.   Black gun in a case.  In a zip thing.

10   Q.   Let's kind of go back.  Where were you when you saw

11   the gun?

12   A.   Oh, it was at his house.

13   Q.   Okay.  And you said -- if you could describe to the

14   jury what kind of gun was it, or what it looked like.

15   A.   It was a -- with a clip, with a clip in it.

16   Automatic.

17   Q.   And it was in a zip bag?

18   A.   Yeah, one of them zip -- zip things you open and

19   shut.

20   Q.   Let me ask you, are you real familiar with guns?

21   A.   No, I'm not.

22   Q.   Okay.  And was there another occasion during the drug

23   transaction that you saw Mr. Garrison with a gun?

24   A.   Yes.  In a car.

25   Q.   And which car was that?

Direct - Painter

1   A.   I think he -- I think it was the Porsche.

2   Q.   Do you recall what kind of Porsche that was?

3   A.   It was an SUV.  SUV kind of Porsche.

4        THE COURT:  Mr. Phillips, can we get a date on

5   this first firearm observation at the defendant's house?

6        MR. PHILLIPS:  Your Honor, I can ask him, but I

7   don't believe he has a specific date.

8        THE COURT:  Well, can we get a rough date so we

9   know that it's within the period of the charged conduct?

10       MR. PHILLIPS:  Certainly.

11  BY MR. PHILLIPS:

12  Q.   And, Mr. Painter, I asked you whether you'd seen guns

13  with Mr. Garrison between June of 2013 and June of 2014

14  during drug transactions.  Approximately when was the first

15  time that you saw him with a gun?

16       MR. LEONARD:  Your Honor, the defense renews its

17  404(b) objection.  This is getting right to the heart of

18  the issue of the 404(b) discrete, or lack thereof, discrete

19  time period.

20       THE COURT:  Well, let's see what the witness would

21  say in response.  So it's overruled for now.

22       THE WITNESS:  What was that again?

23  BY MR. PHILLIPS:

24  Q.   Now you were asked during the course of the

25  conspiracy -- those are the dates of the conspiracy.  You

Direct - Painter

1    were charged with a conspiracy, correct?

2    A.    Yes.

3    Q.    And that was June of 2013 through June of 2014?

4    A.    Yes.

5    Q.    And I focused you very specifically during the

6    conspiracy, and that's what I want to limit it to.  When

7    was the first time you approximately saw him with a gun

8    during the conspiracy?

9    A.    Oh, I -- it was at his house, probably -- right --

10   right on 2000 -- beginning of 2014, maybe.  Yeah.

11   Q.    Okay.  And when you saw him with the gun during the

12   drug transaction in the Porsche SUV, approximately when was

13   that?

14   A.    I can't -- that would -- that was in 2013 at the --

15   like in the middle of 2013.  Around June.

16   Q.    But it was when he had a Porsche Cayenne?

17   A.    It was right -- right -- I really don't remember.

18   I'm -- to be honest with you, I don't know.  I don't

19   remember exactly what the date was.  But it was in the

20   Porsche.

21          MR. LEONARD:  Your Honor, the defense again renews

22   its objection and would specifically point out Count 48's

23   date is May 23d, 2014.  The best that Mr. Painter has said

24   now is early 2014, some five and a half months prior, or

25   maybe 2013.  We would move that the testimony regarding the

Direct - Painter

1    firearm be stricken.

2              THE COURT:  Mr. Phillips.

3              MR. PHILLIPS:  It's the same argument that Ms.

4    Rangel gave earlier that the Court has heard.  This

5    defendant can testify what he observed during the course of

6    the conspiracy.  Guns are a part and parcel of drug

7    dealing.  The jury's already heard Mr. Garrison's voice

8    talk about having guns in order to protect himself from

9    being robbed.  The drug business is a business that

10   oftentimes involves guns.

11             This defendant -- this witness, I'm sorry -- this

12   witness can testify as to what he observed during drug

13   transactions, during the course of the conspiracy.  It's no

14   different as to what house he was at, what car he was in

15   and things of that nature.  I was very specific in focusing

16   during the course of the conspiracy, and I am not offering

17   anything outside of that conspiracy.

18             THE COURT:  All right.  I agree.  The objection's

19   overruled.

20   BY MR. PHILLIPS:

21   Q.   Now, you mentioned earlier, and we've talked about it,

22   the fact that you've pled guilty in this case and been

23   sentenced.  You've also been convicted of other felonies;

24   is that correct?

25   A.   Yes.

Direct - Painter

1    Q.   And was one of those from 1997 in Las Vegas?

2    A.   Yes.

3    Q.   Do you recall what you pled guilty to?

4    A.   Comprehensive theft.  I had a lot of them out there.

5    I kind -- kind of forgot a lot.  I mean, the 1997, it was

6    comprehensive theft and stealing a car, I think.

7    Q.   Okay.  And do you recall what sentence you got for

8    that felony conviction?

9    A.   Four years.  One to four in the state prison.

10   Q.   And do you also recall a felony conviction from

11   Pennsylvania in 2005?

12   A.   Yes.

13   Q.   And what was that for?

14   A.   Workmen's comp fraud.

15   Q.   And do you recall that sentence?

16   A.   Yeah, 11 months work release.

17   Q.   Now, you mentioned earlier that you've been friends

18   with Mr. Garrison since 2008 or 2009.  Fair?

19   A.   Yes.

20   Q.   Fair to say you're not happy being here today?

21   A.   No, I'm not happy being here today.

22   Q.   You're here because you got subpoenaed, correct?

23   A.   Yes.

24   Q.   And that subpoena was from me or from the United

25   States?

404

Cross - Painter

1    A.    Yes.

2    Q.    And it's part of your plea agreement to be here.

3    A.    Yes.

4           MR. PHILLIPS:  If I may I have one moment, Your

5    Honor.

6           THE COURT:  You may.

7           MR. PHILLIPS:  Nothing further.  Thank you, Your

8    Honor.

9           THE COURT:  All right.  Cross-examination.

10                    CROSS-EXAMINATION

11   BY MR. LEONARD:

12   Q.    Good afternoon, Mr. Painter.  How are you?

13   A.    How you doing?

14   Q.    I'm well.  Thank you.

15           You talked about many things with the Government.

16   I wanted to focus back on the alleged drug transactions,

17   all right?

18   A.    Yes.

19   Q.    You didn't have an agreement with Mr. Garrison, did

20   you?

21   A.    Never had an agreement.

22   Q.    The alleged drugs that you say you purchased from Mr.

23   Garrison were for personal use, correct?

24   A.    Most of the time, yes.

25   Q.    And the other times were to party with friends,

Cross - Painter

1    right?

2    A.    Absolutely.

3    Q.    Mr. Garrison did not give you drugs to sell, did he?

4    A.    No.

5    Q.    And when you conducted the alleged transactions, my

6    understanding of your testimony is that you paid Mr.

7    Garrison cash in full, correct?

8    A.    Yes, I did.

9    Q.    The prosecution focused on the purchase of the alleged

10   one ounce of cocaine.  Do you recall that?

11   A.    Yes.

12   Q.    And you stated that was for a party, correct?

13   A.    That's right.

14   Q.    So I'm correct in my understanding that that was a --

15   where you were celebrating or having fun with your friends,

16   not redistributing for proceeds; is that correct?

17   A.    That's right.

18   Q.    As you sit here today, you're not using any drugs,

19   right?

20   A.    No.

21   Q.    And you're clean; isn't that right?

22   A.    Yes.

23   Q.    Okay.  And some of the stuff that I want to talk to

24   you about -- I'm not trying to embarrass you, but it's fair

25   to say that during the time period that they're playing

Cross - Painter

1   those phone calls, you were using drugs regularly?

2   A.   Woke up doing it.

3   Q.   And that impacts your memory, right?

4   A.   Yes.

5   Q.   And, in fact, what I noticed is when the Government

6   was asking you about one of the exhibits and asking you to

7   describe what exactly was going on, you looked down at the

8   exhibit notebook and had to just read off what it was,

9   didn't you?

10  A.   Yeah, I -- yes.

11  Q.   During the time period that has been discussed on

12  direct examination -- that's when Mr. Phillips was talking

13  to you -- you were on Social Security, right?  That's

14  basically how you're making your living?

15  A.   Yes, I was.

16  Q.   The Government asked you if you knew, when you came in

17  to cooperate, who, in fact, was going to trial.  Do you

18  remember those questions -- or that question?

19  A.   Yeah.  I figured it out, so -- soon enough.

20  Q.   You at that time pretty much knew that it was Mr.

21  Garrison who was going to trial, correct?

22  A.   Absolutely, yes.

23  Q.   Now, let's talk about what you would have known prior

24  to coming in to speak with the Government, all right?  You

25  have a very competent lawyer, don't you; Mr. Pat Burke?

407

Cross - Painter

1    A.    Yes.

2    Q.    And as part of Mr. Burke's representation, he would

3    have gone over discovery with you, and by that I mean the

4    reports in this case?

5    A.    The discovery, yes.

6    Q.    The indictments in this case, right?

7    A.    Uhm-hum.

8    Q.    He would have been able to go over phone calls with

9    you, correct?

10   A.    Yes.

11   Q.    He would review all those charges with you, correct?

12   A.    Yes, he did, yes.

13   Q.    Now, you didn't plead guilty to the conspiracy charge,

14   did you?

15   A.    No, I didn't.

16   Q.    But you were aware that the conspiracy charge carried

17   a mandatory five-year sentence if you were convicted,

18   correct?

19   A.    Yes.

20   Q.    And it would go all the way up to 20 years in prison,

21   correct?

22   A.    I thought it was zero to 20.

23   Q.    Yeah.  It's -- but the codefendants -- that's what you

24   pled guilty to was zero to 20, right?

25   A.    I pled guilty to 20 -- 21 to 27 -- time served.

Cross - Painter

1    Q.    That's the sentence you ended up with, time served?

2    A.    That was the intent.

3    Q.    Right.  The maximum sentence you could have gotten on

4    the charge you pled guilty to was 20 years, though, right?

5    A.    On the charge that I took -- or -- the charge I took?

6    Q.    Yes, sir.

7    A.    I'm not too sure if it was 20 years or if it was --

8    it -- it was what, five years, right?  Or something like

9    that?  Because the conspiracy was 20 years, so I didn't --

10   I didn't even take that charge.

11   Q.    All right.

12   A.    I took --

13   Q.    You never pled guilty to a conspiracy.

14   A.    No, I didn't.

15   Q.    All right.  I want to talk with you also about the

16   fact that you have --

17            THE COURT:  Where did that come from?

18            MR. LEONARD:  I don't know.

19            THE COURT:  All right, let's keep going.

20   BY MR. LEONARD:

21   Q.    You have a daughter, correct?

22   A.    Yes, I do.

23   Q.    Is it fair to say that one of the reasons you entered

24   into your agreement with the Government was you wanted to

25   be able to see your daughter?

Cross - Painter

1   A.   Yes.  And to get out.

2   Q.   Yeah.  Getting out is pretty big, isn't it?

3   A.   Yes.

4   Q.   Now, when you come in and talk to the Government, it's

5   the Government agents who are asking you questions,

6   right?

7   A.   Yeah, they asked me some questions.

8   Q.   They have pretty direct questions for you, too, don't

9   they?

10  A.   Yes.

11  Q.   And they immediately start focusing in on Mr.

12  Garrison, don't they?

13  A.   Yes.

14  Q.   And one of the things that they're starting to ask you

15  about is did you see guns with Mr. Garrison, right?

16  A.   Yes.  Yes.

17  Q.   And the person who, in fact, was asking you that

18  specific question would be Investigator Mohlman, who's

19  sitting over at the Government's table, right?

20  A.   Him in the middle?

21  Q.   Yes, sir.

22  A.   He didn't ask me really anything.

23  Q.   Was it Investigator Gullicksrud?

24  A.   The one in the middle, yes, he asked me some

25  questions.

Cross - Painter

1    Q.   He was the one asking you questions, right?

2    A.   He asked me some questions, yes.

3    Q.   They're asking you about the guns, right?

4    A.   Yes.

5    Q.   And then you told them that on one occasion, quote,

6    you'd seen Mr. Garrison show you a new gun, correct?

7    A.   Yes.

8    Q.   And you did not give a date for that showing of the

9    alleged new gun, did you?

10   A.   No, I didn't give him no date because I don't remember

11   the date.

12   Q.   And let's just talk a little bit more about the

13   specifics there.  Now, you didn't tell them what the

14   weather was like outside, did you?

15   A.   No, I didn't.

16   Q.   You didn't say what type of clothes you were wearing,

17   did you?

18   A.   No, I didn't.

19   Q.   You didn't say what type of clothes Mr. Garrison was

20   wearing, did you?

21   A.   No, I didn't.

22   Q.   You didn't say what type of day, in fact, just in

23   general, it was, did you?

24   A.   No.

25   Q.   And you said that the gun is in the back room of

Cross - Painter

1   Mr. Garrison's residence, correct?

2   A.   Yes.

3   Q.   Now, let's talk about the room.  You didn't give the

4   color of that room, did you?

5   A.   No, I didn't.

6   Q.   You didn't say if there was wallpaper, did you?

7   A.   No.

8   Q.   You didn't talk about how it was decorated, did you?

9   A.   No, I didn't.

10  Q.   Didn't tell where the lights were located in that

11  room, did you?

12  A.   Nope.

13  Q.   They didn't even ask you those questions, did you --

14  did they?

15  A.   No, no, they didn't.

16  Q.   They didn't get into that kind of detail, did they?

17  A.   No, they didn't.

18  Q.   They made no effort to see if you had other facts to

19  back up the allegation that on one day you saw a gun in

20  Mr. Garrison's residence; isn't that right?

21  A.   Yes.

22  Q.   Now, you didn't tell the investigators that the gun

23  was in a holster on Mr. Garrison's body, did you?

24  A.   No, I didn't.

25  Q.   You didn't say that gun was located in his waistband,

Cross - Painter

1    right?

2    A.    No.

3    Q.    You didn't say it was in his hand, right?

4    A.    No.

5    Q.    He wasn't waving that gun at you, right?

6    A.    Nope.

7    Q.    Now, I've heard you talk with the Government and say

8    that you thought the gun was a semi-automatic, correct?

9    A.    Yes.

10   Q.    And I want to be fair.  You said you didn't really

11   know guns too well, right?

12   A.    No, I don't know guns.

13   Q.    So you told them it was a black gun; is that right?

14   A.    Yes.  With a clip.

15   Q.    With a clip.  Did you sit down with the Government and

16   go through a series of pictures of firearms?

17   A.    No.

18   Q.    Did you tell the Government approximately how large or

19   small the firearm was?

20   A.    I don't think so, no.  It was a -- just a small little

21   handgun -- yes -- no, I didn't say, I don't think I did.

22   Q.    And handguns come in different sizes, right?

23   A.    Yes.  It was a handgun, yes.

24   Q.    And you didn't identify the brand of that firearm, did

25   you?

Cross - Painter

1    A.    No, I didn't.

2    Q.    And you didn't identify the caliber of that firearm,

3    did you?

4    A.    Nope.  I didn't --

5    Q.    But you were specific that on the first time you

6    talked with the Government, that you weren't -- excuse

7    me -- I misread my question.

8              MR. LEONARD:  I'll strike that from the record,

9    please.

10             THE COURT:  Sure.

11   BY MR. LEONARD:

12   Q.    Now, my understanding is that next you told the

13   Government you saw a gun in Mr. Garrison's Porsche; is that

14   correct?

15   A.    Yes.

16   Q.    And let's talk about that statement.  Did you give

17   them a day of the week?

18   A.    No, I didn't, sir.

19   Q.    Did you give them a month of the year?

20   A.    No.

21   Q.    Did you talk to them about what time of day you

22   thought it might be?

23   A.    No.

24   Q.    Did you tell them perhaps it was at night?

25   A.    No, I didn't.

414

Cross - Painter

1    Q.   Did you describe what Mr. Garrison was wearing?

2    A.   No, I didn't.

3    Q.   Did you describe what you were wearing?

4    A.   No, I didn't.

5    Q.   Did you tell them if it was cold outside or warm

6    outside?

7    A.   No, I didn't.

8    Q.   Did you tell them if it was raining or snowing?

9    A.   Nope.

10   Q.   You say you saw this gun in the Porsche.  You didn't

11   tell them where in the Porsche you saw it exactly, did

12   you?

13   A.   I think I said under the seat.

14   Q.   Right.  You said --

15   A.   Front seat.

16   Q.   You said under a seat, right?

17   A.   Yeah, under a seat.

18   Q.   Now, did the Government come to you and say, Look,

19   here's a diagram of a Porsche Cayenne.  Can you put an X on

20   this diagram and show us where you saw that gun?

21   A.   No, I didn't.

22   Q.   My understanding is you said you just saw the butt of

23   a gun; is that correct?

24   A.   Yes, I seen -- yeah, I seen the --

25   Q.   By the butt of the gun, that would mean the back end

Cross - Painter

1    or some part of the grip, correct?

2    A.    Yes.

3    Q.    Did you describe if the grip was black plastic, like a

4    Glock, for instance?

5    A.    It was black.  I don't know if it was a Glock or -- I

6    don't know.  I don't know -- I don't know guns, so I don't

7    really know.

8    Q.    Right.  And you don't know guns, I understand that.

9    So let's see what the Government tried to do to see if what

10   you saw was actually a gun.  Did they show you pictures of

11   the back end of firearms?

12   A.    No, they didn't.

13   Q.    And you understand that different firearms look

14   differently, both from the front and the back?

15   A.    Yes.

16   Q.    You'd agree with me that one of the distinguishing

17   aspects of a firearm is its grip or its butt, correct?

18   A.    Well, I'm pretty sure that -- yeah -- I don't know

19   guns, so I don't really -- it's -- just the handle, right?

20   Q.    It's the handle, right.  But it's something that's --

21   each gun's handle --

22   A.    Is different.

23   Q.    -- is going to look a little different, right?

24   A.    Probably, yes.

25   Q.    And they didn't ask you to start looking at different

Cross - Painter

1    kind of guns and say, Was it this one?  Right?

2    A.   Yeah.

3    Q.   And X it out and say, No, it wasn't that one.  That

4    didn't happen, did it?

5    A.   No.

6    Q.   My understanding is that your -- you told the

7    Government that you saw the gun in the Porsche during the

8    alleged drug transaction, but you didn't tell them what

9    kind of drugs you were supposedly buying, did you?

10   A.   No, I didn't.

11   Q.   You didn't tell them how much of the alleged drugs you

12   were purchasing, correct?

13   A.   No.

14   Q.   And you didn't say how much money you were allegedly

15   paying for these drugs, right?

16   A.   No, I didn't.

17   Q.   I want to talk to you about February 14th, 2017, which

18   is eight days ago, correct?

19   A.   Yes.

20   Q.   You went back in and talked to the Government again,

21   correct?

22   A.   On the 17th, yes, I think so, yup.  It was -- 2017.

23   Yeah.  Eight days ago.  So that was --

24   Q.   My understanding is it was -- it occurred on the 14th.

25   If I show you a report that was typed up, would that

Cross - Painter

1   refresh your recollection as to the date?

2   A.   Yes, it would.

3   Q.   All right.

4        MR. LEONARD:  Your Honor, may I hand these reports

5   to your clerk?

6            THE WITNESS:  It was --

7            THE COURT:  Yes.

8        MR. PHILLIPS:  Your Honor, I don't believe he's

9   seen the reports.  I don't know if this witness has seen

10  the reports, but we would stipulate that's the date.

11           MR. LEONARD:  All right.  That's fine.

12           THE COURT:  All right.

13  BY MR. LEONARD:

14  Q.   So you understand by stipulating, the Government

15  agrees that they talked to you on February 14th.

16  A.   Yes.

17  Q.   And, again, the Government starts focusing in on the

18  guns again, right?

19  A.   Yes.

20  Q.   Now you're saying that not one handgun, but you

21  observed two handguns; is that right?

22  A.    They didn't focus on guns.  I -- they didn't just come

23  out and say what of -- was there guns involved?  They

24  didn't come out and say that.  They -- they had -- had

25  asked me other questions, and then that came in with

Cross - Painter

1    that --

2    Q.   All right.

3    A.   -- with that conversation.

4    Q.   And at this time, you say there's not one gun, but two

5    guns, correct?

6    A.   Well, yeah.  No, no.  No, I seen two guns, which --

7    one in the car, one in the house.  I don't know if it was

8    the same gun, because I don't know -- I don't know guns.

9    Q.   And I want to make sure that I understand your

10   statement.  You did not tell the Government that you

11   observed two handguns on the table in --

12   A.   On the table --

13   Q.   -- Ricky Garrison's --

14   A.   -- in his house, yes.

15   Q.   I think we were talking over each other.

16        THE COURT:  Yeah, let me tell Mr. Painter the same

17   thing I said to the prior witness.  My court reporter can't

18   take down two voices at once.

19        THE WITNESS:  Okay.

20        THE COURT:  So be patient.  Please let Mr. Leonard

21   finish his question and then start your answer.

22   BY MR. LEONARD:

23   Q.   So I want to make sure.  Did you -- you told the

24   Government on February 14th of 2017, that between June 2013

25   and June 2014, you observed two handguns on the table

Cross - Painter

1      inside of Ricky Garrison's residence; is that correct?

2      A.   Yes.

3      Q.   My understanding is you described those firearms as

4      black, correct?

5      A.   Yes.

6      Q.   Semi-automatic handguns, correct?

7      A.   Yeah, with a clip.  I don't know if it's -- it had a

8      clip.

9      Q.   Now, let me go through some of the questions I asked

10     you previously.  Did you tell them the date of the week?

11     A.   No, I didn't.

12     Q.   Did you tell them what month this occurred in?

13     A.   No.

14     Q.   Did you tell them, other than June 2013 to June 2014,

15     what year it occurred in?

16     A.   No, I don't think so.

17     Q.   So you couldn't be any more specific than June 2013 to

18     June 2014, correct?

19     A.   Yeah.

20     Q.   Did they ask you, when you saw those alleged two

21     firearms, if it was cold outside?

22     A.   No, they didn't.

23     Q.   Did they ask you if it was warm outside?

24     A.   Nope.

25     Q.   Did the Government attempt to focus you in on

Cross - Painter

1    important holidays like Christmas or Thanksgiving?

2    A.    No, but it was on -- on --

3    Q.    Thank you.  I appreciate your answer.

4              THE COURT:  Why don't you let him finish his

5    answer.

6              Go ahead.

7              THE WITNESS:  It was on 13th Street.

8    BY MR. LEONARD:

9    Q.    So it wasn't at the Monaco address, correct?

10   A.    It was 13th and --

11   Q.    Havana; is that roughly 13th and Havana?

12   A.    Right.  Well, I got to remember because I don't -- I

13   don't remember how -- I don't really know Denver that good,

14   so it's like going up -- going up that way -- it's on 13th

15   Street, though, 13th and Yosemite, close to that, over

16   there.

17   Q.    Did you describe what Mr. Garrison was wearing that

18   day?

19   A.    No.

20   Q.    Did you describe what you were wearing that day?

21   A.    Huh-uh.

22   Q.    Did the Government bring out a book of handguns and

23   show you pictures and say, Can you identify which one of

24   these guns it might be?

25   A.    Nope.

Cross - Painter

1    Q.   Now, the Government also, you stated in your first

2    interview, asked you some questions about Mr. Garrison and

3    allegations of prostitution, correct?

4    A.   Yes.

5    Q.   And, again, it was the Government that brought this

6    up, correct?

7    A.   Yes.

8    Q.   You never made any mention of Mr. Garrison

9    transporting Ms. Quintanilla to Oklahoma for prostitution,

10   did you?

11   A.   Repeat that again.  What did you say?

12   Q.   Sure.  You never told the Government that Mr. Garrison

13   transported Ms. Quintanilla to Oklahoma for prostitution,

14   did you?

15   A.   No, I never said that.  But --

16   Q.   And the April 27th, 2016, interview with the

17   Government, you also told the Government -- you told the

18   Government that Mr. Simeon Ramirez was mad at Mr. Garrison;

19   isn't that right?

20   A.   Simeon Ramirez was mad?

21   Q.   Uhm-hum.

22   A.   Who's that?  The dude on our case?  The --

23   Q.   Do you recall Mr. Simeon Ramirez?

24   A.   Yes.  I met him in the -- I met him in the FDC.  Yes,

25   he was mad at him.

Redirect - Painter

1          MR. LEONARD:  One second, Your Honor, please.

2          THE COURT:  Sure.

3          MR. LEONARD:  I have no further questions.

4          THE COURT:  All right.  Redirect.

5          MR. PHILLIPS:  Thank you, Your Honor.

6                    REDIRECT EXAMINATION

7     BY MR. PHILLIPS:

8     Q.   Now, Mr. Leonard was asking you about whether Mr.

9     Ricky Garrison ever told you that he transported Heather to

10    Oklahoma or something like that.  And then it seemed like

11    you were going to say something.  Was there something you

12    felt like saying --

13    A.   Oh, we -- we both -- we both had women.  I mean, I had

14    a girl, he had girls.  We -- we did our thing with girls.

15    That's all I can say.

16    Q.   Did he ever tell you anything about Oklahoma?

17    A.   Since -- a little bit of something, but I don't -- I

18    can't say because I don't really know much about what he

19    did, so I can't -- I can't bring something out that I don't

20    know.

21    Q.   Right.  And we absolutely don't want that.  I just

22    want -- it just seemed like you wanted to say something.

23    Do you know anything that he said about Oklahoma?

24         MR. LEONARD:  Your Honor, I would --

25         THE WITNESS:  This --

Redirect - Painter

1          MR. LEONARD:  I object.  I think that's been asked

2     and answered.

3          THE COURT:  Overruled.

4          You may answer.

5          THE WITNESS:  I -- I don't know -- I forget a lot,

6     so I'm not -- you's are -- I don't -- I mean, I'm confused

7     right now, so I don't want to say nothing because I'm

8     confused.

9     BY MR. PHILLIPS:

10    Q.   I totally understand that, and it's been a long time.

11    All we're asking is what you remember --

12    A.   What I remember, I remember girls -- I remember the

13    girls, a couple of girls and stuff.  I -- I don't remember

14    him -- I don't remember nothing about out of state or

15    anything.

16    Q.   Okay.  Great, thank you.

17         And just to follow up, when you were being asked

18    about your plea agreement, originally you were looking at a

19    potential sentence of five to 20 years, correct?

20    A.   Five to 20, yeah, is what it was.

21    Q.   And what you pled guilty to has a sentence of zero to

22    20 years.

23    A.   Yes.

24    Q.   So the biggest difference is only the fact that the

25    judge now can sentence anywhere he wishes from zero to 20

Redirect - Painter

1    years as opposed to five to 20.

2    A.    Yes.

3           MR. PHILLIPS:  Nothing further.  Thank you, Your

4    Honor.

5           THE COURT:  All right.  May this witness be

6    excused?  Mr. Phillips?

7           MR. PHILLIPS:  Yes, Your Honor.

8           THE COURT:  The defendant?

9           MR. LEONARD:  Yes, Your Honor.

10          THE COURT:  Mr. Painter, you are excused.  You may

11   step down.  Thank you.

12          All right, the Government may call its next

13   witness.

14          MR. PHILLIPS:  Your Honor, may we approach for one

15   moment?

16          THE COURT:  Sure.

17      (Discussion at side bar)

18          MS. RANGEL:  Your Honor, our next witness is here,

19   he's in custody and I think the marshals just need to bring

20   him in.

21          THE COURT:  Okay.

22          MS. RANGEL:  We can just --

23          THE COURT:  Do the same thing we did before?

24          MS. RANGEL:  Yes.  And I apologize, I meant to

25   bring that up on the break.

Redirect - Painter

1        THE COURT:  That's all right.  We'll do the same

2   thing.

3        (End of discussion at side bar)

4        THE COURT:  All right, members of the jury, we're

5   going to excuse you for, again, for about another five

6   minutes.  Don't venture too far because it really will be

7   no more than five minutes, I promise you that.

8        (Jury left the proceedings at 4:11 p.m.)

9        THE COURT:  Please be seated.

10       MR. PHILLIPS:  Your Honor, if I may check to see

11   if Mr. Ramirez's attorney is in the hallway.

12       THE COURT:  Okay.  Mr. Phillips, where did Ms.

13   Rangel go?

14       MR. PHILLIPS:  Contacting Ms. Lisa Wayne, Mr.

15   Ramirez's attorney.  We've been communicating with her by

16   e-mail trying to keep her updated when Mr. Ramirez would

17   take the stand and I think she was trying to confirm that

18   she got the message and --

19       MS. RANGEL:  She's walking in the courthouse.

20       MR. PHILLIPS:  She's walking in the courthouse.

21       THE COURT:  She's walking in the courthouse right

22   now?

23       MR. PHILLIPS:  Yes.

24       THE COURT:  Thank you.  We'll wait two minutes.

25       MS. RANGEL:  Thank you.

Redirect - Painter

1      (Pause)

2             MS. RANGEL:  We're ready.

3             THE COURT:  Okay.  Let's bring in the jury.

4             U.S. MARSHAL:  Your Honor, the witness did state

5      he wanted to speak to his attorney real quick.

6             MS. WAYNE:  Is that all right, Judge?

7             THE COURT:  Real quick.  I promised the jurors

8      five minutes and I'll --

9             MS. WAYNE:  I understand.  Unfortunately my

10     schedule has not been synced with this trial.

11         (Pause)

12            THE COURT:  All right.  Let's bring in the jury.

13         (Jury was present at 4:16 p.m.)

14            THE COURT:  Government may call its next

15     witness.

16            MS. RANGEL:  Thank you, Your Honor.  The

17     Government calls Simon Ramirez.

18            COURTROOM DEPUTY:  Will you please stand and raise

19     your right hand.

20         SIMEON RAMIREZ, GOVERNMENT'S WITNESS, SWORN

21            COURTROOM DEPUTY:  Please be seated.  Pull your

22     chair all the way up and put your elbows on here so we can

23     hear you.

24            State your full name for the record and spell your

25     first and last name.

427

Direct - Ramirez

1       THE WITNESS:  My name is Simeon Ramirez Leja.

2    S-i-m-o-n, R-a-m-i-r-e-z.

3       THE COURT:  You may -- first let me ask, Mr.

4    Leonard.

5       MR. LEONARD:  Yes, the defense would renew its

6    404(b) objection, as previously stated, and for the reasons

7    I stated, we would ask that it be incorporated into the

8    record as a standing objection.

9       THE COURT:  All right.  I'll allow it as a

10   standing objection.  And for the reasons I ruled previously

11   that objection's overruled.

12      Ms. Rangel, you may proceed.

13      MS. RANGEL:  Thank you, Your Honor.

14                    DIRECT EXAMINATION

15   BY MS. RANGEL:

16   Q.   Good afternoon, Mr. Ramirez.

17   A.   Good afternoon.

18   Q.   You are appearing here in court and it appears as if

19   you are in custody.

20   A.   Yes.

21   Q.   What are you currently in custody for?

22   A.   For reentry.

23   Q.   Reentry into this country?

24   A.   Yes.

25   Q.   From another country?

Direct - Ramirez

1    A.    From Mexico.

2    Q.    Is that case out of the state of Colorado or out of a

3    different state?

4    A.    A different state.

5    Q.    And with regard to that case, where are you at

6    procedurally?  And what I mean by that is are you still

7    facing charges, have you pled guilty, have you been

8    sentenced?

9    A.    I'm still facing charges out there.

10   Q.    Okay.  Have you pled guilty to anything?

11   A.    No, not yet.

12   Q.    You've not pled guilty?

13   A.    No.  Just to like the probation violation.

14   Q.    Okay.  And the probation violation is out of the state

15   of Colorado?

16   A.    Yes.

17          MS. RANGEL:  Your Honor, may I have just one

18   moment?

19          THE COURT:  Yes.

20          MS. RANGEL:  Thank you, Your Honor.

21          THE COURT:  Sure.

22   BY MS. RANGEL:

23   Q.    So that case is down in New Mexico?

24   A.    Yes, it's New Mexico.

25   Q.    Okay.  And you are here today testifying on a

Direct - Ramirez

1    different case than that?

2    A.   Yes.

3    Q.   All right.  So I'm going to focus you on the reason

4    why you're here today, okay?

5    A.   Okay.

6    Q.   Okay.  And we're going to be talking about conduct

7    specifically from June of 2013 to June of 2014.

8    A.   Okay.

9    Q.   Okay?  Okay.  You are here today because you were

10   charged as a defendant in this case originally, right?

11   A.   Yes.

12   Q.   Do you remember what you were originally charged

13   with?

14   A.   Conspiracy and a phone count.

15   Q.   And just so it's clear, conspiracy to do what?

16   A.   To distribute.

17   Q.   To distribute drugs?

18   A.   Yes.

19   Q.   Specifically cocaine?

20   A.   Yes.

21   Q.   Okay.  Did you plead guilty to that charge or did you

22   plead guilty to a different charge?

23   A.   I plead guilty to a possession with intent to

24   distribute.

25   Q.   And was that, again, cocaine?

Direct - Ramirez

1    A.    Yes.

2    Q.    As a result of pleading guilty to that -- a different

3    charge, do you remember reaching a plea agreement with the

4    Government?

5    A.    Yes.

6    Q.    I'm going to direct your attention -- the third binder

7    should have Exhibit 114.

8          Mr. Ramirez, do you recognize the document in

9    Exhibit 114?

10   A.    Yes.

11   Q.    Is that your plea agreement with the Government in

12   this case?

13   A.    Yes.

14         MS. RANGEL:  And if we could go ahead and publish

15   this exhibit to the jury.

16         And if we could go -- actually, can we just expand

17   that last paragraph on the first page?  Thank you.

18   BY MS. RANGEL:

19   Q.    So that's the charge that it looks like you pled

20   guilty to, contained -- it's on the screen as well, but

21   it's also right in front of you in the book, whichever

22   one's easier for you to look at, okay?

23   A.    Okay.

24   Q.    So when we look at that portion of the plea agreement,

25   that's the charge that you pled guilty to; is that fair to

431

                        Direct - Ramirez

1    say?

2    A.    Yes.

3    Q.    Okay.

4              COURTROOM DEPUTY:  Ms. Rangel, one minute.  For

5    some reason his monitor is turned off.

6              MS. RANGEL:  Oh, thank you.

7              COURTROOM DEPUTY:  All right.

8              MS. RANGEL:  Thank you.

9    BY MS. RANGEL:

10   Q.    And specifically that charge is distribution and

11   possession with intent to distribute less than 500 grams of

12   a mixture or substance containing cocaine within 1,000 feet

13   of a school.

14   A.    Yes.

15   Q.    You'd agree that that's the charge you pled guilty

16   to?

17   A.    Yes.

18   Q.    Okay.  And what were the penalties for that charge?

19   A.    I don't recall the -- the penalty?

20   Q.    Okay.  If you want to take a look at that document,

21   I'll help you out.  Specifically page 6.  Under Roman

22   Numeral III, Statutory Penalties.  Does that refresh your

23   recollection as to those penalties?

24   A.    Yes.

25   Q.    What were the penalties for that charge that you pled

432

Direct - Ramirez

1   guilty to?  And specifically just the imprisonment.

2   A.   20 years imprisonment.

3   Q.   And is that not more than 20 years of imprisonment?

4   A.   Yes.

5   Q.   To the best of your memory, is that a lesser penalty

6   than what you were originally charged with?

7   A.   I don't recall.

8   Q.   Okay.  Have you already been sentenced for pleading

9   guilty to that charge?

10  A.   Yes.

11  Q.   What was the sentence that you received?

12  A.   I received a time served.  I had done 28 months.

13  Q.   Do you recall when you were sentenced?

14  A.   Approximately it was September -- I think the 20th.

15  Q.   Of 2016?

16  A.   Yes.

17  Q.   Okay.  Now, as you were working on a plea agreement in

18  this case and thinking about this case, did part of that

19  involve sitting down and giving an interview to the

20  Government?

21  A.   Yes.

22  Q.   If you could, in that binder right in front of you,

23  look at Exhibit 115.  It's going to be the next exhibit

24  from the one you're currently on.  Do you recognize

25  Government's Exhibit 115?

Direct - Ramirez

1    A.    Yes.

2    Q.    Is that a letter that you received -- both you and

3    your attorney received when you sat down to talk to the

4    Government?

5    A.    Yes.

6    Q.    And that letter is dated November 12th, 2014?

7    A.    Yes.

8    Q.    Is your testimony here today part of that letter and

9    part of your plea agreement in this case?

10   A.    Yes.

11   Q.    At the time that you sat down with the Government in

12   2014, did you know which of your codefendants were going to

13   go to trial?

14   A.    No.

15   Q.    Fair to say it was more than you and one other person

16   charged?

17   A.    Yes.

18   Q.    In the entire case.

19   A.    Uhm-hum.

20   Q.    Okay.  And when you say that you have an agreement to

21   come in and testify, were you told specifically what to say

22   when you testified?

23   A.    No.

24   Q.    Do you know an individual by the name of Ricky

25   Garrison?

434

Direct - Ramirez

1    A.    Yes.

2    Q.    Do you see him present in this courtroom?

3    A.    Yes.

4    Q.    Can you please identify him by where he's seated and

5    what he's wearing.

6    A.    He's sitting right there wearing the blue shirt.

7            MS. RANGEL:  Your Honor, if the record could

8    reflect that this witness has identified the defendant,

9    subject to cross-examination.

10           THE COURT:  The record will so reflect.

11           MS. RANGEL:  Thank you.

12   BY MS. RANGEL:

13   Q.    When did you first meet Mr. Garrison?

14   A.    I met him in the summer of 2013.

15   Q.    In the summer of 2013, were you working?

16   A.    Yes.

17   Q.    What did you do?

18   A.    I had a repair -- repair shop.

19   Q.    And what was the name of that repair shop?

20   A.    It was called Finesse Auto Repair.

21   Q.    So you repaired automobiles?

22   A.    Yes.

23   Q.    What was the address of that location?

24   A.    It was 2331 West Hampden Avenue.

25   Q.    When did you open up your auto repair shop?

435

Direct - Ramirez

1    A.   It was 2008.

2    Q.   In 2008?

3    A.   Yes.

4    Q.   Now, when you first met Mr. Garrison in the summer of

5    2013, had you met him because you worked on his car?

6    A.   No.

7    Q.   How did you meet him?

8    A.   I met him through a -- through one of my clients.

9    Q.   And, Mr. Ramirez, I just am having a little bit of a

10   hard time hearing you.  If you could just -- and I think

11   maybe move the microphone towards you a little bit.  Let's

12   see if that helps.

13   A.   Right there?

14   Q.   Okay.  Thank you.

15   A.   Okay.

16   Q.   So you met him through one of your clients?

17   A.   Yes.

18   Q.   Tell me about that.

19   A.   It was just one of my clients picking up a vehicle

20   from the shop, and me and him were just talking a little

21   bit, and he asked me about some marijuana.  And then we

22   were just talking about it, and then he also mentioned if I

23   could get some cocaine, that he had a friend that would be

24   interested in it.

25   Q.   And this was the first time you met him?  Or did that

Direct - Ramirez

1   conversation take place at a later time after you'd first

2   met him?

3   A.   It was when I first met him.

4   Q.   Okay.  When you first met him, did he also talk to you

5   about purchasing a vehicle from you?

6   A.   Well, I -- they -- he did ask me because I had cars

7   for sale, and I also mentioned it to him that I was selling

8   some cars.

9   Q.   Specifically what vehicle was he interested in?

10  A.   It was a Chevy Impala.

11  Q.   Do you remember the color of that vehicle?

12  A.   It was gray.

13  Q.   Do you remember the year of that vehicle?

14  A.   Approximately I think it was a 2001, 2002, about

15  that.

16  Q.   Early 2000s model?

17  A.   Yes.

18  Q.   How much did you tell Mr. Garrison you would sell it

19  to him for?

20  A.   I was selling it for 2,500.

21  Q.   How did he respond to that when you told him you'd

22  sell him the Chevrolet Impala for $2500?

23  A.   He just said he would give me a thousand down on it

24  and he would pay me the rest later.

25  Q.   Did he, in fact, give you a thousand dollars right

Direct - Ramirez

1    then?

2    A.    Yes.

3    Q.    Did he return with the remainder of the money?

4    A.    Yes.

5    Q.    Do you remember approximately how long between when he

6    gave you the thousand dollars down and when he returned?

7    A.    Approximately it was about a week later, I delivered

8    the car to his apartment.

9    Q.    So you delivered the vehicle to his apartment?

10   A.    Yes.

11   Q.    Do you remember where that apartment was?

12   A.    I -- I don't.  I'm not good with the -- with Aurora.

13   Q.    So it was in Aurora?

14   A.    Yes.

15   Q.    Where is that in relation to your shop?

16   A.    I don't -- I don't recall the -- the streets.

17   Q.    Let me ask it this way:  Was it close to your shop or

18   far from your shop?

19   A.    It was far from the shop.

20   Q.    Now, at the time that you gave him this vehicle, was

21   that when he asked you about cocaine?

22   A.    No, it was when I talked to him at my shop.

23   Q.    So you remember having a conversation with Mr.

24   Garrison at your shop about cocaine?

25   A.    Yes.

438

Direct - Ramirez

1   Q.   And specifically what was it that he asked you?

2   A.   If I could get some cocaine.

3   Q.   And what would you do with that cocaine as it relates

4   to him?  Would you sell it to him?

5   A.   Yes.

6   Q.   Were you selling cocaine at that time?

7   A.   I had done it once before, yeah.

8   Q.   So what did you tell Mr. Garrison when he asked you if

9   you could get cocaine to sell to him?

10  A.   That I -- I'll make a phone call, see if I could get

11  some.

12  Q.   And did you, in fact, do that?

13  A.   Yes, I did.

14  Q.   Who did you contact to get cocaine?

15  A.   I contacted my friend, Chuy.

16  Q.   Can you spell that for the court reporter?

17  A.   It's C-h-u-y.

18  Q.   And is this the individual that you had previously

19  obtained cocaine from?

20  A.   Yes.

21  Q.   So did you, in fact, obtain cocaine from Chuy to sell

22  to Mr. Garrison?

23  A.   Yes.

24  Q.   When did that take place?

25  A.   I can't recall the exact date.

Direct - Ramirez

1    Q.   So let me ask it this way:  When he bought the Impala

2    from you, was that in the summer of 2013?

3    A.   Yeah.  It's late, yeah.

4    Q.   Later in the summer?

5    A.   Uhm-hum.

6    Q.   So when you then sold him cocaine, when was that in

7    comparison to when he purchased the Impala?

8    A.   It was like a couple of months before.

9    Q.   So you sold him cocaine before you sold him the

10   Impala?

11   A.   Yes.

12   Q.   Okay.  So if -- and correct me if I'm wrong on this --

13   so if you sold him the Impala in late summer, is it fair to

14   say that you would have sold him the cocaine in mid --

15   early to mid summer?

16   A.   Yes.

17   Q.   Okay.  And when you sold him cocaine for the first

18   time in early to mid summer 2013, how much cocaine did you

19   sell to him?

20   A.   Four ounces of cocaine.

21   Q.   How much did you charge him for that?

22   A.   A thousand dollars an ounce.

23   Q.   After that 4-ounce sale to Mr. Garrison, did you sell

24   cocaine to him on another occasion?

25   A.   Yes.

440

Direct - Ramirez

1  Q.   When was that in comparison to the 4-ounce deal that

2  you just talked about?

3  A.   It was like two weeks later -- two weeks later.

4  Q.   And how did that sale occur?  Was that at your shop or

5  somewhere else?

6  A.   At my shop.

7  Q.   How did you communicate with Mr. Garrison about that

8  deal?

9  A.   On the phone.

10  Q.   Did you call him or did he call you?

11  A.   He called me.

12  Q.   How much cocaine did you sell to him at that time?

13  A.   Four ounces.

14  Q.   And how much did you charge him?

15  A.   A thousand dollars an ounce.

16  Q.   And when is the next time that you sold to Mr.

17  Garrison?

18  A.   It was later, in November.

19  Q.   So there was a few months in between?

20  A.   Yes.

21  Q.   In November, did you communicate with Mr. Garrison

22  over the phone?

23  A.   Yes.

24  Q.   I'm going to direct your attention to November 22d,

25  2013, and Government's Exhibit 3, which is going to be in

Direct - Ramirez

1    that first binder, and also the transcript for this call

2    associated with Exhibit 3.  Okay.

3         Do you have both the physical exhibit and the

4    transcript in front of you.

5         COURTROOM DEPUTY:  I haven't given him the

6    transcript.

7         MS. RANGEL:  Sorry.

8         COURTROOM DEPUTY:  That's all right.

9         MS. RANGEL:  And while she's doing that, we'll

10   start with the physical Exhibit 3 in front of you.  Do you

11   recognize that physical exhibit?

12   A.   Yes.

13   Q.   How do you recognize that?

14   A.   By my initials.

15   Q.   Why are your initials on that disk?

16   A.   Because I heard the CD.

17   Q.   And did you recognize the call that's on that CD?

18   A.   Yes.

19   Q.   Is that what your initials mean on that disk?

20   A.   Yes.

21        MS. RANGEL:  At this time, if we could please play

22   for the jury Exhibit 3.  And I'd ask that the jurors follow

23   along in the transcript, Exhibit 3, in their binders.

24        (Phone call played)

25   BY MS. RANGEL:

442

Direct - Ramirez

1    Q.   So you recognize that call from November 22d, 2013?

2    A.   Yes.

3    Q.   Is your voice one of the voices on that call?

4    A.   Yes.

5    Q.   Who's the person you're talking to?

6    A.   Ricky Garrison.

7    Q.   And during that call, when you tell him that you have

8    two of those singles left, could you use any, what are you

9    telling him and asking him?

10   A.   I'm telling him that I have 2 ounces, 1 or 2 ounces of

11   cocaine; that if he could use -- use them.

12   Q.   So you're asking if he wants to purchase 2 ounces of

13   cocaine from you?

14   A.   Yes.

15   Q.   And are we talking about powder cocaine?

16   A.   Yes.

17   Q.   How does he -- how does he respond to you on that?

18   Did he want to purchase the 2 ounces of cocaine from you?

19   A.   Yes.

20   Q.   How much were you going to charge him for 2 ounces of

21   cocaine?

22   A.   A thousand each.

23   Q.   A thousand per ounce?

24   A.   Per ounce.

25   Q.   And where would you sell him those 2 ounces of

Direct - Ramirez

1    cocaine?

2    A.    I was going to go to his house.

3    Q.    Had you been to his house before November 22d, 2015?

4    A.    Yes.

5    Q.    When you dropped off that Impala was at least one of

6    those times; is that fair to say?

7    A.    The Impala was at an apartment.

8    Q.    Okay.  So it sounds like then he moved after that?

9    A.    Yes.

10   Q.    And so you had been to both of his previous

11   residences?

12   A.    Yes.

13   Q.    And when he starts talking about the catalytic

14   converter --

15   A.    Yes.

16   Q.    -- what is he talking about there?

17   A.    When I sold him the car, I guess he took it for

18   emissions and it wouldn't pass emissions.  And the

19   catalytic converter code was coming up, so it meant that

20   either the catalytic converter is bad or it was clogged, to

21   get it repaired so it will pass emissions.

22   Q.    Mr. Ramirez, I next want to have you look at Exhibit

23   4, which is just the next exhibit, and the next transcript.

24   Do you have that exhibit in front of you, Exhibit 4?

25   A.    Yes.

Direct - Ramirez

1    Q.   Do you also recognize that physical disk?

2    A.   Yes.

3    Q.   Does it once again have your initials on it?

4    A.   Yes.

5    Q.   Meaning that you recognize that call?

6    A.   Yes.

7         MS. RANGEL:   At this time, if we could please play

8    Government's Exhibit 4 for the jurors.   And I ask that the

9    jurors follow along with the transcript, Exhibit 4, in your

10   binders.

11        (Phone call played)

12   BY MS. RANGEL:

13   Q.   Mr. Ramirez, this call in Government's Exhibit 4 from

14   November 22d, 2013, that's a call between you and Mr.

15   Garrison, right?

16   A.   Yes.

17   Q.   And is it fair to say that that call is continuing

18   your previous conversation from Government's Exhibit 3?

19   A.   Yes.

20   Q.   So previously you talked about 2 ounces.   Are you

21   talking about a delivery of cocaine in Exhibit 4, in that

22   call that we just listened to?

23   A.   Yes.

24   Q.   How much cocaine did you take over to Mr. Garrison's

25   residence at that time?

Direct - Ramirez

1    A.   One ounce.

2    Q.   And is that reflected in the call?  Specifically, do

3    you tell him that you took over one ounce?

4    A.   Yes.

5    Q.   What do you tell him?

6    A.   I have one of those.

7    Q.   You say you have one.

8    A.   Yeah, one.

9    Q.   Now, when you went over to his house, were you

10   expecting him to be there?

11   A.   Yes.

12   Q.   When did you learn that he was not there?

13   A.   When I got there.

14   Q.   When you called him or when you tried the door?

15   A.   When I got there, I called him to see if he was there,

16   and he wasn't there.

17   Q.   So tell us what's happening in this call when you

18   realize he's not there.  Where does he tell you to put the

19   1 ounce of cocaine?

20   A.   In the car.

21   Q.   And specifically which car?

22   A.   In the Chevy Impala I sold him.

23   Q.   And where in the Chevy Impala did he want you to put

24   that 1 ounce of cocaine?

25   A.   In the trunk.

446

Direct - Ramirez

1    Q.   Does he indicate to you, if you were to put it in the

2    trunk, how he would pay you for that?

3    A.   He just said later on he would -- we'll see each

4    other.

5    Q.   When Mr. Garrison says to you -- let me just get back

6    to that -- when Mr. Garrison asks you, rather, It's all

7    clean, right?  It ain't all shaky and shit, is it?  And you

8    tell him no, what -- what are you guys talking about?

9    A.   Just if it's shaky, like powdery, or one piece, I

10   guess.  I don't know what to say.

11   Q.   The ounce of cocaine?

12   A.   Yes.

13   Q.   Was it powder or crack cocaine that you were

14   delivering?

15   A.   It was powder.

16   Q.   And so is it fair to say when he asks that, is he

17   inquiring as to the quality of it?

18   A.   Yes.

19   Q.   Does he indicate to you how much money he had on him

20   at that time as payment for that 1 ounce?

21   A.   He just said that he had $700 on him.

22   Q.   Is that what you would have charged him for the 1

23   ounce?

24   A.   No.  It was a thousand.

25   Q.   Do you discuss whether or not he's going to come to

Direct - Ramirez

1    you or you're going to return to him as payment for that 1

2    ounce?

3    A.   Yes.

4    Q.   In the call, do you talk to him about your ability to

5    get into the Impala to leave that 1 ounce?

6    A.   Yes.

7    Q.   Were you able to get into the trunk of the Impala and

8    leave that 1 ounce of cocaine?

9    A.   No, I wasn't.

10   Q.   And why not?

11   A.   It was locked.

12   Q.   So at that point in time, what did Mr. Garrison tell

13   you to do with that cocaine?

14   A.   To leave it in his garage.

15   Q.   And the garage was attached to his house?

16   A.   No.

17   Q.   It was separate from his house?

18   A.   Yes.

19   Q.   So where did you go?

20   A.   I just went through his fence and it was in the

21   back.

22   Q.   Was he telling you where to go while you were on the

23   phone with him?

24   A.   Yes.

25   Q.   And you were following those directions?

Direct - Ramirez

1    A.    Yes.

2    Q.    Once you were able to get into the garage, did you

3    leave the 1 ounce of cocaine inside of his garage?

4    A.    Yes.

5    Q.    Where did you put it?

6    A.    There was a box in there with like cleaning supplies

7    in there.  I just left it in there.

8    Q.    On November 22d, did you meet up with Mr. Garrison to

9    receive payment for that 1 ounce of cocaine?

10   A.    Yes.

11   Q.    Where did you meet up with him and when?

12   A.    We met later on in the day.  It was approximately

13   about 6:30, 7:00.

14   Q.    Where did you meet him?

15   A.    It was at the Benihana's parking lot.

16   Q.    Do you remember which Benihana?

17   A.    I know it's on Hampden Avenue.

18   Q.    And where did that take place in terms of that

19   Benihana?  Were you inside of the restaurant or in the

20   parking lot?

21   A.    In the parking lot.

22   Q.    Did you get into his vehicle or did he get into your

23   vehicle or did you stand outside of your vehicles?

24   A.    He just got in my vehicle.

25   Q.    And did he pay you money at that point in time?

449

Direct - Ramirez

1    A.    Yes.

2    Q.    How much did he pay you?

3    A.    A thousand.

4    Q.    I'm going to move you forward one week to November

5    29th, 2013.  And I think this might be in the third binder,

6    Government's Exhibit 99.  And we're also going to use a

7    transcript for this, which is going to be transcript 99.

8         MS. RANGEL:  Thank you, Ms. Hansen.

9    BY MS. RANGEL:

10   Q.    Do you have both the transcript and Exhibit 99 in

11   front of you?

12   A.    Yes.

13   Q.    Do you recognize the physical Exhibit 99 in front of

14   you?

15   A.    Yes.

16   Q.    Do you see your initials again?

17   A.    Yes.

18   Q.    And what do your initials mean?

19   A.    That I heard the CD.

20   Q.    And you recognized it?

21   A.    Yes.

22        MS. RANGEL:  If we could go ahead and play

23   Government's Exhibit 99, please.  And I ask that the jurors

24   follow along with transcript 99 in the binders.

25        (Phone call played)

450

Direct - Ramirez

1   BY MS. RANGEL:

2   Q.   Mr. Ramirez, when you recognized that call from

3   November 29th, 2013, that's a call with you and Mr.

4   Garrison?

5   A.   Yes.

6   Q.   And what are you talking about on that call?

7   A.   He was asking if I could get him some cocaine.

8   Q.   And specifically how does he ask for that?  Does he

9   come straight out and ask you, Can you get me some

10  cocaine?, or does he say something else to you?

11  A.   He just said four.

12  Q.   And what does four mean to you?

13  A.   Four ounces.

14  Q.   What do you tell him when he says that he wants four?

15  A.   I told him I was working on it and let me see if I

16  could get it.

17  Q.   Did Mr. Garrison tell you that he needed an answer by

18  a certain time?

19  A.   Yes.

20  Q.   And what was that time?

21  A.   By 3:00.

22  Q.   That same day?

23  A.   Yes.

24  Q.   Were you able to supply Mr. Garrison with cocaine on

25  November 29th, 2013?

Direct - Ramirez

1    A.   No.

2    Q.   I'm going to direct your attention now, I think it's

3    in the same binder, Government's Exhibit 107.  So I think

4    it's a just a little bit further from 99.  And there's also

5    going to be a transcript 107.  Thank you.

6         Do you recognize the physical Exhibit 107 that's

7    in front of you?

8    A.   Yes.

9    Q.   And does that disk similarly bear your initials?

10   A.   Yes.

11   Q.   So you recognize the call from March 2nd, 2014?

12   A.   Yes.

13        MS. RANGEL:  At this time, if we could please play

14   for the jury Exhibit 107 and I'd ask that the jurors follow

15   along with the transcript 107.

16       (Phone call played)

17   BY MS. RANGEL:

18   Q.   Mr. Ramirez, that call from March 2d, 2014, is that

19   call also with Mr. Garrison?

20   A.   Yes.

21   Q.   And when he is talking about clips, what did you

22   understand him to be talking about?

23   A.   Clips for -- for guns.

24   Q.   For firearms?

25   A.   Yes.

Direct - Ramirez

1    Q.   Now, Mr. Ramirez, we were talking in the very

2    beginning about you being in custody and having been

3    charged in this case.  You've previously been convicted of

4    a felony, correct?

5    A.   Yes.

6    Q.   And specifically in 1996?

7    A.   Yes.

8    Q.   What was that felony for?

9    A.   It was for possession of a controlled substance.

10           MS. RANGEL:  Your Honor, if I may have just one

11   moment.

12           THE COURT:  You may.

13           MS. RANGEL:  Thank you.

14   BY MS RANGEL:

15   Q.   Mr. Ramirez, I think you told me -- and correct me if

16   I'm wrong -- that you were sentenced in this case back in

17   September of 2016.

18   A.   On which case?

19   Q.   I'm sorry, the case that you're currently here for

20   today, testifying.

21   A.   Oh, yes.

22   Q.   And that you were sentenced to time served at that

23   point in time.

24   A.   Yes.

25   Q.   After you received that sentence, were you removed, or

Direct - Ramirez

1   some people call it deported, from the United States?

2   A.   Yes.

3   Q.   To Mexico?

4   A.   Yes.

5   Q.   During the time from June 2013 to June 2014, when you

6   were selling cocaine to Mr. Garrison, approximately how

7   much cocaine would you say you sold to him?

8   A.   Nine ounces.  Nine ounces.

9   Q.   Between that entire period of time?

10  A.   Yes.

11  Q.   And I just want to walk you through to make sure that

12  I'm not the one with the math problems, okay?  You told us

13  before that you sold him 4 ounces in early 2000 -- I'm

14  sorry, early summer 2013.

15  A.   Yes.

16  Q.   Okay.  And two weeks later you sold him another 4

17  ounces?

18  A.   Yes.

19  Q.   And that you sold him the 1 ounce that you left in his

20  garage.

21  A.   Yes.

22  Q.   So that is, in fact, 9 ounces.

23  A.   Yes.

24  Q.   Okay.  Thank you very much for clarifying that.

25  That's why I became a lawyer.  I have no further questions

1    for you.

2              THE WITNESS:  Okay.

3              THE COURT:  All right.  Why don't we call it a

4    day.  All right.  Members of the jury, we're going to meet

5    up again tomorrow at 8:45, just like this morning.  I ask

6    that you be in the deliberation room by 8:35.  Please do

7    not discuss this case with anyone and please don't do any

8    independent research into the facts or the law or the

9    persons involved in this case.

10             We will be in recess until 8:45 tomorrow morning.

11         (Proceedings concluded at 5:01 p.m.)

12

13                            **INDEX**

14   Item                                              PAGE

15                   GOVERNMENT'S WITNESSES

16       **BRADLEY GULLICKSRUD**
         Direct Examination by Mr. Phillips (Cont'd)  261
17       Cross-examination by Mr. Leonard             269
         Redirect Examination by Mr. Phillips         284
18
         **GREGORY WILLIAMS**
19       Direct Examination by Ms. Rangel             291
         Cross-examination by Mr. McDermott           328
20       Redirect Examination by Ms. Rangel           334

21       **SIDNEY TAYLOR**
         Direct Examination by Mr. Phillips           340
22       Cross-examination by Mr. Leonard             357
         Redirect Examination by Mr. Phillips         372
23
         **ROBERT PAINTER**
24       Direct Examination by Mr. Phillips           376
         Cross-examination by Mr. Leonard             404
25       Redirect Examination by Mr. Phillips         422

| | | | | |
|---|---|---|---|---|
| Item | | | | PAGE |

GOVERNMENT'S WITNESSES

**SIMEON RAMIREZ**
Direct Examination by Ms. Ranagel          427

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 106 | 266 | 267 | | |
| 110 | 343 | 344 | | |
| 111 | 343 | 344 | | |
| 112 | 343 | 344 | | |
| 113 | 343 | 344 | | |
| 114 | 343 | 344 | | |
| 115 | 343 | 344 | | |
| 116 | 343 | 344 | | |
| 117 | 343 | 344 | | |
| 118 | 343 | 344 | | |
| 119 | 343 | 344 | | |
| 120 | 343 | 344 | | |
| 121 | 343 | 344 | | |
| 122 | 295 | 295 | | |
| 123 | 299 | 300 | | |

456

1                    *      *      *      *      *

2                      REPORTER'S CERTIFICATE

3

4         I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled

6    matter.

7         Dated at Denver, Colorado, this 6th day of May, 2017.

8

9

10                              Mary J. George

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25